UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; and the CHELSEA COLLABORATIVE, INC.,<br><br>      Plaintiffs,<br><br>    v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Immigration and Customs Enforcement, Enforcement and Removal Operations, Acting Field Office Director; U.S. DEPARTMENT OF HOMELAND SECURITY; and KEVIN McALEENAN, in his official capacity as Acting Secretary of United States Department of Homeland Security,<br><br>      Defendants. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

# INTRODUCTION

1.      This case presents a challenge brought by Massachusetts prosecutors, public defenders, and civil litigants to the federal government's appropriation of the Massachusetts state courts to carry out federal civil immigration policy.  For the last two years, officers from U.S. Immigration and Customs Enforcement ("ICE") have patrolled Massachusetts state courthouses—including courtrooms, hallways, clerk's offices, parking lots and front steps—following, arresting, and detaining those they believe violated federal *civil*, not criminal, law.  In the face of widespread opposition to this practice, ICE has not only refused to stop it, but has issued a formal Directive authorizing such civil courthouse arrests.  ICE's Directive, and its widespread practice of conducting civil arrests in state courthouses, are unprecedented in American history.  Indeed, the U.S. Supreme Court and the Massachusetts Supreme Judicial Court have long recognized a privilege against civil arrests for those attending court on official business—a privilege that traces its roots back to English common law, and rests on the common-sense principle that the judicial system cannot function if parties and witnesses fear that their appearance in court will be used as a trap.

2.      ICE's decision to flout the long-standing common-law privilege against civil courthouse arrests and to commandeer the state courts for federal civil immigration purposes has led to effects on Plaintiffs, the Massachusetts justice system, and the public at large that are as dramatic as they are predictable.  Entire communities now view the Massachusetts courts as places where they cannot go, for any reason, greatly impeding access to justice and undermining the administration of justice in these communities.  Criminal defendants refuse to appear, defaulting rather than risk civil arrest, detention, and removal by ICE.  Witnesses do not appear for fear of arrest and deportation, undermining prosecutions, depriving criminal defendants of their right to present a defense, and interfering with the operation of civil litigation.  And civil

litigants seeking relief such as restraining orders against violent partners, unpaid wages from an unscrupulous employer, or remedies from landlords providing illegal housing are forced to tolerate domestic violence, illegal working conditions, and unsafe living conditions to avoid ICE civil arrest.

3.      Plaintiffs represent a range of actors in the state court system—prosecutors, defense attorneys, and civil litigants—all of whom have directly felt the impact of ICE's policy of civilly arresting parties, witnesses, and others attending court on official business.  Without any ability to ensure that Massachusetts residents can appear in court without ICE interference, Plaintiffs Marian Ryan and Rachael Rollins, the District Attorneys for Middlesex County and Suffolk County (the "District Attorneys"), are unable to prosecute many crimes because the victims, key witnesses, or even the defendants do not appear.  Plaintiff Committee for Public Counsel Services, which is responsible for indigent criminal defense in the Commonwealth, cannot present meaningful defenses because its clients or defense witnesses do not appear.  And Plaintiff Chelsea Collaborative is a membership organization with noncitizen members who have been unable to access the courts to enforce their state-law rights for fear of ICE arrest.  This has not only led to harm to Chelsea Collaborative's members, but has forced Chelsea Collaborative to spend significant resources assisting its members, including by instituting its own extra-judicial mediation program in an attempt to resolve disputes between Massachusetts residents who no longer feel safe appearing in Massachusetts state courts.

4.      ICE's civil-courthouse-arrest policy not only undermines the administration of justice in Massachusetts, it is also illegal for at least three reasons.

5.      First, Congress never authorized ICE to conduct civil courthouse arrests because it never abrogated the longstanding and well-settled common-law privilege against such arrests.

The Supreme Court has recognized that the common-law privilege against civil courthouse arrests is "well settled." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916). When Congress acts in an area governed by "long-established and familiar" common-law principles, Congress is presumed to retain those principles. *United States v. Texas*, 507 U.S. 529, 534 (1993). Here, where Congress granted the federal government a general civil-arrest power to enforce civil immigration laws, Congress retained traditional common-law limitations on that arrest power—including that such arrests cannot be made against parties and witnesses attending court on official business. Indeed, finding that Congress abrogated the common-law privilege would be particularly inappropriate given the significant constitutional concerns relating to separation of powers and court access raised by federal appropriation of state courts for civil arrests. Because the INA does not grant the federal government the authority to conduct civil courthouse arrests in violation of the common-law privilege, ICE's Directive authorizing such arrests, and its corresponding policy of conducting such arrests, exceed ICE's statutory authority, and must be set aside under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

6.      Second, even if ICE's Directive were authorized by statute, the Directive and the corresponding practice of civilly arresting parties, witnesses, and others attending Massachusetts state courts on official business exceed the powers granted to the federal government, and hence violate the Tenth Amendment of the U.S. Constitution. "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Yet that is precisely what ICE's civil courthouse arrest program does. ICE has coopted the state's justice system, using it as a tool for trapping those required to attend state court. ICE's civil-courthouse-arrest policy triggers all of the concerns that the Supreme Court recently identified as signaling a Tenth Amendment

violation, including the shifting the political responsibility for and costs of immigration enforcement to the states. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018).

7.     Third, ICE's policy violates the Constitutional right of access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002).  Conditioning litigants' ability to access the courts on making themselves available for civil arrest creates precisely such impermissible frustration.  Indeed, common-law courts created the privilege against civil courthouse arrest in recognition of the intolerable chilling effect of such arrests, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice." *Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817).  Because of ICE's policy, Chelsea Collaborative's members have been unable to use the courts to obtain relief from domestic violence or other civil wrongs like illegal living and working conditions.  In response, Chelsea Collaborative has been forced to establish its own extra-judicial mediation program—which handles three or four mediations *per week*—to attempt to resolve disputes between Massachusetts residents who are no longer willing to appear in Massachusetts court for fear of civil ICE arrest.

8.     For these reasons, and as set forth below, Plaintiffs ask this Court to declare that ICE's Directive authorizing the civil arrest of parties, victims, witnesses, and others attending court on official business, and ICE's policy of conducting such arrests, are unlawful, and to enjoin ICE from such activity.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*  The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

10.    Venue properly lies within the District of Massachusetts because this is an action against an officer, employee, and/or agency of the United States, all Plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to this action have occurred in this judicial district.  *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

11.    Plaintiff Marian Ryan is the Middlesex County District Attorney, and brings this suit in her official capacity.  The Middlesex County District Attorney's office is headquartered at 15 Commonwealth Avenue, Woburn, MA 01801.  The Middlesex County District Attorney's Office serves 54 cities and towns in and around the Boston area, and handles criminal prosecutions and investigations in district and municipal courts.  Middlesex County is the largest county in the Commonwealth in terms of population and number of communities served.  Middlesex County has a larger population than eleven states.

12.    Plaintiff Rachael Rollins is the Suffolk County District Attorney, and brings this suit in her official capacity.  The Suffolk County District Attorney's office is headquartered at One Bulfinch Place, Boston, MA 02114.  The Suffolk County District Attorney's Office serves the cities and towns of Boston, Chelsea, Revere, and Winthrop, Massachusetts, and handles criminal prosecutions and investigations in district and municipal courts.

13.    The combined population of Suffolk and Middlesex Counties is nearly 2.5 million people—approximately one-third of the Commonwealth's population.

14.     Plaintiff Committee for Public Counsel Services ("CPCS") is the public defender agency for the Commonwealth of Massachusetts. CPCS is headquartered at 44 Bromfield Street, Boston, Massachusetts, 02108, and is overseen by a fifteen-member body appointed by the heads of the executive, legislative, and judicial branches of Massachusetts. CPCS is responsible for the provision of legal representation, by both staff attorneys and court-appointed private attorneys, of all indigent persons in civil, criminal, and administrative cases in Massachusetts in which there is a right to appointed counsel.

15.     As the key players on the prosecution and defense sides of the criminal justice system, the District Attorneys and CPCS have joined together to challenge what they collectively agree to be a profound threat to the Massachusetts criminal justice system. Both prosecutors and defense attorneys depend on witnesses to carry out investigations, prosecutions, and criminal defense. ICE's civil-courthouse-arrest policy is undermining the work of both prosecutors and defense attorneys by deterring many victims and witnesses from appearing in court, forcing the District Attorneys to abandon otherwise promising prosecutions. ICE's policy also makes it more difficult to obtain *defendants'* appearance in court—both because defendants arrested, detained and subject to removal proceedings prior to resolution of their criminal cases may not be able to appear in court, and because the risk of ICE arrest leads some criminal defendants to default—which makes both prosecution and defense impossible. On information and belief, this case represents the first time that the District Attorneys and CPCS have joined as plaintiffs to challenge such a threat to the Massachusetts justice system.

