UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; and the CHELSEA COLLABORATIVE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Immigration and Customs Enforcement, Enforcement and Removal Operations, Acting Field Office Director; U.S. DEPARTMENT OF HOMELAND SECURITY; and KEVIN McALEENAN, in his official capacity as Acting Secretary of United States Department of Homeland Security, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

FACTS ............................................................................................................................... 3

    I.    As the U.S. Supreme Court has recognized, the government's civil-arrest power is limited at common law by a "well settled" privilege against civil arrests of parties, witnesses, and others appearing in court on official business. .......................... 3

    II.    The Immigration and Nationality Act grants a general civil-arrest power, without specifying its scope. .......................................................................................... 7

    III.    ICE's Directive No. 11072.1 authorizes civil immigration arrests of parties and witnesses attending court, in violation of the "well settled" common-law privilege. ....................................................................................................................... 7

ARGUMENT ...................................................................................................................... 9

    I.    Plaintiffs are likely to succeed in demonstrating that ICE's policy of conducting civil courthouse arrests exceeds its statutory authority ................................................. 9

        A.    The civil-arrest power granted by the Immigration and Nationality Act incorporates, not abrogates, common-law limitations on civil arrest, including the common-law privilege against civil courthouse arrests. ............. 10

        B.    Finding abrogation would be particularly inappropriate given the significant constitutional concerns raised by ICE's Directive. .......................... 14

    II.    ICE's Directive is causing Plaintiffs ongoing and irreparable harm. .......................... 17

    III.    The public interest and the balance of harms weigh strongly in favor of preliminary injunctive relief. ..................................................................................... 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)................................................................................................11, 12

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017)..................................................................................................12

*Christopher v. Harbury*,
  536 U.S. 403 (2002).................................................................................................14, 15

*Clark v. Martinez*,
  543 U.S. 371 (2005)......................................................................................................14

*Diamond v. Earle*,
  105 N.E. 363 (Mass. 1914) .............................................................................................6

*Ex Parte Byne*,
  35 Eng. Rep. 123 (1813) .................................................................................................5

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)......................................................................................................16

*Halsey v. Stewart*,
  4 N.J.L. 366 (N.J. 1817).........................................................................................6, 7, 15

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992)......................................................................................................12

*Illinois v. Allen*,
  397 U.S. 337 (1970)......................................................................................................15

*INS v. Lopez-Mendoza*,
  468 U.S. 1032 (1984).......................................................................................................7

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013)......................................................................................................11

*La. Pub. Serv. Comm'n v. FCC*,
  476 U.S. 355 (1986)..................................................................................................2, 10

*Lamb v. Schmitt*,
  285 U.S. 222 (1932)....................................................................................................4, 5

*Larned v. Griffin*,
  12 F. 590 (D. Mass. 1882) ......................................................................................1, 4, 5, 6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)............................................................................................2, 11

*Long v. Ansell*,
293 U.S. 76 (1934) ....................................................................................................5

*Matter of C. Doe*,
No. SJ-2018-119 (Mass. Sept. 18, 2018) ..................................................................6

*In re M'Neil*,
3 Mass. 287 (1807) ....................................................................................................6

*Malley v. Briggs*,
475 U.S. 335 (1986).................................................................................................12

*Manoharan v. Rajapaksa*,
711 F.3d 178 (D.C. Cir. 2013) ...............................................................................12

*Meekins v. Smith*,
126 Eng. Rep. 363 (1791).........................................................................................4

*Meyer v. Holley*,
537 U.S. 280 (2003)............................................................................................11, 12

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018).............................................................................................17

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................................19

*Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*,
464 U.S. 30 (1983)............................................................................................12, 13

*Odebrecht Construction, Inc. v. Sec'y, Fla. Dep't of Transp.*,
715 F.3d 1268 (11th Cir. 2013) .........................................................................17, 18

*Page Co. v. MacDonald*,
261 U.S. 446 (1923)..........................................................................................4, 5, 10

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
963 F. Supp. 1 (D.D.C. 1997)..................................................................................20

*Phillips v. Pembroke Real Estate, Inc.*,
459 F.3d 128 (1st Cir. 2006)....................................................................................11

*Printz v. United States*,
521 U.S. 898 (1997).................................................................................................17

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
    397 F.3d 56 (1st Cir. 2005) ................................................................................18

*Rock v. Arkansas,*
    483 U.S. 44 (1987) ...........................................................................................15

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ................................................................................10, 11

*Scharfeld v. Richardson,*
    133 F.2d 340 (D.C. Cir. 1942) .........................................................................11

*Sierra Club v. U.S. Army Corps of Eng'rs,*
    645 F.3d 978 (8th Cir. 2011) ............................................................................18

*Simmons v. Dickhaut,*
    804 F.2d 182 (1st Cir. 1986) ......................................................................14, 15

*Spence v. Stuart,*
    102 Eng. Rep. 530 (1802) ...................................................................................5

*Stewart v. Ramsay,*
    242 U.S. 128 (1916) ................................................................................ *passim*

*Tennessee v. Lane,*
    541 U.S. 509 (2004) ......................................................................................14, 15

*The King v. Holy Trinity in Wareham,*
    99 Eng. Rep. 530 (1782) .....................................................................................4

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ...........................................................................................13

*United States v. Hoffman,*
    832 F.2d 1299 (1st Cir. 1987) ...........................................................................15