16.     Plaintiff Chelsea Collaborative, Inc. is a 501(c)(3) non-profit organization located at 318 Broadway, Chelsea, Massachusetts, 02150. The Collaborative, originally founded in 1988 as the Chelsea Human Services Collaborative, is an organization dedicated to the needs of the

community of Chelsea.  The mission of the Collaborative is to enhance the social, environmental, and economic health of the community and its people.  The Collaborative provides numerous services to the immigrant community in Chelsea, including citizenship classes, summer employment for teenagers, landlord-tenant education, voter mobilizations, and assistance in accessing the judicial system.

17.     Defendant U.S. Immigration and Customs Enforcement is a federal agency charged with enforcement of federal immigration laws, including execution of ICE Directive No. 11072.1 entitled "Civil Immigration Actions Inside Courthouses" (the "Directive"), dated January 10, 2018.

18.     Defendant Matthew T. Albence is the Deputy Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement.  On information and belief, Defendant Albence is responsible for executing the Directive.  Deputy Director Albence is sued in his official capacity.

19.     Defendant Todd M. Lyons is the Acting Boston Field Office Director of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations.  He is charged with ICE enforcement in the Boston area.  Acting Field Office Director Lyons is sued in his official capacity.

20.     Defendant the Department of Homeland Security ("DHS") is a cabinet department of the U.S. federal government, which oversees Defendant U.S. Immigration and Customs Enforcement.

21.     Defendant Kevin McAleenan is the Acting Secretary of the Defendant DHS. Acting Secretary McAleenan is responsible for executing relevant provisions of the Executive Order 13,768, entitled "Enhancing Public Safety in the Interior of the United States" (the "EO

13,768" or "Executive Order"), issued on January 25, 2017.  Acting Secretary McAleenan is sued in his official capacity.

## STATEMENT OF FACTS

22.     In January 2017, at the direction of President Trump, then-DHS Secretary John Kelly, and then-ICE Deputy Director Thomas Homan, ICE began a nationwide campaign specifically targeting state courthouses as sites for civil immigration enforcement.  The practice sent a shockwave of fear and anxiety through immigrant communities in Massachusetts and across the country.  This pervasive fear has paralyzed the effective administration of justice in dramatic yet predictable ways.  So predictable in fact that centuries of English and American jurisprudence have guarded against such a chilling effect by affording individuals with a common-law privilege precluding such civil courthouse arrests.  ICE's Directive authorizing civil courthouse arrests, and its policy of conducting them, violate the long-standing common-law protection against civil arrests in and around courthouses, exceed ICE's statutory authority under the INA, and violate the Constitution.

**I.     There is a "well settled" common-law privilege against civil arrests of parties, witnesses, and others attending court on official business.**

23.     In England, and in the early years of this country, civil arrest, or civil capias, was a common means for initiating civil proceedings.  *See* Nathan Levy, Jr., *Mesne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L.J. 52, 61-70 (1968).  The possibility that such civil arrests could take place in court, however, posed a significant problem for the judicial system:  If a party or witness's appearance in one case could be used as a trap for a civil arrest in *another* case, many parties and witnesses would not attend court.  To avoid this problem, courts both in England and the United States—including the U.S. Supreme Court, this Court, and the Massachusetts Supreme Judicial Court—all recognized and strictly enforced an

"inflexib[le]" privilege, and an "absolute protection," against the civil arrest of parties or witnesses attending court. *E.g.*, *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923); *Larned v. Griffin*, 12 F. 590, 594 (D. Mass. 1882); *Valley Bank & Trust Co. v. Marrewa*, 354 Mass. 403, 406-07 (1968). As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

24. The common-law privilege against civil arrest while attending court on official business is longstanding, tracing its origins back at least to English courts in the eighteenth century. Blackstone's *Commentaries on the Laws of England* explained the common-law rule that "[s]uitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning." 3 William Blackstone, *Commentaries on the Laws of England* 289 (1769); *see also* 6 Matthew Bacon, *A New Abridgment of the Law* 530 (London, A. Strahan, 7th ed. 1832) ("[A]ll [] persons whatsoever, are freed from arrests so long as they are in view of any of the courts at Westminster, or if near the courts, though out of view, lest any disturbance may be occasioned to the courts or any violence used."). This principle was repeatedly endorsed by the English courts, which held that, "for the purpose of justice," and "to encourage witnesses to come forward voluntarily," they are privileged from arrest "in coming, in staying, and in returning" from court. *The King v. Holy Trinity in Wareham*, 99 Eng. Rep. 531 (1782); *see also Meekins v. Smith*, 126 Eng. Rep. 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which

number bail were included,) were intitled to privilege from arrest eundo et redeundo [*i.e.*, coming and returning][.]"); *Spence v. Stuart*, 102 Eng. Rep. 530 (1802); *Ex Parte Byne*, 35 Eng. Rep. 123 (1813).

25.     The U.S. Supreme Court has adopted this privilege and held that it bars service of any other civil process while attending court.  For instance, in *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Court described the privilege as "well settled," explaining that a litigant "should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance.  He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights."  *Id.* at 129. The Court described it as particularly firmly established that there was an "exemption from arrest," or "capias," and held that this exemption applied to any civil process to protect the "necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify."  *Id.* at 130.  The Court has emphasized the "necessity of [the rule's] inflexibility" in order to serve its purpose of protecting litigants and witnesses in appearing in court.  *Page Co.*, 261 U.S. at 448; *see also Long v. Ansell*, 293 U.S. 76, 83 (1934) (Brandeis, J.) (describing "the common-law rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service in another"); *Lamb*, 285 U.S. at 225.

26.     The District of Massachusetts has also vigorously enforced this privilege.  As this Court has explained, "[i]t has long been settled that parties and witnesses attending in good faith any legal tribunal . . . are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."  *Larned*, 12 F. at 590.  This is an "absolute protection."

*Id.* at 594.  This Court therefore held that the civil arrest of the defendant while he was attending

an Illinois state court proceeding was impermissible.  *See id.* at 590.

27.     The privilege against civil courthouse arrests is also firmly entrenched in

Massachusetts common law.  As the Supreme Judicial Court has explained, "[p]arties and

witnesses, attending in good faith any legal tribunal, whether a court of record or not, having

power to pass upon the rights of the persons attending, are privileged from arrest on civil process

during their attendance, and for a reasonable time in going and returning, whether they are

residents of this state or come from abroad, whether they attend on summons or voluntarily."

*Valley Bank*, 354 Mass. at 406-07 (quoting *In re Thompson*, 122 Mass. 428, 429 (1877)); *see*

*also M'Neil's Case*, 3 Mass. 288 (1807); *Diamond v. Earle*, 217 Mass. 499, 500 (1914).  Indeed,

just this past year, Justice Cypher recognized, in a Single Justice opinion, that the "privilege

against civil arrest" in attending court is "well settled" in the Commonwealth.  *Matter of C. Doe*,

SJ-2018-119 at *10 (Mass. Sept. 18, 2018).

28.     The consistent theme throughout the cases discussing this common-law privilege

is that strict and absolute enforcement of the privilege is necessary to allow courts to serve their

purpose of providing a forum where parties and witnesses can freely attend to testify and assert

their rights.  In a decision the Supreme Court recognized as a "leading authority" on the

privilege, *Stewart*, 242 U.S. at 129, the New Jersey Supreme Court explained that "[c]ourts of

justice ought, everywhere, to be open, accessible, free from interruption, and to cast a perfect

protection around every man who necessarily approaches them."  *Halsey*, 4 N.J.L. at 367.  The

"fear that . . . a *capias* might be served upon [parties and witnesses]" would "prevent [their]

approach," obstructing "this great object in the administration of justice."  *Id.* at 368.  In sum:

> This privilege of parties and witnesses is alike the privilege of the
> court and the citizen.  It protects the court from interruption and

> delay.  It takes away a strong inducement to disobey its process,
> and enables the citizen to prosecute his rights without molestation,
> and procure the attendance of such as are necessary for their
> defence and support.

*Id.* at 368-69.

29.     The same sentiment has been consistently expressed across all courts discussing the privilege.  As the Supreme Court explained in *Stewart v. Ramsay*, the privilege "is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify."  242 U.S. at 130.  This Court and the Massachusetts Supreme Judicial Court have also recognized that the privilege is "necessary to the due administration of justice," *Larned*, 12 F. at 594, and "is a prerogative exerted by the sovereign power through the courts for the furtherance of the ends of justice," *Valley Bank*, 354 Mass. at 405.  "[T]he reason upon which [the privilege] rests is that justice requires the attendance of witnesses cognizant of material facts, and hence that no unreasonable obstacles ought to be thrown in the way of their freely coming into court to give oral testimony." *Diamond v. Earle,* 217 Mass. 499, 501 (1914).  Thus, a litigant "in every claim of right which he exhibits, and every defense which he is obliged to make, should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance.  He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights."  *Stewart*, 242 U.S. at 129 (quoting *Halsey*, 4 N.J.L. at 367-68).