*United States v. Morrison,*
    529 U.S. 598 (2000) .........................................................................................16

*United States v. Texas,*
    507 U.S. 529 (1993) .................................................................................2, 10, 13

*Valley Bank & Trust Co. v. Marrewa,*
    237 N.E.2d 677 (Mass. 1968) .......................................................................6, 16

*Washington v. Texas,*
    388 U.S. 14 (1967) ...........................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................9

**Statutes**

5 U.S.C. § 706(2) ..........................................................................................2, 10

8 U.S.C. § 1226(a) .....................................................................................2, 7, 13

8 U.S.C. § 1357(a)(2) .................................................................................2, 7, 13

Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 ..................7, 13

**Other Authorities**

Matthew Bacon, *A New Abridgment of the Law* (London, A. Strahan, 7th ed.
   1832) ................................................................................................................4

Devlin Barrett, *DHS: Immigration agents may arrest crime victims, witnesses at
   courthouses*, Wash. Post (Apr. 4, 2017), *available at*:
   https://wapo.st/2ZkdwCx ..................................................................................8

William Blackstone, *Commentaries on the Laws of England* (1768) .............................4

Nathan Levy, Jr., *Mensne Process in Personal Actions at Common Law and the
   Power Doctrine*, 78 Yale L.J. 52 (1968) ............................................................3

P.R. Lockhart, *Immigrants Face a Choice Between Domestic Violence and
   Deportation*, Mother Jones (March 20, 2017), *available at*:
   http://bit.ly/2VPCYxn ......................................................................................8

Letter from Sessions and Kelly to Cantil-Sakauye (Mar. 29, 2017), *available at*:
   https://wapo.st/2vaJYt5 ....................................................................................8

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Chelsea Collaborative or Collaborative | Plaintiff Chelsea Collaborative, Inc. |
| CPCS | Plaintiff Committee for Public Counsel Services |
| DHS | United States Department of Homeland Security |
| Directive | ICE Directive No. 11072.1, "Civil Immigration Enforcement Actions Inside Courthouses" |
| District Attorneys | Plaintiffs Marian Ryan, Middlesex County District Attorney, and Rachael Rollins, Suffolk County District Attorney |
| Espinoza Decl. | Declaration of Ivan Espinoza-Madrigal in Support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 13 to the Zimmer Decl. |
| Foley Decl. | Declaration of Anne Foley in Support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 12 to the Zimmer Decl. |
| ICE | United States Immigration and Customs Enforcement |
| INA | Immigration and Nationality Act |
| Klein Decl. | Declaration of Jennifer Klein in Support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 11 to the Zimmer Decl. |
| Moshier Decl. | Declaration of Michaela Moshier in Support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 14 to the Zimmer Decl. |
| Vega Decl. | Declaration of Gladys Vega in Support of Plaintiffs' Motion for Preliminary Injunction, attached as Exhibit 10 to the Zimmer Decl. |
| Zimmer Decl. | Declaration of David Zimmer in Support of Plaintiffs' Motion for Preliminary Injunction |

## INTRODUCTION

For more than two centuries, courts, including the Supreme Court and this Court, have strictly enforced a "well settled" and "absolute" common-law privilege against civil arrest of those attending court on official business, recognizing that the judicial system cannot function if victims, parties, and witnesses are deterred from appearing in court by the threat that their appearance could be used as a trap. *E.g.*, *Stewart v. Ramsay*, 242 U.S. 128, 129-130 (1916); *Larned v. Griffin*, 12 F. 590, 594 (D. Mass. 1882). In complete disregard for that well-recognized limitation on the government's civil-arrest power, United States Immigration and Customs Enforcement ("ICE") has ordered its agents to arrest parties and witnesses appearing in court—arrests based on alleged *civil*, not criminal, immigration infractions. As a result, tens of thousands of Massachusetts residents will not set foot in Massachusetts courts. Victims of domestic violence or of abusive practices by landlords and employers tolerate that abuse rather than risk ICE arrest. Criminal defendants accept default rather than risk appearing in court. And when prospective plaintiffs, victims, witnesses, and defendants do not appear in court, civil and criminal prosecution and defense often become impossible. In short, ICE's new and unprecedented policy has undermined access to justice in the precise way that common-law courts have predicted and protected against for centuries.

Plaintiffs—the District Attorneys for two of the largest counties in Massachusetts, the Massachusetts public defender agency, and a membership-based community organization that protects the rights of many immigrant Massachusetts residents—bring this suit to stop ICE from carrying out this unprecedented policy. Given the plainly unlawful nature of ICE's conduct, and the irreparable harm it is causing to Plaintiffs and the Massachusetts public, this Court should enjoin ICE from civilly arresting victims, parties, and witnesses attending Massachusetts courts during the pendency of this lawsuit.