30.     Because of the privilege's importance, courts have recognized numerous different ways in which courts can enforce the privilege, including ordering the person arrested immediately discharged and holding the arresting officers in contempt for violating the privilege.

*See Arding v. Flower*, 8 T.R. 533 (1800); *Parker v. Marco*, 136 N.Y. 585 (1893) ("[A wrongfully detained individual] may move in the court whose privilege has been violated to punish the party in that court who has been guilty of such violation, or he may move in the court out of which the process has been improperly issued to vacate it, and the motion will be granted.").

31.     Similarly, courts have recognized that because the privilege inherently involves two different proceedings, often the court that enforces the privilege is different than the court with jurisdiction over the proceeding in which the improper arrest would or could take place. Thus, the English courts held that a claim for discharge out of custody can be made to the court out of which "the process was issued," because that court has "a right to see that it is not improperly enforced." *Selby v. Hills*, 131 Eng. Rep. 364, 365 (1832). The U.S. Supreme Court reached the same conclusion in *Page Co. v. MacDonald*, 261 U.S. at 447-48. In that case, a party was served in a federal case filed in this Court while attending court for a Massachusetts state court case. The served party asked the federal court to hold the service improper. The plaintiff argued that a party in state court could not claim immunity from service "from the judicial process of a different sovereignty," but the Supreme Court disagreed. As the Court explained, "the courts, federal and state, have equal interests in [the necessities of the judicial administration]," and they "are both instruments of judicial administration within the same territory, available to suitors, fully available, neither they nor their witnesses subject to be embarrassed or vexed while attending, the one for the protection of his rights; the others while attending to testify." *Id.* at 448. The Court therefore enforced the privilege against civil arrest and service of process on behalf of the state court.

32.     Federal district courts, including this Court, thus routinely held that federal and state courts should enforce the privilege on each other's behalf. In *Larned*, for instance, this

14

Court upheld an assertion of the privilege against an arrest carried out in an Illinois state court proceeding. 12 F. at 590. And in *Bridges v. Sheldon*, 7 F. 17, 45 (D. Vt. 1880), the court held that it can enforce the privilege to invalidate service of state civil process on those attending federal court because the privilege is a "protection which all courts furnish to litigants before them, without regard to the subject of that litigation," and violations of the privilege are "a contempt, which the court should punish."

## II.   Congress grants ICE a general civil arrest power, which ICE interprets to authorize civil courthouse arrests.

### A.   Congress grants ICE generic civil-arrest authority, without any suggestion that it intended to abrogate the common-law limits that apply to civil arrests.

33.     The provisions authorizing civil immigration arrests originate in the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163. That statute includes two provisions authorizing civil immigration arrests. Section 242(a) of that statute states that, "[p]ending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody." Section 287(a)(2) of that statute authorizes an immigration officer to carry out a warrantless civil arrest "if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."

34.     The language Congress enacted in 1952 remains largely unchanged today. Specifically, 8 U.S.C. § 1226(a) states: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." And 8 U.S.C. § 1357(a)(2) authorizes an immigration officer to perform a civil immigration arrest "if he has reason to believe that the alien so arrested is in the United States in

violation of any [immigration] law or regulation and is likely to escape before a warrant can be obtained for his arrest."

35.     The statute thus gives the government the same type of civil-arrest authority that had historically been used to institute civil proceedings.  *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country").  The statute today, as in 1952, gives no indication that the authority Congress granted differs in any way from the civil-arrest authority that existed at common law— including the limitation privileging those attending court on official business from civil courthouse arrest.

### B.     ICE unilaterally decides to exercise its civil-arrest authority in state courthouses.

36.     The federal government's exercise of its civil-arrest powers changed dramatically after President Trump assumed office in 2017—sixty-five years after Congress first authorized civil immigration arrests.  Shortly after taking office, President Trump issued Executive Order 13,768, entitled "Enhancing Public Safety in the Interior of the United States" ("EO 13,768").  In that Order, President Trump abandoned past deportation prioritization programs embraced by both the Bush and Obama Administrations, calling for the deportation of anyone potentially removable from the United States—likely more than 10 million people.  As EO 13,768 recognized, administering this massive increase in immigration enforcement would require a correspondingly massive increase in federal resources, including a near-tripling of ICE's capacity.

37.     One way ICE has attempted to reduce the *federal* resources necessary to implement this federal policy is to coopt the *state* court system by using parties' appearances in state courts as a trap for purposes of federal immigration enforcement.  Early in the Trump

administration, ICE officials began conducting courthouse surveillance and arrest raids at state courthouses.  Exhibit A.  The practice began almost immediately after President Trump's inauguration and escalated quickly.  Courthouse arrest and surveillance operations have continued to expand in geographic scope and severity.

38.   ICE officials have repeatedly acknowledged and defended the practice of civil courthouse arrests.  On March 29, 2017, then-Homeland Security Secretary John Kelly and then-Attorney General Jefferson Sessions acknowledged the civil courthouse arrest practice and stated adamantly that ICE would continue the practice.  *See* Exhibit B at 2.  Further, they have admitted that using state courthouses to trap those suspected of civil immigration violations is a way of using the state's resources for federal benefit.  Sessions and Kelly emphasized the benefit to ICE of this forced cooperation by state officers, noting that "[b]ecause courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting [ICE] officers and persons being arrested are substantially decreased."  Exhibit B at 2.

39.   DHS and ICE have also made clear that *anyone* is subject to an ICE civil arrest while attending court, *including victims*.  For instance, in April 2017, a DHS spokesman stated:

> Just because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien[.] Just because they're a witness doesn't mean they might not pose a security threat for other reasons.

Similarly, on August 30, 2017, the Boston Field Officer Director for ICE told immigration advocates they should not assure restraining order applicants with no prior criminal record that ICE would not arrest them if they went to the courthouse to seek protection.  Indeed, ICE has arrested at least one woman while appearing in court to obtain a protective order from an abusive partner.  In public remarks throughout 2017, DHS and other Trump Administration officials continued to clarify their intent to arrest victims and witnesses, including an ICE spokeswoman's

statement: "If [a courthouse is] the only place we can find them, why wouldn't we? . . . We will continue to make those arrests."

40.     Consistent with these official statements and conduct, ICE has refused, as a more formal matter, to rule out the possibility of conducting enforcement against anyone, anywhere in court.  In a "frequently asked questions" document, ICE responded to the question of whether there is "any place in a courthouse where enforcement will not occur" by stating, in effect, "no":

> ICE officers and agents will *generally* avoid enforcement actions in courthouses, or areas within courthouses, that are dedicated to non-criminal (e.g., family court, small claims court) proceedings. In those instances in which an enforcement action in such locations is *operationally necessary*, the approval of the respective Field Office Director (FOD), Special Agent in Charge (SAC), or his or her designee is required.

Exhibit C at 3 (emphases added).  ICE provided no information concerning when it would deem such enforcement "operationally necessary," maintaining full discretion to civilly arrest anyone in any courthouse.

**C.     ICE formalizes its courthouse-arrest policy in Directive No. 11072.1.**

41.     On January 10, 2018, ICE formalized its courthouse arrest policy in Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses" (the "Directive"; attached as Exhibit D).  This Directive "sets forth [ICE's] policy regarding civil immigration enforcement inside federal, state, and local courthouses."

42.     While ostensibly setting some limitations to ICE enforcement at courthouses, the Directive ultimately vests ICE with the unbridled discretion to make civil arrests in virtually *any* courthouse location when ICE deems it "necessary," providing noncitizens with no assurance that they will be safe from arrest at any courthouse or under any specific circumstances.  Exhibit D at 2.

18

43.    The Directive states that ICE's courthouse arrests will "include" actions against "specific, target aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed."  But it pointedly does not *limit* its arrests to these "target aliens."  Exhibit D at 1.

44.    Similarly, the Directive provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, *absent special circumstances*."  The Directive provides no information concerning what ICE considers "special circumstances," but simply states that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with U.S. Department of Homeland Security (DHS) policy."  Exhibit D at 1.

45.    The Directive does not state what this DHS policy is, but instead cross-references two other internal DHS memoranda.  Those two memoranda, however, say nothing about courthouse arrests.  Exhibits E and F.  Indeed, one of the memoranda simply reiterates EO 13,768, stating that DHS "no longer will exempt classes or categories of removable aliens from potential enforcement."  Exhibit F at 2.  This memorandum suggests, if anything, that *anyone* potentially removable would be a fair target of a courthouse arrest.