1

Plaintiffs are likely to succeed on the merits of all of their claims, but this Court need only reach the first:  Congress did not grant ICE the authority to violate the common-law privilege and civilly arrest parties, witnesses, and others attending court on official business, and ICE's Directive authorizing these arrests is thus "in excess of statutory jurisdiction, authority, or limitations" and must be "set aside" under the Administrative Procedure Act.  5 U.S.C. § 706(2).  As a federal agency, ICE "literally has no power to act . . . unless and until Congress confers powers upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  The INA confers only a general civil-arrest power—the statute is silent concerning the scope of that power.  *See* 8 U.S.C. §§ 1226(a), 1357(a)(2).  Under longstanding principles of statutory interpretation, such a Congressional authorization of a well-understood power like civil arrest presumptively carries with it the limitations that accompanied that power at common law.  *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 534 (1993); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).  That interpretive principle is directly applicable here:  Congress's general grant of civil-arrest power does not give ICE unbridled authority to conduct civil arrests whenever and however it wants, but instead incorporates within it the common-law limitations on the civil-arrest power, including the well-settled common-law rule that the government cannot civilly arrest victims, witnesses, and parties appearing in court.  This interpretation is further supported by the serious constitutional questions that would arise from authorizing federal agents to conduct civil arrests against victims, witnesses, and parties attending state courts.

ICE's policy is not only unlawful, it is causing ongoing and irreparable harm to Plaintiffs and the public.  As the supporting declarations show, the chilling effect of ICE's policy is real, and its effects are dramatic.  For instance, prior to ICE's policy, Plaintiff Chelsea Collaborative's noncitizen members routinely appeared in Massachusetts courts.  But since ICE's civil-

2

courthouse-arrest policy, even those suffering from domestic violence or clear violations of Massachusetts law will not use the courts for fear of ICE arrest.  The problem has become so severe that Chelsea Collaborative has been forced to devote significant resources to establishing its own, entirely new, mediation system to attempt to resolve disputes involving those who will not appear in Massachusetts courts for fear of civil ICE arrest.  Noncitizens' refusal to appear in court also creates obvious and irreparable harms to the District Attorneys and the Committee for Public Counsel Services ("CPCS")—if crime victims, witnesses, and defendants will not appear in court, prosecution and criminal defense become much more difficult, and at times impossible.

Because ICE's policy plainly exceeds its statutory authority, and because it is causing continuous and irreparable harm to Plaintiffs and the public, this Court should enjoin Defendants from carrying out these unlawful civil arrests during the pendency of this suit.[1]

## FACTS

I.      **As the U.S. Supreme Court has recognized, the government's civil-arrest power is limited at common law by a "well settled" privilege against civil arrests of parties, witnesses, and others appearing in court on official business.**

In England, and in the early years of this country, civil proceedings were often initiated by having the government civilly arrest the defendant to guarantee his or her appearance in court. *See* Nathan Levy, Jr., *Mensne Process in Personal Actions at Common Law and the Power Doctrine*, 78 Yale L.J. 52, 61-70 (1968).  The possibility that such civil arrests could take place in court, however, posed a significant problem for the judicial system:  If a party or witness's appearance in one case could be used as a trap for a civil arrest in *another* case, many parties and witnesses would not attend court.  To avoid this problem, courts both in England and the United States, including the Supreme Court and this Court, all recognized and strictly enforced an

---

[1] This Memorandum uses the phrase "civil courthouse arrests" to mean arrests of those attending court for official business under their own power.  Plaintiffs are not challenging in this litigation ICE's authority to arrest those brought into court while in state custody.

3

"inflexib[le]" privilege, and an "absolute protection," against the civil arrest of parties or witnesses attending court. *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923); *Larned*, 12 F. at 594. As the Supreme Court explained, "the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932).

The common-law privilege against civil arrest while attending court on official business traces its origins back at least to English courts in the eighteenth century. Blackstone's *Commentaries on the Laws of England* explained the common-law rule that "[s]uitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning." 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768); *see also* 6 Matthew Bacon, *A New Abridgment of the Law* 530 (London, A. Strahan, 7th ed. 1832) ("[A]ll other persons whatsoever, are freed from arrests, so long as they are in view of any of the courts at Westminster, or if near the courts, though out of view, lest any disturbance may be occasioned to the courts or any violence used."). This principle was repeatedly endorsed by the English courts, which held that, "for the purposes of justice," and "to encourage witnesses to come forward voluntarily," they are privileged from arrest "in coming, in staying, and in returning" from court. *The King v. Holy Trinity in Wareham*, 99 Eng. Rep. 530 (1782); *see also Meekins v. Smith*, 126 Eng. Rep. 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which number bail were included,) were intitled to privilege from arrest endo et redeundo [*i.e.*, coming and returning][.]"); *Spence v.*

*Stuart*, 102 Eng. Rep. 530 (1802); *Ex Parte Byne*, 35 Eng. Rep. 123 (1813).[2]

The Supreme Court has not only adopted this privilege, but also held that it bars service of any other civil process while attending state or federal court.  For instance, in *Stewart*, the Court described the privilege as "well settled," explaining that citizens "should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance.  He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights."  *Stewart*, 242 U.S. at 129. The Court described it as particularly firmly established that there was an "exemption from arrest," or "capias," and held that this exemption applied to any civil process to protect the "necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify."  *Id.* at 129-30.  The Court has emphasized the "necessity of [the rule's] inflexibility" in order to serve its purpose of protecting litigants and witnesses in appearing in court.  *Page Co.*, 261 U.S. at 448; *see also Long v. Ansell*, 293 U.S. 76, 83 (1934) (Brandeis, J.) (describing "the common-law rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service in another"); *Lamb*, 285 U.S. at 225.  The Court has thus held that a federal court can apply the privilege on behalf of a state court.  *Page Co.*, 261 U.S. 488.