46.    Ultimately, the Directive simply formalizes the Trump Administration's consistent policy that ICE has complete discretion to use federal and state courthouses as a trap to arrest *anyone* suspected of a civil immigration violation—including criminal defendants, victims, witnesses, and parties to civil proceedings.

III.   **ICE officers are routinely present in Massachusetts state courthouses, making multiple arrests per week, causing significant disturbances, and sending a clear signal that appearing in Massachusetts courts entails risking civil ICE arrest.**

47.    ICE does not disclose the frequency of, or details concerning, its civil courthouse arrests in Massachusetts.  Nevertheless, Plaintiffs have attempted, through their own and others' observations of ICE in Massachusetts courts, and through reviewing the limited data that is available from the Massachusetts courts, to capture the extent of ICE's presence in Massachusetts courts.  It is readily apparent that ICE officers are regularly present in Massachusetts state courts such that appearing in a Massachusetts state court requires exposing oneself to the possibility of civil ICE arrest.

48.    The presence of ICE officers in Massachusetts state courts is sufficiently routine that those regularly practicing in state courts—including Assistant District Attorneys and public defenders—recognize the ICE officers even though they are generally in plain clothes, not in uniform.

49.    On information and belief, based on Plaintiffs' own observations and incident reports filed with the Massachusetts state trial courts, ICE conducts a civil arrest against someone attending a Massachusetts state court on official business approximately two or three times a week.  A significant percentage of these arrests appear to take place in Middlesex and Suffolk Counties.  This includes arrests in and around the courthouse, including the parking lot and the front steps.  It does not include arrests of those who are brought to court while in state criminal custody.  It also does not include incidents in which ICE attempts, but fails, to make an arrest.  Many of the most disruptive incidents involve such attempted arrests.

50.    Arrests of those brought into court while in state criminal custody do not raise the same concerns as arrests of those who come to court under their own power.  Plaintiffs here are not challenging ICE's authority to arrest those brought into court while in state criminal custody.

51.     On information and belief, the following are characteristics of ICE's civil courthouse arrests:

a.  ICE agents are in plain clothes, but are readily identifiable by those who frequent the courts.

b.  ICE agents are, on information and belief, generally, if not always, armed.

c.  Though ICE officers often appear to have some target in mind when they arrive in court, they sometimes question and arrest others in court who the ICE officers believe may have committed civil immigration infractions.  This can include family members who are accompanying someone ICE has targeted for arrest.  ICE often reviews court dockets upon arriving in court, and sometimes arrests or attempts to arrest others who happen to appear in court that day, and who ICE believes may have committed a civil immigration infraction.

d.  ICE's arrests and attempted arrests are disruptive and may even involve violence.  There have been reports of slamming family members against walls, dragging individuals from cars, and pulling guns on people while leaving court.  ICE has handcuffed family members who turn out to be lawfully present in the United States.  In one such instance in Massachusetts, ICE was unable to remove the handcuffs because it had lost the keys, and was forced to obtain a handsaw to saw the handcuffs off in a courthouse conference room.  These incidents often occur in public areas of the court, including the court lobby.  Given the physical nature of some of these incidents, ICE arrests can require intervention of state court staff.

e. ICE agents, who are typically in plain clothes, frequently fail to show their badges or show any documentation while making arrests, which has at times led members of the public to believe that ICE agents are kidnapping their targets.

f. ICE arrests often interfere with ongoing state court proceedings.  When criminal defendants are arrested and detained by ICE while their criminal cases are still pending, the defendants often are unable to return to state court to resolve their criminal cases.

52.     The following paragraphs provide several examples that demonstrate the nature of ICE's presence in the Massachusetts court system.  These examples are far from exhaustive, but show the type of disruption often caused by ICE's presence in the Massachusetts courts.

53.     **March 2018 seizure and interrogation at Lawrence Juvenile Court.**  A juvenile defendant was meeting with counsel in the library of the courthouse when five ICE officers barged into the room and surrounded the defendant.  ICE demanded that the juvenile put his hands up and they began to question him.  His counsel was able to successfully stop the interrogation, and prevent the arrest of his client, but the officers proceeded to follow the juvenile and his counsel throughout the courthouse.

54.     **April 2018 harassment of court interpreter in Lynn District Court.**  An ICE Officer was seen verbally harassing a court interpreter regarding a communication she had interpreted between a defendant and counsel.  The officer's threatening tone prompted onlookers to intervene to force the officer to leave the interpreter alone.

55.     **June 27, 2018 arrest at Marlboro District Court**.  A criminal defendant was taken into custody just outside of the courtroom door, in a public area, by plain-clothes ICE agents.  ICE had to tell the target that they were not kidnapping him.

56.     **July 2018 interrogation at Boston Municipal Court.**  While a criminal defendant was retrieving documents from the clerk's office, an ICE officer present in the clerk's office approached the defendant, demanded identification and forced him into a private room in the courthouse reserved for police and prosecutors for further questioning.

57.     **December 2018 attempted arrest at Roxbury District Court**.  A criminal defendant was attending court for a pretrial hearing.  As the defendant, his girlfriend, and her young child were leaving the courthouse, they were approached by four ICE officers in plain clothes who asked for identification.  The defendant went back into the courthouse to find his attorney.  From that point on, the ICE officers followed the defendant and his attorney as he awaited a second hearing, telling him that they were going to arrest him as soon as his hearing was over and showing him handcuffs.  Six ICE officers sat in the gallery directly behind the defendant whispering to him that they were going to get him as soon as the hearing ended.  During the second hearing, the defendant fainted from the stress of the ICE officers' constant threats.  Ultimately, the court ordered bail and the defendant was placed in criminal custody.  When asked for an administrative warrant or an immigration detainer, ICE could not produce any document.  The defendant subsequently posted bail and was released.  At the defendant's next hearing, his case was almost certainly going to be dismissed because the witness against him had recanted and the Commonwealth was unable to prove the charges against him.  But the defendant did not appear at that hearing and could not be contacted by his defense attorney.  The court thus entered a criminal default against him.

58.     **February 2019 arrest in Somerville District Court**.  A criminal defendant had attended a pretrial conference.  When leaving the courtroom, two ICE agents tackled him in the public lobby of the courthouse, bringing him to the ground.  Onlookers believed it was a civilian fist fight (unrelated to law enforcement) because the officers were in plain clothes with no visible law enforcement identification and they had chased a man through the courthouse and tackled him.  The disruption was sufficiently violent that state court officers were required to intervene.

59.     **January 2019 attempted arrest in Middlesex Superior Court**.  A criminal defendant and his uncle were waiting for a hearing to begin, seated in a conference room open to the public.  ICE officers entered the conference room and handcuffed both the defendant and his uncle.  The ICE officers then blocked access to the conference room, preventing the defendant's attorney from entering.  The ICE officers ultimately realized that the defendant's uncle was not removable, but by that time they had lost the keys to the handcuffs.  The officers were ultimately forced to obtain a handsaw to saw the handcuffs off of the uncle.

60.     Notably, many of the individuals ICE has targeted for its civil courthouse arrests have no criminal records and are charged with only minor misdemeanors.  However, because of ICE arrests or the fear of such arrests, they are unable to defend against these charges.  For instance, ICE arrested an individual who had lived lawfully in the United States for years on a non-immigrant work visa.  This individual remained in the United States after his visa expired and was a popular youth athletic coach for many years.  Then, he was involved in a car accident; the other driver fled, but this individual remained at the scene and called the police.  The police charged him with operating under the influence.  ICE arrested this individual while he was leaving the courthouse after his first pre-trial conference; he was subsequently deported and never able to defend himself against the criminal charge.  In another example, ICE arrested a

lawful permanent resident entering court for a probation violation hearing. Because he could not appear in court and missed his hearing, a default warrant was issued against him. In another example, ICE arrested a man outside of East Boston District Court before he could answer to charges of unlicensed operation of a motor vehicle, prompting the issuance of a default against him. Defendants frequently miss criminal hearings, and even trials, because of ICE's civil-courthouse-arrest policy.

61.    ICE has also used courthouse arrests to target those with a path towards legal residence. For instance, ICE arrested a juvenile defendant who had been approved for Special Immigrant Juvenile status and was waiting to apply for legal permanent residence. On the day the juvenile court dismissed his pending delinquency charges, finding him incompetent to stand trial, ICE arrested him as he was walking out of the courthouse.