This Court has recognized a similarly "absolute protection."  *Larned*, 12 F. at 594.  As the Court explained, "[i]t has long been settled that parties and witnesses attending in good faith any legal tribunal . . . are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."  *Id.* at 590.  The Court therefore applied the privilege in

---

[2] The sources cited in this paragraph are attached as Exhibits 1 through 6 of the Zimmer Declaration.

favor of a witness appearing in a state court proceeding.  *Id.*

The privilege against civil courthouse arrests is also firmly entrenched in Massachusetts common law.  As the Supreme Judicial Court has explained, "[p]arties and witnesses, attending in good faith any legal tribunal, whether a court of record or not, having power to pass upon the rights of the persons attending, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."  *Valley Bank & Trust Co. v. Marrewa*, 237 N.E.2d 677, 680 (Mass. 1968) (quoting *In re Thompson*, 122 Mass. 428, 429 (1877)); *see also In re M'Neil*, 3 Mass. 287 (1807); *Diamond v. Earle*, 105 N.E. 363, 363 (Mass. 1914).  Indeed, Justice Elspeth Cypher recently recognized, in a Single Justice opinion, that the "privilege against civil arrest" in attending court is "well settled" in the Commonwealth.  *Matter of C. Doe*, No. SJ-2018-119, at 10-11 (Mass. Sept. 18, 2018) (Zimmer Decl. Ex. 7).

The consistent theme throughout these cases is that strict and absolute enforcement of the privilege is necessary to allow courts to serve their purpose of providing a forum where parties and witnesses can freely attend to testify and assert their rights.  In a decision the Supreme Court recognized as a "leading authority" on the privilege, *Stewart*, 242 U.S. at 129, the New Jersey Supreme Court explained that "[c]ourts of justice ought, everywhere, to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them."  *Halsey v. Stewart*, 4 N.J.L. 366, 367 (N.J. 1817).  The "fear that . . . a *capias* might be served upon [parties and witnesses]" would "prevent [their] approach," obstructing "this great object in the administration of justice."  *Id.* at 368.  In sum:

> This privilege of parties and witnesses is alike the privilege of the court and the citizen.  It protects the court from interruption and delay.  It takes away a strong inducement to disobey its process, and enables the citizen to prosecute his rights without molestation, and procure the attendance of such as are necessary for their defence and support.

*Id.* at 368-69.  Thus, "[t]he citizen in every claim of right which he exhibits, and every defense which he is obliged to make, should be permitted to approach [the courts], not only without subjecting himself to evil, but even free from the fear of molestation or hindrance.  He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights."  *Stewart*, 242 U.S. at 129 (quoting *Halsey*, 4 N.J.L. at 367-68).

## II.     The Immigration and Nationality Act grants a general civil-arrest power, without specifying its scope.

The INA's two civil-arrest provisions originated in the Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163, and have changed little since then.  Section 242(a) of the 1952 Act states that, "[p]ending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody."  Section 287(a)(2) of that Act authorizes an immigration officer to carry out a warrantless civil arrest "if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest."  That Act thus granted a general civil-arrest power to immigration officers, without suggesting that the power exceeds the scope of the government's civil-arrest power at common law.  *See INS v. Lopez*-Mendoza, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action[.]").  The language Congress enacted in 1952 remains largely unchanged today.  *See* 8 U.S.C. §§ 1226(a), 1357(a)(2).

## III.    ICE's Directive No. 11072.1 authorizes civil immigration arrests of parties and witnesses attending court, in violation of the "well settled" common-law privilege.

For more than six decades after Congress granted the federal government authority to carry out civil immigration arrests, no federal agency ever officially interpreted that authority to extend to arresting parties and witnesses appearing in court.  Starting with President Trump's inauguration in 2017, however, the federal government began publicly insisting that it had the

right to carry out such arrests.  For instance, in March 2017, in response to a letter from the Chief

Justice of the California Supreme Court expressing concern based on reports that ICE officers

had been "stalking" individuals attending the California courts, then-Homeland Security

Secretary John Kelly and then-Attorney General Jefferson Sessions insisted that ICE could and

would continue the practice.[3]  DHS and ICE have also made clear that *anyone* is subject to an

ICE civil arrest while attending court, *including victims of crimes*.  For instance, a DHS

spokesman defended the practice of arresting crime victims in court, stating:

> Just because they're a victim in a certain case does not mean
> there's not something in their background that could cause them to
> be a removable alien[.] Just because they're a witness doesn't
> mean they might not pose a security threat for other reasons.[4]

ICE has, in fact, followed through on such statements, arresting at least one woman when she

appeared in court to obtain a protective order from an abusive partner.[5]

On January 10, 2018, ICE formalized its courthouse-arrest policy in Directive No.

11072.1, entitled "Civil Immigration Enforcement Actions Inside Courthouses" (the

"Directive").  Zimmer Decl. Ex. 8.  This Directive "sets forth [ICE's] policy regarding civil

immigration enforcement actions inside federal, state, and local courthouses." *Id*. at 1.  While

ostensibly setting some limitations on ICE enforcement at courthouses, the Directive ultimately

vests ICE with the unbridled discretion to arrest *anyone* in virtually *any* courthouse location

when they deem "necessary," providing noncitizens no assurance that they will ever be safe from

arrest at court.  *Id*. at 1-2.