62.    Given the publicity around these stories and others like them, and given the myriad other incidents of ICE courthouse arrests that occur without disruption or violence but where news of the arrest travels throughout the local communities, ICE's civil-courthouse-arrest policy has sent a strong message that appearing in Massachusetts courts requires exposure to civil ICE arrest. As discussed below, this has had a dramatic impact on many noncitizens' willingness to appear in Massachusetts courts.

**IV.    Because of ICE's courthouse arrest policy, many noncitizen Massachusetts residents will not attend Massachusetts state courts for fear of civil arrest and detention, causing significant harm to Plaintiffs.**

63.    The impact of ICE's civil-courthouse-arrest policy has made clear that the concerns that underlie the privilege against civil arrest of those attending court on official business are well founded. Civil plaintiffs, criminal defendants, prosecutors, defense attorneys, and civil and criminal legal aid societies all suffer the negative effects of the chill on the immigrant community's willingness to engage with courts—a direct result of ICE's policy.

Plaintiffs' experience makes clear that the targets of ICE's civil arrests no longer view Massachusetts state courts as places they can attend—a result that significantly harms not just Plaintiffs, but the entire Massachusetts justice system.

**A. Many noncitizen Massachusetts residents refuse to appear in Massachusetts state courts for fear of civil immigration arrest.**

64. Prior to the current administration's civil-courthouse-arrest policy, Massachusetts state courts were understood to be open to everyone, even noncitizens potentially subject to removal. Chelsea Collaborative regularly assists with its members' litigation in Massachusetts state courts, including members who are noncitizens. Prior to the current civil-courthouse-arrest policy, Chelsea Collaborative's members, including those who are potentially subject to removal, were regularly willing to participate in state court proceedings. For example, in the past, the Collaborative filled courtrooms with members to show community support for the vindication of the rights of other Collaborative members.

65. In one instance in or around 2008, the Collaborative brought claims on behalf of victims of a consumer fraud scheme involving a travel agency that promised to book travel for the victims, but instead took the money and provided no services. The Collaborative brought over sixty community members, including some who were potentially subject to removal, to the trial to show support and to testify against the fraudsters. Similarly, from 2013-2014, the Collaborative helped with a criminal prosecution related to the Chelsea Housing Authority, asserting the rights of its members suffering the uninhabitable conditions of Chelsea public housing as a result of the then-executive director of the Housing Authority's misappropriation of funds. The Collaborative loaded two buses of member-victims and their supporters, including some who were potentially subject to removal, to appear in court on behalf of the community. None of these members expressed any fear of attending a Massachusetts courthouse.

66.     This has completely changed because of the new policy authorizing civil courthouse arrests.  Now, the Collaborative can hardly convince anyone to appear in court or bring suits that could ultimately require a court appearance.  With accounts of ICE officers in the courthouses spreading through Massachusetts communities, and with the increased likelihood that a courthouse arrest will lead to prolonged detention given other policies of the current administration, noncitizens fear engagement with the courts either as witnesses, claimants, victims, or supporters.  The following paragraphs provide just a few examples of the Collaborative's recent experiences reflecting the pervasive fear that ICE's presence in the courthouses has instilled in the community.  These examples are not exhaustive but provide illustrations of the harm to Chelsea Collaborative's members, and the type of conduct that is no longer being reported and acted upon by many noncitizen Massachusetts residents.

67.     **Domestic violence victims fear reporting abuse.**  Under Massachusetts General Law ch. 209A, victims of domestic violence may seek abuse prevention orders where they have a close relationship with their abuser (e.g., they are married or residing together) and they are suffering physical harm at the hands of this individual.  Prior to 2017, Chelsea Collaborative assisted members, including noncitizens, in securing such orders.  Currently, some members of Chelsea Collaborative are victims of domestic violence and would qualify for an abuse prevention order under chapter 209A.  Yet, despite encouragement by the Collaborative and other organizations, many noncitizen Collaborative members who are victims of domestic violence and would qualify for an abuse prevention order, are now not willing to seek such an order because it requires going to court, where the victims fear ICE arrest for themselves and their families.  Abusers prey on the vulnerability of these victims, using the threat of deportation to silence survivors and drive them further into the shadows.  Though the Collaborative

27

encourages victims to seek relief in court, given ICE's Directive, the Collaborative cannot guarantee these victims that they can appear in court without being arrested by ICE.

68.     The Collaborative's experience of the chilling effect of ICE's policy on victims of domestic violence is consistent with trends that have been documented nationally.  For instance, a survey by the National Immigrant Women's Advocacy Project, partnering with the American Civil Liberties Union, found that of the prosecutors they interviewed across 19 states, "82 percent of prosecutors reported that since President Trump took office [in 2017], domestic violence is now underreported and harder to investigate and/or prosecute [compared to in 2016]. Seventy percent of prosecutors reported the same for sexual assault, while 55 percent state the same difficulties for human trafficking and 48 percent for child abuse." *See* American Civil Liberties Union, *Freezing Out Justice: How immigration arrests at courthouses are undermining the justice system*, 2 (2018).  Similarly, the Domestic Violence Bureau of the Bronx District Attorney's office has publicly reported that numerous complaining witnesses expressed fear of testifying or otherwise participating in criminal proceedings due to ICE presence in the courthouse, including at least one instance in which a previously cooperative complaining witness became extremely reluctant to testify following several news reports regarding ICE arrests occurring in courthouses.  There are numerous other reports of the increased refusal among noncitizens to report domestic violence in light of ICE's presence in courts.

69.     **Victims of fraud refuse to seek judicial relief, fearing ICE in court.**  A scam artist has victimized many in the Chelsea community, building false trust and security with unknowing victims of an investment scheme to defraud the victims of hundreds of thousands of dollars.  Since early 2018, this fraudster has stolen hundreds of thousands of dollars by convincing Collaborative members to invest in a shell company with false promises of returns.

After months of requests for an accounting of the use of the funds and recovery of the original investment, the fraudster refuses, threatening the victims with the immigration consequences of appearing in court to vindicate their rights.  Despite wanting to seek relief from the courts and the return of their stolen funds, and despite the fact that the conduct at issue is clearly actionable as fraud under Massachusetts law, the undocumented victims have refused to initiate civil claims against the fraudster due to the fear of ICE arrest upon appearing in court, and the threat that their families would be torn apart by deportation.

70.     **Victims of church embezzlement scheme refuse to sue or assist with prosecution, fearing ICE in courts.**  Close to fifty parishioners of a local, now-defunct church, including many Collaborative members, sought to recover $140,000 of their offerings to the church that were embezzled by a former pastor.  Due to the fear of ICE's presence in the courthouses, the noncitizen victims fear pursuing their rights in court and have sought the advice and help of the Collaborative.  In an effort to provide some mechanism to help these exploited victims, the Collaborative instituted an ad hoc investigation in cooperation with the Suffolk District Attorney to seek some form of justice for these victims.

71.     **Victims of employer abuses and wage theft refuse to assert their rights, fearing ICE in court**.  Massachusetts General Law chapter 151, sections 1A-1B requires that employers provide overtime of one and one-half times their regular wage for hours worked above 40 hours per week and creates a cause of action to recover unpaid overtime owed under these provisions.  One Collaborative member's home was destroyed in a fire, and she took time off of work to relocate her family.  After returning to work, the woman was fired.  After being fired, she realized that she had not been paid in accordance with chapter 151 section 1A-1B, and that she had not even been paid minimum wage.  Despite offers by the Collaborative to represent

her in suing her employer to recover what she was owed under these provisions, the victim refused to file a complaint in court, fearing ICE arrest.

72.     **Victims of landlord abuses refuse to challenge illegal eviction, fearing ICE in court.**  A family of noncitizens, including Collaborative members, was threatened by their landlord after an illegal rent increase and notice to vacate the premises if they did not agree to the substantial rent increase.  Fearing ICE arrest if they appeared in court, the family moved out rather than seek relief from the landlord's abusive and illegal tactics.

   B.     **By making courthouses unavailable to many noncitizen residents of Massachusetts, ICE's policy has injured Chelsea Collaborative's members and forced Chelsea Collaborative to spend additional resources helping its members access justice and resolve disputes.**

73.     These examples alone demonstrate that ICE's Directive and ICE's policy of civilly arresting witnesses, parties, and others attending court on official business concretely harm Chelsea Collaborative's members by depriving them of a judicial forum in which to assert their rights, forcing them to endure domestic violence and employment and housing practices that violate Massachusetts law.