The Directive states that ICE's courthouse arrests will "include actions against specific,

---

[3] *See* Letter from Sessions and Kelly to Cantil-Sakauye (Mar. 29, 2017), https://wapo.st/2vaJYt5.

[4] Devlin Barrett, *DHS: Immigration agents may arrest crime victims, witnesses at courthouses*, Wash. Post (Apr. 4, 2017), https://wapo.st/2ZkdwCx.

[5] P.R. Lockhart, *Immigrants Face a Choice Between Domestic Violence and Deportation*, Mother Jones (March 20, 2017), http://bit.ly/2VPCYxn.

target aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." *Id.* at 1. But it does not in any way *limit* its arrests to these "target aliens." Similarly, the Directive provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "target alien[s] . . . will not be subject to . . . enforcement action, absent special circumstances." *Id.* The Directive does not explain what ICE considers "special circumstances," but simply states that ICE's decision will be consistent with an unspecified "U.S. Department of Homeland Security (DHS) policy." *Id.* at 1 n.1. Making matters worse, the Directive suggests that DHS policy includes broad enforcement against anyone potentially removable by cross-referencing another DHS memorandum that states that DHS "no longer will exempt classes or categories of removable aliens from potential enforcement." Zimmer Decl. Ex. 9 at 2. Ultimately, the Directive simply formalizes the Trump Administration's consistent policy that ICE has complete discretion to use federal and state courthouses to arrest *anyone* suspected of a civil immigration infraction—including victims, witnesses, criminal defendants, and parties to civil proceedings.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four factors strongly favor Plaintiffs.

**I.      Plaintiffs are likely to succeed in demonstrating that ICE's policy of conducting civil courthouse arrests exceeds its statutory authority.**

ICE's Directive authorizing civil courthouse arrests is impermissible for the simple reason that Congress never granted ICE the power to make such arrests. ICE's civil-arrest power

is only as broad as the power granted by Congress, *see La. Pub. Serv. Comm'n*, 476 U.S. at 374,

and, under well-settled interpretive principles, the INA's generic grant of civil-arrest authority

extends only so far as the government's civil-arrest authority at common law.  At common law,

the government's civil-arrest power was limited by the "well settled" and "inflexib[le]" privilege

against the civil arrest of parties, witnesses, and others attending court on official business.

*Stewart*, 242 U.S. at 129; *Page Co.*, 261 U.S. at 448.  ICE's civil-arrest authority is therefore

cabined by that common-law privilege.  Further, to the extent there were any ambiguity in the

scope of ICE's authority, that ambiguity is resolved by the serious constitutional questions raised

by allowing ICE to arrest victims, witnesses, and parties attending state court proceedings.

Plaintiffs are therefore likely to succeed in showing that ICE's Directive is "in excess of

statutory jurisdiction, authority, or limitations," and is otherwise "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," and must be "set aside" under the

Administrative Procedure Act.  5 U.S.C. § 706(2).

> **A.**     **The civil-arrest power granted by the Immigration and Nationality Act incorporates, not abrogates, common-law limitations on civil arrest, including the common-law privilege against civil courthouse arrests.**

It is a "longstanding . . . principle that statutes which invade the common law are to be

read with a presumption favoring the retention of long-established and familiar principles, except

when a statutory purpose to the contrary is evident." *Texas*, 507 U.S. at 534 (quotation marks

and alterations omitted).  In such cases, "Congress does not write upon a clean slate," and thus

"[i]n order to abrogate a common-law principle, the statute must speak directly to the question

addressed by the common law." *Id*. (quotation marks omitted).  Put slightly differently, "courts

may take it as a given that Congress has legislated with an expectation that the common law

principle will apply" absent a "statutory purpose to the contrary." *Id.* (quotation marks and

alterations omitted); *see also  Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010) ("Congress is

understood to legislate against a background of common-law principles," and "when a statute covers an issue previously governed by the common law, we interpret the statute with the presumption that Congress intended to retain the substance of the common law" (internal quotation marks and alterations omitted)); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013); *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 142 (1st Cir. 2006); *Scharfeld v. Richardson*, 133 F.2d 340, 341 (D.C. Cir. 1942) ("The courts have consistently held legislation derogative of the common law accountable to an exactness of expression, and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms.").

The Supreme Court has repeatedly applied this principle and held that when Congress invokes a general common-law principle, it intends to incorporate common-law limitations on that principle. For instance, the Court has repeatedly held that when Congress creates a tort-like cause of action, it presumptively incorporates common-law principles governing tort actions, even if those principles are not apparent in the statute's text. The Lanham Act, for instance, creates a broad cause of action for "any person who believes that he or she is likely to be damaged" by false advertising—language that, "[r]ead literally," would allow anyone with Article III standing to bring suit. *See Lexmark*, 572 U.S. at 129. But, this "broad language notwithstanding," the Lanham Act incorporates "well established" common-law limitations on tort liability, like proximate cause, because "Congress, we assume, is familiar with the common-law rule and does not mean to displace it *sub silentio*." *Id.* at 132. The Court has similarly interpreted many other statutes creating causes of action that, read literally, "encompass every harm that can be attributed directly or indirectly to the consequences of a[] [statutory] violation" to incorporate "common-law damages" principles like proximate cause. *Associated Gen.*

*Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529, 535 (1983) (Sherman Act); *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 266-67 (1992) (RICO); *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017) (Fair Housing Act).