74.     The Directive and ICE's policy of civilly arresting witnesses, parties, and others attending court on official business also harm the Collaborative by forcing it to spend and divert resources to assist its members in responding to ICE's civil courthouse arrests.  Most importantly, the Collaborative has instituted a mediation program to resolve disputes in the community involving members and other Chelsea residents who refuse to go to court.  At no point prior to the current administration's civil-courthouse-arrest policy did the Collaborative have to create such an alternative-dispute-resolution mechanism for its noncitizen members, because those members were always willing to resolve their disputes in court.  Now, Collaborative staff conduct approximately three to four mediations a week, each lasting several

hours.  The subject matters range from resolution of family disputes, consumer fraud claims, wage theft allegations, and others.  This program has placed an incredible strain on the organization's resources, forcing the Collaborative to divert resources it would otherwise spend on its core mission.  Although a necessary stopgap measure, this extra-judicial program suffers from obvious shortcomings, including that participation cannot be compelled and agreements reached in the mediation are not enforceable as a court judgment would be.

75.     As discussed above, prior to ICE's Directive and prior to ICE's policy of regularly carrying out civil immigration arrests in Massachusetts courthouses, Chelsea Collaborative's members regularly appeared in Massachusetts state courts.  Thus, if ICE were enjoined from conducting civil arrests in and around courthouses, Chelsea Collaborative's members would be willing to appear in Massachusetts courts, and Chelsea Collaborative would not need to continue its costly mediation program.

**C.     By making courthouses unavailable to many noncitizen Massachusetts residents, ICE's policy injures the District Attorneys and CPCS by deterring victims, witnesses, and criminal defendants from appearing in court.**

76.     The criminal justice system cannot function if the key players in that system— victims, witnesses, and criminal defendants—are not willing and able to appear in court.

77.     As the above illustrations demonstrate, many noncitizen victims, witnesses, and defendants are no longer willing to appear in court as a result of ICE's policy of civil courthouse arrests.  Crime victims, especially domestic violence victims, endure abuse rather than risk civil ICE arrest.  Defendants sometimes refuse to appear for hearings and trials and sometimes are unable to appear due to ICE arrests, even in instances when the result of the hearings will most likely be dismissal of the cases.

78.     The illustrations above are consistent with the District Attorneys' experience.  It is difficult for the District Attorneys to capture the full extent of ICE's interference with their

work because both the Middlesex and Suffolk District Attorneys do not generally ask victims and witnesses about their immigration status.  Further, even if they do ask, many victims and witnesses refuse to disclose their immigration status to the District Attorneys and Assistant District Attorneys because the victims and witnesses often do not differentiate between state prosecutors and federal ICE officials.  Thus, when a given victim or witness does not appear in court, it is difficult to know why that person has not appeared.

79.     The illustrations above are also consistent with CPCS's experience.  When a given criminal defendant does not appear at a scheduled hearing or trial, it is sometimes difficult to know whether that failure was caused by fear of ICE arrest, actual ICE arrest outside the courthouse prior to the hearing or trial, or some other factor.  But, like the District Attorneys, CPCS attorneys have noted a significant increase in criminal defendants expressing fear of appearing in court, and an increase in defendants' failure to appear, since ICE's Directive and since ICE began implementing its policy of regularly carrying out arrests in state courthouses. Indeed, as the Roxbury example discussed above demonstrates, criminal defendants that have encountered ICE in courthouses are often unwilling to appear at a subsequent hearing, even when the result of the hearing is almost certain dismissal of the criminal charges.

80.     By causing victims, witnesses, and defendants to refuse to appear in court, ICE's civil-courthouse-arrest policy injures the District Attorneys in concrete ways:

        a.   Most importantly, it makes some prosecutions impossible.  For crimes like domestic violence in which a singular victim is often the only witness, if the victim is a noncitizen who is unwilling to risk ICE arrest by appearing in court, then prosecution is impossible.

    b.   Prosecution is also impossible when the defendant refuses to appear due to fear of ICE arrest or fails to appear because of ICE arrest prior to resolution of the criminal case.

    c.   Even for prosecutions in which there are multiple victims and the defendant does appear, ICE's policy sometimes makes prosecution significantly more costly, time-consuming and difficult.  For example, the Suffolk County District Attorney's prosecution of the former pastor who stole $140,000 from his congregation was significantly complicated by the fact that many of the victims refused to appear in court for fear of ICE arrest.

    d.   ICE's courthouse arrests also force the District Attorneys' Victim Witness Advocates to spend additional time finding ways for victims and witnesses to feel comfortable attending court, diverting their resources from their other responsibilities.

    e.   ICE's courthouse arrests also force Assistant District Attorneys to spend significant time and resources preparing for hearings and trials that do not occur because the defendant and/or key witnesses do not appear because of either fear or actual ICE arrest.

81.    Other District Attorneys in Massachusetts have noted the same problems.  For example, Johnathan W. Blodgett, Essex County District Attorney, has stated that "[ICE] arrests at courthouses in our county have impacted witnesses appearing for trial, victims of crime (especially those of domestic violence), and criminal defendants we are seeking to prosecute. This practice often impedes access to justice for victims, as well as our ability to prosecute cases."

82.     For similar reasons, ICE's civil-courthouse-arrest policy injures CPCS in concrete

ways:

    a.   Most importantly, it directly impacts CPCS in its representations.  When a

        CPCS attorney's client fails to appear at a hearing or trial due to fear or actual

        ICE arrest, the hearing or trial cannot go forward.  Moreover, if a defense

        witness refuses to appear due to fear of ICE arrest, defending the client

        becomes significantly more difficult, and at times impossible.

    b.   ICE's courthouse arrests force CPCS attorneys to spend significant time and

        resources preparing for hearings and trials that do not occur because either the

        defendant and/or key witnesses do not appear due to fear or actual ICE arrest.

83.     As discussed above, prior to ICE's policy of regularly carrying out civil

immigration arrests in state courthouses, noncitizens potentially subject to ICE arrest did not fear

arrest upon appearing in Massachusetts courts, and regularly appeared in those courts.  Thus, if

ICE were not permitted to conduct civil arrests in and around courthouses—either by policy or

by court order—then the District Attorneys and CPCS would no longer suffer the concrete harms

identified above.

84.     A study conducted by Northeastern University's Immigrant Justice Clinic

summarized the disruptions it observed in Massachusetts courts at the hands of the ICE policy as

follows:

        ICE enforcement practices routinely interfere with court
        proceedings.  ICE frequently arrests immigrants prior to the
        resolution of their criminal case.  ICE detention can have grave
        impacts on a criminal proceeding, resulting in probation violations,
        default warrants, and other adverse consequences.  ICE
        interference with the criminal process does not just harm
        defendants.  It also harms victims, whose rights are compromised
        when defendants are not available to stand trial, and it disrupts the

> entire operation of the courts. In addition, the climate of fear
> created by ICE courthouse enforcement deters immigrant victims
> and witnesses from seeking assistance or participating in legal
> proceedings.

Northeastern University School of Law, Immigrant Justice Clinic, Blocking the Courthouse

Doors:  ICE Enforcement at Massachusetts Courthouses and Its Effects on the Judicial Process, 7

(March 2018).

**V.    There has been widespread recognition, including by numerous judges, that ICE's policy of civil courthouse arrests has caused precisely the harms to the administration of justice that the common law recognized.**

85.    Stakeholders participating in every facet of state judicial systems have spoken out

about the pervasive and destabilizing effect that ICE's civil arrest practices have had on the

proper functioning of this core state institution.  States have been vocal in rejecting the

courthouse arrest practice and in calling on ICE to terminate it entirely, or to impose significant

limitations on its frequency.

86.    State court judges and justices in the Commonwealth and across the country from

California, Connecticut, New Jersey, New York, Oregon, and Washington have issued multiple

letters and public statements to ICE objecting to the courthouse arrest practice, citing to

disruptions to the administration of justice and public safety, and calling on ICE to substantially

alter its practice.

87.    Paula M. Carey, Chief Justice of the Massachusetts Trial Court, summarized the

negative consequences stemming from the ICE policy as follows:

> It is essential that these individuals [victims and litigants] be free
> to seek relief from the Court without fear that their presence in
> Court will be the cause of an immigration enforcement action.  If
> not, the unfortunate result will be that public safety will decrease,
> communities will become less safe and perpetrators of domestic
> violence will feel empowered to abuse their victims with impunity.
> Further, individuals who currently come to our Courts to help
> themselves or a loved one in obtaining a civil commitment for

35

> detox or treatment will be reluctant to come forward if they fear immigration consequences.
>
> Any increased immigration enforcement in these civil matters would mean fewer applications, more withdrawn cases, and more defaults, resulting inevitably in violence, injustice, and threats to public safety.  In my view, it would ultimately affect the Court's ability to carry out its mission to provide the protections guaranteed by the laws of this Commonwealth.

Exhibit G at 2.