The Supreme Court (and other courts) have similarly read tort-like statutes as incorporating other common-law limits and rules.  For instance, in *Malley v. Briggs*, 475 U.S. 335, 339-40 (1986), the Court held that, though 42 U.S.C. § 1983 "on its face admits of no immunities" because it creates liability for "[e]very person" who violates its terms, it must be read "in harmony" with common-law tort limitations, rather than "in derogation of them."  The D.C. Circuit similarly held that, though the Torture Victims Protection Act imposes, without limitation, liability on "an individual" that violates its terms, it does not "abrogate the preexisting common law" of "head of state immunity."  *Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013).  And in *Meyer v. Holley*, the Court held that the Fair Housing Act's cause of action, which "says nothing about vicarious liability," nevertheless imposes such liability.  Because a statute only "abrogate[s] a common-law principle" when it "speak[s] directly to the question addressed by the common law," the Court held that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  *Meyer*, 537 U.S. at 285 (internal quotation marks omitted).

Courts have applied this interpretive principle in numerous other contexts as well.  For instance, in *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 32 (1983), a utility company sought to recover the cost of relocating its facilities based on a federally-funded project under the Uniform Relocation Act, which entitled any "displaced person" to such relocation benefits.  Though the Court expressed "no doubt" that the

utility company qualified as a "displaced person" under the statute's text, it held that the statute did not expressly abrogate the "traditional common law rule [that] utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." *Id.* at 35-36 (internal quotation marks and alterations omitted).  Relying on the "well-established principle of statutory construction that the common law ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose," the Court held that the utility was not entitled to recover—despite the facially broad statutory provision. *Id.* at 36; *see also United States v. Bestfoods*, 524 U.S. 51, 55, 63 (1998) (though CERLA only imposes liability on those who "owned or operated" a facility, it nevertheless incorporates the "well-settled" common-law rules regarding corporate veil piercing because a statute only "abrogate[s] a common-law principle" if it "speak[s] directly to the question addressed by the common law").

This case presents a straightforward application of that well-settled interpretive principle. The INA is directly analogous to the statutes at issue in the cases discussed above:  Its two civil-arrest provisions invoke a general common-law concept without specifying its precise scope. *See* 8 U.S.C. §§ 1226(a), 1357(a)(2).  Neither provision touches on *where* civil immigration arrests are authorized, let alone "speak[s] directly" to an intention to abrogate the common-law rule that civil arrests cannot be carried out on those attending court. *Texas*, 507 U.S. at 534.  The history of these civil-arrest provisions similarly suggests no intent to grant authority exceeding that at common law.  Both of these provisions were initially adopted in the Immigration and Nationality Act of 1952 §§ 242(a), 287(a)(2), Pub. L. 82-414, 66 Stat. 163, 208-209, 233, and have not been substantively revised since that time, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2).  Neither the legislative history of the 1952 Act, nor the history of subsequent acts that made non-

substantive amendments to these provisions, include any relevant discussion of the civil-arrest

provisions.  Absent any indication of Congressional intent, the statute does not grant the full

scope of civil-arrest authority Congress could constitutionally authorize, but instead simply

grants a civil-arrest authority commensurate with the scope of that authority at common law.

And, as discussed above, the government's common-law civil-arrest authority did *not* include the

power to arrest victims, witnesses, and parties attending court.

Because ICE's civil-arrest authority is limited to the government's authority at common

law, and because ICE's Directive authorizes the very civil arrests that are prohibited at common

law, ICE's Directive exceeds its statutory authority, and must be set aside.

### B.     Finding abrogation would be particularly inappropriate given the significant constitutional concerns raised by ICE's Directive.

To the extent there is any ambiguity as to whether the INA abrogates the common-law

privilege against civil arrest, the canon of constitutional avoidance resolves it.  *See, e.g.*, *Clark v.*

*Martinez*, 543 U.S. 371, 380-82 (2005).  Under that canon, when there are "competing plausible

interpretations of a statutory text," courts should apply "the reasonable presumption that

Congress did not intend the alternative which raises serious constitutional doubts."  *Id.* at 381.

Interpreting the INA to authorize civil courthouse arrests—effectively conditioning appearance

in court on the risk of ICE arrest and detention—would create at least three significant

"constitutional doubts" that reinforce the need to interpret ICE's civil-arrest authority as limited

by the common-law privilege against civil courthouse arrests.

First, abrogating the common-law privilege implicates the constitutional right of access to

the courts, which prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class

in preparing and filing suits."  *Christopher v. Harbury*, 536 U.S. 403, 413, 415 & n.12 (2002);

*see also Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004); *Simmons v. Dickhaut*, 804 F.2d 182,

183 (1st Cir. 1986).  Such "frustrat[ion]" includes not only policies that ban access outright, but also those that obstruct it by, for instance, imposing significant filing fees, *Christopher*, 536 U.S. at 413 (citing *M.L.B. v. S.L.J.*, 519 U.S. 102, 106-07 (1996)), or making courts inaccessible to those with disabilities, *Lane*, 541 U.S. at 522-23.  Forcing noncitizen litigants to risk civil arrest to access the courts creates such impermissible frustration.  Indeed, the cases establishing the common-law privilege recognized precisely this, explaining that the fear of arrest would "prevent [parties and witnesses'] approach," obstructing "the administration of justice."  *Halsey*, 4 N.L.J. at 367-68.  The impact of ICE's Directive has vindicated this common-law wisdom: Noncitizen victims of domestic violence and landlord and employer abuse have been forced to continue to suffer abuse rather than risk ICE arrest, and Plaintiff Chelsea Collaborative has been forced to establish its own extra-judicial mediation program to attempt to resolve disputes between those who are no longer willing to attend court.  *See* Vega Decl. ¶¶ 12-20.