88.     Chief Justice Tani G. Cantil-Sakauye of the California Supreme Court wrote a letter to then-Attorney General Sessions, expressing concerns about ICE's policy of arresting undocumented immigrants at California trial courts.  Chief Justice Cantil-Sakauye echoed concerns felt by judges and lawyers across the nation:

> Our courthouses serve as a vital forum for ensuing access to justice and protecting public safety. . . .  [ICE's courthouse arrest policy is not only unsafe and unfair, but] undermine[s] the judiciary's ability to provide equal access to justice.

Exhibit H at 1-2.

89.     She further explained that ICE's policy affects a wide array of individuals, including "[c]rime victims, victims of sexual abuse and domestic violence, witnesses to crimes who are aiding law enforcement, limited-English speakers, unrepresented litigants, and children and families," by limiting their ability to "come to our courts seeking justice and due process of law."  Exhibit H at 1.

90.     Chief Justice Mary E. Fairhurst of the Supreme Court of Washington has also recognized that the ICE courthouse arrest policy "impede[s] the fundamental mission of [all] courts, which is to ensure due process and access to justice for everyone, regardless of their immigration status."

91.     In a joint letter, dozens of former state and federal judges stressed that "for courts to effectively do justice, ensure public safety, and serve their communities, the public must be able to access courthouses safely and without fear of retribution.  For many, however, ICE's courthouse arrests have made courts places to avoid."  Exhibit I at 1.

92.     These judges also recognized that the ICE policy has caused recognizable and tangible fear in individuals who would otherwise petition courts for redress:

> Surveys of law enforcement and legal service providers confirm that ICE's reliance on immigration arrests in courthouses instills fear in clients and deters them from seeking justice in a court building.  Affidavits detail persons "terrified" to request orders protecting them from violence or enforcing child support, to serve as witnesses, and to defend themselves.

Exhibit I at 1.

93.     The Victim Rights Law Center has also seen the ICE courthouse arrest policy's chilling effect in action, expressing that "The immigrant [sexual assault] survivors we work with unanimously express significant fear of detention or deportation when contemplating engaging in criminal justice and/or civil legal remedies in the aftermath of their assaults."

94.     The Boston Bar Association believes that the chilling effect that ICE courthouse arrests fosters has "significantly impair[ed] the ability of the Commonwealth to ensure access to our courts and fair administration of justice for all our residents."

95.     Similarly, the Massachusetts Law Reform Institute has summarized the negative impact of the ICE courthouse arrest policy as follows:

> The recent ICE presence in the courthouses of the Commonwealth . . . has already chilled access to civil legal remedies by legal services clients and is likely to imperil the participation of litigants and witnesses in key areas of our practice, including the following: [Housing, Child Welfare, Family Law, Domestic Abuse and Harassment Protection, and Employment Rights].

*     *     *

96.     A clear consensus has emerged in Massachusetts, and across the nation, among all

stakeholders in the legal community that ICE's civil-courthouse-arrest policy has resulted in a

noticeable chill on court access, and as a result, on access to justice.  Massachusetts judges,

prosecutors, defense attorneys, and legal aid societies are united against this destructive ICE

policy.  These stakeholders agree that ICE courthouse arrests at the very least chill—and in some

cases, outright prevent—noncitizens from accessing courthouses, and in turn justice, across

Massachusetts.

## CAUSES OF ACTION

### COUNT I
**ICE's Directive No. 11072.1 Violates the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Immigration and Nationality Act, 8 U.S.C. §§ 1226(a), 1357(a) (by all Plaintiffs)**

97.     Plaintiffs repeat and incorporate by reference each and every allegation contained

in paragraphs 1 through 96 as if fully set forth herein.

98.     The Administrative Procedure Act instructs courts to "hold unlawful and set aside

agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," as well as agency action that is "in excess of statutory jurisdiction,

authority, or limitations."  5 U.S.C. § 706(2).

99.     ICE's Directive is a final agency action subject to review under the

Administrative Procedure Act.

100.    Congress has not given ICE the power to conduct civil arrests of parties,

witnesses and others attending court on official business.  "[A]n agency literally has no power to

act . . . unless and until Congress confers power upon it."  *Louisiana Pub. Serv. Comm'n v.

F.C.C.*, 476 U.S. 355, 374 (1986).  The validity of ICE's Directive authorizing civil arrest of

parties and witnesses attending court thus depends on whether the general grant of power to

conduct civil arrests somehow abrogated the well-settled common law privilege that such civil

arrests cannot be used to arrest parties, witnesses and others attending court on official business.

101.    Given the "longstanding [] principle that statutes which invade the common law

are to be read with a presumption favoring the retention of long-established and familiar

principles," a statute must "speak directly to the question addressed by the common law" to

"abrogate a common-law principle." *Texas*, 507 U.S. at 534 (1993) (internal quotation marks

and alterations omitted).  The statute authorizing ICE to conduct civil immigration arrests does

not "speak directly to the question addressed by the common law"—*i.e.*, it does not speak to the

question of whether ICE can use a party or witness's appearance in court as a trap for purposes

of a civil arrest.  Instead, the statute simply authorizes arrest and detention, while saying nothing

about how, when, or where such arrests can take place.  8 U.S.C. § 1226(a), 1357(a).  Thus, the

power Congress granted to ICE to conduct civil arrests inherently contains within it the common-

law limitation that parties, witnesses, and others attending court on official business are

privileged from civil arrest.

102.    To the extent there is any ambiguity concerning whether the INA incorporates or

abrogates the common-law privilege, the constitutional concerns raised by the Directive resolve

that ambiguity in favor of interpreting the statute to limit ICE's authority.  *See Clark v. Martinez*,

543 U.S. 371, 380-82 (2005) (when there are "competing plausible interpretations of a statutory

text," courts should apply "the reasonable presumption that Congress did not intend the

alternative which raises serious constitutional doubts").

103.    Abrogating the common-law privilege would violate the Constitutional right of

access to the courts, which prohibits "systemic official action [that] frustrates a plaintiff or

plaintiff class in preparing and filing suits."  *Christopher*, 536 U.S. at 413, 415 & n.12.  Such

"frustrat[ion]" includes not only policies that ban access outright, but also those that obstruct it. *E.g.*, *id.* at 413. Forcing noncitizen litigants potentially subject to removal to risk civil arrest in order to access the courts creates such impermissible frustration. *See* ¶¶ 118-122, *infra*.

104. Abrogating the privilege would likely deprive criminal defendants of their Sixth Amendment rights. A "fundamental element of due process of law" is criminal defendants' "right to present a defense," which includes the "right to offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Government acts that "cause[] the loss or erosion" of favorable testimony violate that right. *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir.1987). By conditioning court appearance on potential civil arrest, ICE's Directive threatens noncitizen witnesses with potential arrest upon appearance in court, likely depriving many criminal defendants of key testimony. Criminal defendants also have the right to testify on their own behalf, *e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987), and to be present at crucial phases of the trial, e.g., *Illinois v. Allen*, 397 U.S. 337, 338 (1970). ICE's Directive impermissibly conditions a criminal defendant's exercise of these rights on exposing herself to potential civil immigration arrest.

105. The federalism and Tenth Amendment concerns involved with abrogating state courts' ability to protect their litigants and witnesses from courthouse arrests further supports interpreting Congress's general grant of civil-arrest authority to incorporate the common-law privilege against courthouse arrests. If Congress intends to "pre-empt the historic powers of the States," it must do so "plain[ly]"—making its intention "unmistakably clear"—in acknowledgment of the fact that "States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). Authorizing ICE to police the halls of state courts—

dissuading parties and witnesses from attending state judicial proceedings—creates a serious threat to the "usual constitutional balance between the States and the Federal Government." *Id.* at 460-61.  Indeed, authorizing such conduct effectively commandeers state resources for implementing a federal program.  *See* ¶¶ 112-117, *infra*.  Such authorization should not be presumed absent express language not present in the statute.

106.    ICE's Directive authorizes civil courthouse arrests that Congress did not authorize ICE to conduct.  The Directive is thus "in excess of statutory jurisdiction, authority, or limitations," and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  This Court should therefore hold it unlawful and set it aside under the Administrative Procedure Act.

## COUNT II
### ICE's Directive No. 11072.1, and Its Policy of Conducting Civil Courthouse Arrests, Violate the Federal and Massachusetts Common-Law Privilege Against Such Arrests (by all Plaintiffs)

107.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 106 as if fully set forth herein.

108.    ICE's arrests based on alleged civil immigration infractions are civil arrests.  *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country").

109.    There is a longstanding common-law privilege against civil arrest of witnesses, parties, and others attending court on official business.  This privilege has been recognized by federal courts, including the Supreme Court and this Court, as well as by the Massachusetts Supreme Judicial Court.  The privilege is one that courts enforce on each other's behalf.  Federal courts enforce the privilege on behalf of those attending state courts, and state courts enforce the

privilege on behalf of those attending federal courts.  The privilege is thus best understood as existing as a matter of both federal and Massachusetts common law.