Second, abrogating the privilege would likely deprive criminal defendants of their Sixth Amendment rights.  A "fundamental element of due process of law" is criminal defendants' "right to present a defense," which includes the "right to offer the testimony of witnesses, and to compel their attendance, if necessary."  *Washington v. Texas*, 388 U.S. 14, 19 (1967). Government acts that "cause[] the loss or erosion" of favorable testimony violate that right. *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987).  By conditioning court appearance on potential civil arrest, ICE's Directive threatens noncitizen witnesses with potential arrest upon appearance in court, likely depriving many criminal defendants of key testimony. Criminal defendants also have the right to testify on their own behalf, *e.g.*, *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987), and to be present at crucial phases of the trial, *e.g.*, *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  ICE's Directive impermissibly conditions a criminal defendant's exercise

of these rights on exposing herself to potential civil immigration arrest—and, if the defendant is civilly arrested and detained, often denies those rights completely.  *See* Klein Decl. ¶¶ 7, 10.

Third, the Directive raises significant federalism and Tenth Amendment concerns, which further caution against reading the INA to abrogate the common-law privilege.  Because "States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere," when Congress intends to "pre-empt the historic powers of the States," it must do so "plain[ly]," making its intention "unmistakably clear."  *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991).  There can be little doubt that it "pre-empt[s] the historic powers of the States" to install ICE agents in state courts to civilly arrest victims, witnesses, and parties attempting to access those courts.  Indeed, ICE's Directive flies in the face of settled Massachusetts law prohibiting such civil courthouse arrests specifically because such a prohibition is necessary for the Massachusetts justice system to function.  *See Valley Bank*, 237 N.E.2d at 679 (recognizing that the privilege "is a prerogative exerted by the sovereign power through the courts for the furtherance of the ends of justice").  The Directive also intrudes on the Commonwealth's police power—a power "the Founders denied the National Government and reposed in the States," *United States v. Morrison*, 529 U.S. 598, 618 (2000)—as the Directive interferes with the ability to investigate and prosecute crime.  *See* Foley Decl. ¶¶ 4-6; Vega Decl. ¶¶ 10-11, 16.  Nothing in the INA suggests an intent to allow such intrusion into state judicial and police powers—and the INA certainly does not do so "plain[ly]" and "unmistakably."

Indeed, even if the INA did include a plain and unmistakable indication of intent to use state courts for purposes of civil immigration arrests, such conduct would likely violate the Tenth Amendment.  The Supreme Court has repeatedly held that the federal government cannot commandeer state resources, and cannot "compel the States to implement, by legislation or

executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Thus, the federal government could not force the District Attorneys, CPCS, or state courts to identify to ICE every defendant, witness, or party they know will be appearing in state court, let alone make any such person available for ICE arrest. *See Murphy*, 138 S. Ct. at 1477. ICE's Directive is functionally equivalent—though it does not explicitly *order* the state government to provide this information, it installs federal officers in state courts to simply extract it, in violation of state law. *Cf. id.* at 1478 (barring state legislature from doing something is "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine."). Further, ICE's Directive raises precisely the concerns around federal shifting of political accountability and costs to the states that underlie the anti-commandeering principle. *See id.* at 1477. This Court should not permit such an end-run around established Tenth Amendment law.

Because the INA does not abrogate the common-law rule against civil courthouse arrests, and because any such abrogation would raise serious constitutional doubts, Plaintiffs are likely to establish that ICE's Directive exceeds its statutory authority, and must be set aside.

## II.     ICE's Directive is causing Plaintiffs ongoing and irreparable harm.

ICE's Directive is inflicting ongoing harm on Plaintiffs—harm that is irreparable, as it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). This includes financial harm from the need to expend significant additional resources in response to ICE's Directive—harm that is unrecoverable given the government's sovereign immunity. *Odebrecht Construction, Inc. v.*

*Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (citing cases).  And it also includes harm that is, by its very nature, irreparable, such as lost opportunities for prosecution.

Chelsea Collaborative—a non-profit membership-based organization—is suffering irreparable harm in at least two different ways.  First, it has had to divert significant resources responding to ICE's unauthorized Directive.  Most notably, because many of its members and others in the Chelsea community are noncitizens who are not willing to use the Massachusetts courts to resolve their disputes because of ICE's Directive, Chelsea Collaborative has been forced to establish, at significant expense, an extra-judicial mediation and dispute-resolution system to attempt to resolve disputes between those unwilling to appear in court.  Vega Decl. ¶¶ 17-20.  Chelsea Collaborative is currently conducting three to four mediations *per week*.  *Id.* This is a program that had never been needed prior to ICE's civil-courthouse-arrest policy.  *Id.* Second, Chelsea Collaborative's members have been unable to vindicate important rights, suffering ongoing domestic violence, unpaid wages, and other legal violations against them due to the risk that an attempt to vindicate their rights would lead to civil arrest by ICE.[6]  *Id.* ¶¶ 12-16.  This not only harms Chelsea Collaborative's members, but also the Collaborative itself, as it prevents the Collaborative from fulfilling its mission of protecting its members' rights.