110.    The federal common law privilege must, at the very least, prevent arrest of those attending state court to the extent those arrests are privileged under state law.

111.    ICE's Directive, and its policy of carrying out civil arrests against parties, witnesses, and others attending courts on official business, violate the privilege against civil courthouse arrests.

**COUNT III**
**ICE's Directive No. 11072.1, and Its Policy of Conducting Civil Courthouse Arrests, Exceed the Federal Government's Powers Under the Tenth Amendment (by all Plaintiffs)**

112.    Plaintiffs repeat and incorporate by reference each and every allegation contained in paragraphs 1 through 111 as if fully set forth herein.

113.    The Constitution leaves in the states "'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918-19 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)).  Key to protecting this "inviolable sovereignty" is the states' ability to prevent the federal government from conscripting key state functions for its own end:  "[U]sing the States as the instruments of federal governance [is] both ineffectual and provocative of federal-state conflict."  *Id.*  The Supreme Court has thus repeatedly "made clear that the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Id.* at 925; *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

114.    The states' judicial and police powers are among the most important powers that the Constitution reserves to the states.  Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the

suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also United States v. Lopez*, 514 U.S. 549, 567 (1995) (discussing "areas such as criminal law enforcement . . . where states historically have been sovereign").  There is therefore particular reason to avoid allowing the federal government to coopt that system for purposes of carrying out its own civil policies, especially when such cooption interferes with the state's administration of its police powers.

115.    ICE's Directive, and its corresponding policy of civilly arresting parties, witnesses, and others attending court on official business, impermissibly commandeer the state criminal justice and judiciary systems for purposes of carrying out the federal government's civil immigration policy.  There can be little doubt that the federal government could not order state district attorneys, public defenders, and judges to provide ICE with lists of people who the state officers know are scheduled to appear in court—let alone, to make those people available for ICE arrest.  *See Murphy*, 138 S. Ct. at 1477 ("The Federal Government may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." (internal alterations and citations omitted)).  However, that is precisely the effect of ICE's civil-courthouse-arrest policy, which simply places federal officials in state courthouses to accomplish indirectly what the federal government could not permissibly do directly.  Stationing armed federal agents within the state government to extract what the federal government could not order the state to provide directly heightens, not minimizes, the intrusion on state sovereignty.  *See Murphy*, 138 S. Ct. at 1478 (telling the state legislature it cannot do something is "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals.  A more direct affront to state sovereignty is not easy to imagine.").

116.     The federal government's use of state courts for civil immigration enforcement shifts the political accountability for and the economic costs of federal immigration policy to the states in precisely the way the Tenth Amendment prohibits. *See Murphy*, 138 S. Ct. at 1477. When those called into court by state prosecutors or state judges are then arrested by federal agents upon appearing in state court, it becomes difficult for members of the public to attribute responsibility for the arrests.  Similarly, ICE's Directive and corresponding policy of arresting those attending state courts on official business shift the costs of immigration enforcement from the federal government to the states.  The federal government saves money by using the state judicial system to trap those the federal government seeks to civilly arrest and detain, while placing significant strains on state resources by requiring the involvement of state court officers, hindering the state judicial process, and making the state's administration of justice more costly, slow, and disordered.

117.     The Tenth Amendment violation is made more acute by the importance of the state institutions ICE is commandeering, and the significance of ICE's interference with those institutions.  The execution of the police power and the administration of justice are core sovereign powers reserved to the states. *See Younger v. Harris*, 401 U.S. 37, 43 (1971) (recognizing a "policy against federal court interference with state judicial proceedings"); *In re Justices of Superior Court Dep't of Massachusetts Trial Court*, 218 F.3d 11, 16 (1st Cir. 2000) (same); *Morrison*, 529 U.S. at 618 ("we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."); *United States v. Lopez*, 514 U.S. 549, 564, 567 (1995) ("areas such as criminal law enforcement or education where states

historically have been sovereign."). ICE's Directive and civil-courthouse-arrest policy

significantly interfere with these core sovereign functions and violate the Tenth Amendment.

## COUNT IV
### ICE's Directive No. 11072.1, and Its Policy of Conducting Civil Courthouse Arrests, Violate the Right of Access to the Courts (by Chelsea Collaborative)

118.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in paragraphs 1 through 117 as if fully set forth herein.

119.    Defendants' actions deprive Plaintiffs of meaningful access to the courts in

violation of Plaintiffs' rights under the First, Fifth and Fourteenth Amendments.

120.    The right of access to the courts prohibits "systemic official action [that] frustrates

a plaintiff or plaintiff class in preparing and filing suits." *Christopher*, 536 U.S. at 413, 415 &

n.12; *see also Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004); *Rogan v. City of Boston*, 267

F.3d 24, 28 (1st Cir. 2001); *Simmons v. Dickhaut*, 804 F.2d 182, 183 (1st Cir. 1986).  Such

"frustrat[ion]" includes not only policies that ban access outright, but also those that obstruct it in

more subtle ways.  *See Christopher*, 536 U.S. at 413 (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 106-

07 (1996)) (excessive filing fees); *Lane*, 541 U.S. at 522-23 (inaccessibility for individuals with

disabilities); *see also Bounds v. Smith*, 430 U.S. 817, 822 (1977) ("access to the courts [must be]

adequate, effective, and meaningful").

121.    Forcing noncitizens potentially subject to removal to risk civil arrest to access the

courts creates such impermissible frustration.  Indeed, the cases establishing the common-law

privilege recognized precisely this, explaining that the fear of arrest would "prevent [parties and

witnesses'] approach," obstructing "the administration of justice."  *Halsey*, 4 N.J.L. at 368.  The

impact of ICE's Directive has vindicated this common-law wisdom:  Noncitizen victims of

domestic violence and landlord and employer abuse have been forced to continue to suffer abuse

and decline to obtain remedies available under Massachusetts law rather than risk ICE arrest.

Plaintiff Chelsea Collaborative has been forced to establish its own extra-judicial mediation program to resolve disputes between those who are no longer willing to attend court.

122.    Chelsea Collaborative's members have meritorious claims—including claims for restraining orders against abusive partners and unpaid wages against former employers—that they are frustrated from bringing by ICE's civil-courthouse-arrest policy, in violation of the Constitutional right of access to the courts.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court grant the following relief:

A. An order holding unlawful, vacating, and setting aside ICE's Directive No. 11072.1 authorizing the civil arrest of parties, witnesses, and others attending court on official business.

B. A declaration pursuant to 28 U.S.C. § 2201 that:

    a.   ICE does not have statutory authority to civilly arrest parties, witnesses and others attending court on official business, and hence ICE's Directive is in excess of statutory jurisdiction, authority, or limitations, and is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

    b.   ICE's Directive and ICE's policy of civilly arresting parties, witnesses and others attending court on official business violate the federal and Massachusetts common-law privilege against such civil courthouse arrests;

    c.   ICE's Directive and ICE's policy of civilly arresting parties, witnesses and others attending court on official business violate the constitutional right of access to the courts; and

    d.  ICE's Directive and ICE's policy of civilly arresting parties, witnesses and others attending court on official business exceed the federal government's constitutional authority under the Tenth Amendment.

C.  An injunction enjoining ICE from implementing its Directive, and from civilly arresting parties, witnesses, and others appearing in court on official business while they are going to, attending, or leaving the courthouse.

D.  Attorneys' fees.

E.  Such other relief as the Court deems just and proper.

Dated: April 29, 2019

Respectfully submitted,

_/s/ David J. Zimmer_
David J. Zimmer (BBO# 692715)
    *Special Assistant Attorney General*
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
Jordan Benson (BBO# 703215)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com
JBenson@goodwinlaw.com

*Attorneys for Plaintiffs Marian Ryan, in
her official capacity as Middlesex County
District Attorney, and Rachael Rollins, in
her official capacity as Suffolk County
District Attorney*

_/s/ Wendy S. Wayne_
Wendy S. Wayne (BBO# 555665)
Committee for Public Counsel Services
Immigration Impact Unit
21 McGrath Highway, Somerville, MA 02143
(617) 623-0591
wwayne@publiccounsel.net

*Attorney for Plaintiff the Committee for Public
Counsel Services*

_/s/ Oren N. Nimni_
Oren N. Nimni (BBO# 691821)
Lawyers for Civil Rights
61 Batterymarch St., 5th Floor
Boston, MA 02110
(617) 482-1145
onimni@lawyersforcivilrights.org

David J. Zimmer (BBO# 692715)
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
Jordan Benson (BBO# 703215)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com
JBenson@goodwinlaw.com

*Attorneys for Plaintiff Chelsea Collaborative, Inc.*