The District Attorneys are also suffering ongoing and irreparable harm in multiple, predictable ways.  ICE's civil-courthouse-arrest policy has increased noncitizen victims' and witnesses' fear of reporting crime and appearing in court.  Vega Decl. ¶¶ 10-11, 13; Espinoza Decl. ¶ 7.  It has also made it impossible for the District Attorneys and their staff to tell potentially removable noncitizen victims and witnesses that their fears of civil ICE arrest upon appearing in court are unfounded given that the Directive specifically *authorizes* their arrest.

---

[6] Courts consider irreparable harm to a plaintiff's members in the preliminary-injunction inquiry.  *E.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 996 (8th Cir. 2011).

Foley Decl. ¶¶ 4-6.  This leads to an inability to prosecute certain cases *at all* when the victims and witnesses refuse to come forward.  Vega Decl. ¶¶ 10-11, 13; Moshier Decl. ¶¶ 3-4.  Finally, the threat of ICE arrests often leads *defendants* to not appear for fear of ICE arrest, which prevents the District Attorneys from completing prosecutions, and victims from having their day in court.  Klein Decl. ¶¶ 7, 10.  It also leads to additional resource diversion, as Assistant District Attorneys are forced to prepare for trials that do not occur.

CPCS has suffered and will continue to suffer similar irreparable harm during the pendency of this suit.  CPCS's three-person Immigration Impact Unit ("IIU") is tasked with advising all Massachusetts court-appointed criminal defense attorneys concerning the immigration consequences of criminal convictions to ensure effective representation under *Padilla v. Kentucky*, 559 U.S. 356 (2010).  Klein Decl. ¶¶ 2-3.  But since ICE's policy took effect, IIU staff have been forced to devote considerable resources to addressing defense attorneys' concerns about the problems caused by potential ICE arrest, assisting defense attorneys in locating their clients who have been arrested and civilly detained by ICE and assisting those attorneys in securing their clients' appearances in court, distracting IIU staff from their core responsibility of ensuring effective assistance of counsel.  *Id.* ¶¶ 12-14.  Criminal defendants' increased failure to appear at hearings and trials—whether out of fear of ICE arrest or because they were actually arrested by ICE upon appearing in court—also creates significant harm to CPCS, forcing its attorneys to prepare for hearings and trials that do not take place, and making it impossible for CPCS to carry out its criminal-defense responsibilities.  *Id.* ¶¶ 11,13.

## III.     The public interest and the balance of harms weigh strongly in favor of preliminary injunctive relief.

The final two factors generally "merge when the Government is the opposing party."

*Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, the public interest strongly favors preliminary

injunctive relief, as ICE's Directive not only harms Plaintiffs, but also the public at large.  First, as to the specific policy at issue, tens of thousands of Massachusetts residents are potentially subject to civil ICE arrest, and are currently forced to risk such arrest as a condition for accessing the court system.  That impacts not only those individuals and their families, but also safety and the rule of law more generally.  When crime goes unreported, or when victims' or witnesses' unwillingness to appear in court makes prosecution impossible, criminals are not punished and remain at large.  Indeed criminals often use the threat of ICE arrest to deter victims and witnesses from reporting the crimes—an issue that is a particular problem in the context of domestic violence.  *See* Foley Decl. ¶ 5; Moshier Decl. ¶¶ 3, 6.  Second, and more generally, "the public interest is best served by having federal agencies comply with the requirements of federal law." *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997).

No countervailing government interest in conducting civil arrests at courthouses outweighs the ongoing and irreparable harm being caused to Plaintiffs and the public.  Plaintiffs seek only an injunction limiting *where* ICE can carry out operations—it does not seek to limit, in any way, *who* ICE can arrest, let alone who ICE can seek to remove.  The fact that the federal government will have to use its own resources to identify and arrest these individuals—rather than simply commandeering state resources—weighs in *favor*, not against, an injunction.

## CONCLUSION

This Court should enjoin Defendants from implementing ICE's Directive, and from arresting individuals attending court on official business, during the pendency of this suit.

Dated: April 29, 2019

Respectfully submitted,

/s/ David J. Zimmer
David J. Zimmer (BBO# 692715)
   *Special Assistant Attorney General*
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
Jordan Benson (BBO# 703215)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com
JBenson@goodwinlaw.com

*Attorneys for Plaintiffs Marian Ryan, in her official capacity as Middlesex County District Attorney, and Rachael Rollins, in her official capacity as Suffolk County District Attorney*

/s/ Wendy S. Wayne
Wendy S. Wayne (BBO# 555665)
Committee for Public Counsel Services
Immigration Impact Unit
21 McGrath Highway, Somerville, MA 02143
(617) 623-0591
wwayne@publiccounsel.net

*Attorney for Plaintiff the Committee for Public Counsel Services*

/s/ Oren N. Nimni
Oren N. Nimni (BBO# 691821)
Lawyers for Civil Rights
61 Batterymarch St., 5th Floor
Boston, MA 02110
(617) 482-1145
onimni@lawyersforcivilrights.org

David J. Zimmer (BBO# 692715)
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
Jordan Benson (BBO# 703215)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com
JBenson@goodwinlaw.com

*Attorneys for Plaintiff Chelsea Collaborative, Inc.*