UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIAN RYAN, *et al.*,           )
                                 )
    Plaintiffs,          )
                                 )
    v.                    )          CASE NO. 1:19-CV-11003-IT
                                 )
U.S. IMMIGRATION AND CUSTOMS     )
ENFORCEMENT, *et al.*,           )
                                 )
    Defendants.          )
_____  )

## <u>DEFENDANTS' OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION</u>
### (LEAVE TO FILE GRANTED - MAY 15, 2019)

# INTRODUCTION

"[T]he formulation of policies pertaining to the entry of aliens and their right to remain here is entrusted exclusively to Congress." *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307 (1st Cir. 2000). Exercising that "plenary" and "pervasive" authority, *id.*, Congress has codified the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357. The Executive may, among other things, arrest aliens with or without a warrant pending a decision on whether they are to be removed from the United States. *Id.*, §§ 1226(a), 1357(a)(2). Upon arrest, an immigration court normally decides whether detention is appropriate. Immigration and Customs Enforcement ("ICE") has long exercised its arrest authority in and around courthouses given its strong interest in removing aliens engaging in criminal activity. ICE recently promulgated, ICE Directive 11072.1: Civil Immigration Enforcement Inside Courthouses (Ex. A), articulating revised policy guidance for the exercise of ICE's discretionary arrest authority in federal and state courthouses. Per the Directive, ICE targets aliens convicted of crimes, gang members, national security of public safety risks, and aliens subject to final orders of removal or who have illegally reentered the country.

Notwithstanding the Executive's "broad" and "undoubted power" to implement its statutory arrest authority, *Arizona v. United States*, 567 U.S. 387, 394 (2012), Plaintiffs, two Massachusetts District Attorneys (DAs), a public defender agency, and an organization, assert that ICE Directive 11072.1 exceeds ICE's authority under 8 U.S.C. §§ 1226 and 1357, and therefore violates the Administrative Procedure Act (APA). Specifically, Plaintiffs contend that a purported "common-law privilege against civil courthouse arrests," Compl. ¶ 2, precludes the Executive from exercising its arrest authority under sections 1226 and 1357, and that the ICE Directive thus is

arbitrary and capricious because it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Based on that single claim—and even though this case is not a class action—Plaintiffs seek a nationwide preliminary injunction prohibiting ICE from implementing the Directive. Compl., Prayer For Relief (C).

The motion should be denied. To start, Plaintiffs, none of whom are aliens subject to ICE arrest or detention, lack Article III standing or a cognizable cause of action. Moreover, the Directive is unreviewable under the APA because it is committed to agency discretion by law, and because it is not final agency action under the APA. 5 U.S.C. §§ 701(a)(2), 704. Further, Plaintiffs' reliance on an "absolute common-law privilege against civil arrest of those attending court on official business," Mot. 1, fails for two reasons: (1) federal common law has never provided immunity from immigration enforcement; and (2) even if the common law once conferred such immunity, Congress abrogated it by enacting a comprehensive immigration arrest and detention scheme. And Plaintiffs cannot assert any harm that outweighs the harm that the government suffers when it is unable to enforce the immigration laws. Accordingly, the Court should deny Plaintiffs' motion.

## **BACKGROUND**

*Federal law.* The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). Pursuant to that power, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien

is to be removed from the United States."[1] 8 U.S.C. § 1226(a). Congress also has provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is generally plenary and unqualified.

The arrest is a critical component for initiating removal proceedings before an immigration judge. Those proceedings are initiated through the issuance of a Notice to Appear (NTA), which ICE files with the immigration court. 8 C.F.R. §§ 1239.1(a), 1003.14, 1003.18. First ICE, through an initial custody assessment, *id.* § 236.1(c)(8, and then an immigration court, through a bond determination "at the earliest possible date," will consider if detention is necessary during immigration proceedings. *See* Immigration Court Practice Manual, Chapter 9.3(d). If the alien is subject to mandatory detention based on prior serious criminal activity, the immigration judge will address whether the alien qualifies for such detention. *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999). An alien may appeal any decision of the immigration court, including a bond decision, to the Board of Immigration Appeals ("BIA"). 8 C.F.R. § 1003.38. An alien also may move to terminate removal proceedings on constitutional, statutory, or regulatory grounds, and may petition for review of any BIA decision in the U.S. Courts of Appeals. 8 U.S.C. § 1252(a)(5).

*Prior Guidance and Directive 11072.1.* ICE has long exercised its arrest authority at and around courthouses given its strong interest in removing aliens who engage in criminal activity, often pursuant to a detainer issued to another law enforcement agency with custody of an alien to obtain a direct transfer of an alien once state or federal criminal proceedings and detention has

---

[1] Congress has transferred immigration enforcement functions from the Attorney General to the Secretary of Homeland Security. 6 U.S.C. § 251; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

concluded. Since at least 2014, ICE policy has permitted courthouse arrests in limited circumstances. Enforcement Actions at or Near Courthouses (Mar. 19, 2014) (Ex. B). In a 2014 policy, ICE explained that arrests in and around courthouses was important to ensure that aliens convicted of crimes, gang members (16 years or older), and national security or public safety risks can be safely apprehended for removal. *Id.* The 2014 policy restricted enforcement actions against "collaterally" present aliens, "such as family members and friends" of the "target alien" and directed that enforcement actions should, "whenever practicable," "take place outside public areas of the courthouse," "be conducted in collaboration with court security and staff," and "utilize the court building's non-public entrances and exits." *Id.*

Until recently, the state courts of Massachusetts generally cooperated with federal immigration enforcement efforts, including ICE's courthouse enforcement policy. However, in 2017 the Supreme Judicial Court of Massachusetts held that State judicial and law-enforcement officers lack authority to transfer detainees to the federal government in civil immigration matters. *Lunn v. Commonwealth*, 477 Mass. 517, 531 (2017); *see also* Mass. Executive Office of the Trial Court, Policy and Procedures Regarding Courthouse Interactions with the Department of Homeland Security (Nov. 8, 2017) ("Trial Court employees shall not hold any individual who would otherwise be entitled to release based solely on a civil immigration detainer or civil immigration warrant."). Accordingly, in Massachusetts, many dangerous aliens involved in criminal activity who were previously transferred to ICE custody in secure locations like jails or prisons, are now released to the streets often immediately following proceedings in state courthouses. ICE, FAQ on Sensitive Locations and Courthouse Arrests, ECF 1-3. Massachusetts law leaves courthouses as one of the few places where "safety risks for the arresting officers, the arrestee, and members of the community are substantially diminished." *Id.*

In 2018, ICE promulgated Directive 11072.1 (the "Directive"), which revised ICE's policy "regarding civil immigration enforcement actions" in courthouses. The Directive indicates that courthouse arrests can be operationally necessary when local jurisdictions decline "to cooperate with ICE in the transfer of custody of aliens from" secure locations like "their prisons and jails" because, given that persons who enter courthouses are typically screened for weapons, "immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." *Id.* The Directive substantively differs from the 2014 policy only in two main respects: (1) it adds two categories of targeted aliens: "aliens who have re-entered the country illegally after being removed" (a federal felony under 8 U.S.C. § 1326) and "aliens who have been ordered removed from the United States but have failed to depart," and (2) it articulates "exceptional circumstances" in which ICE may arrest non-target aliens, such as "when the individual poses a threat to public safety or interferes with ICE's enforcement actions." ECF 1-4 at 1. As to witnesses and victims of crimes (including domestic violence), ICE policy and 8 U.S.C. § 1367 set additional limitations, which have remained unchanged for nearly a decade. Mem. on Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011) (Ex. C). The Directive instructs ICE officers "generally [to] avoid enforcement actions in courthouses," and proscribes enforcement in areas "that are dedicated to non-criminal (e.g. family court, small claims court) proceedings." *Id.* at 2.

Under the Directive, when an enforcement action inside a courthouse is "operationally necessary," it may be conducted with the approval of a high-level officer. *Id.* at 1. The Directive "has provisions that attempt to make enforcement actions within courthouses orderly, safe, and nondisruptive." *Matter of Doe*, No. SJ-2018-119 (Mass. Sup. Jud. Ct. Sept. 18, 2018), ECF 7-7 at 7 n.5. It mandates that, "when practicable," ICE officers "conduct enforcement actions discreetly

to minimize their impact on court proceedings." ECF 1-4 at 1. In line with prior policy, the Directive states that enforcement actions in courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.* at 3. It directs ICE officers and agents to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public;" and it requires them to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* Thus, the Directive strikes a balance between ICE's legitimate interests in enforcing immigration law, protecting the safety of its officers, and minimizing interference with judicial proceedings.

*Procedural Background.* On April 29, 2019, Plaintiffs filed their complaint and the instant motion for preliminary injunction. ECF No. 6. Plaintiffs are: the Middlesex County and Suffolk County DAs (the "DAs"); the Committee for Public Counsel Services ("CPCS"), Massachusetts' public defender agency; and the Chelsea Collaborative (the "Collaborative"), "an organization dedicated to the needs of the community of Chelsea." Compl. ¶¶ 11, 12, 14, 16. The complaint asserts four claims, but Plaintiffs seek preliminary injunctive relief only on Count One. *See* Mot. 9 ("[T]his Court need only reach the first [claim]"). In Count One, Plaintiffs claim that the 2018 ICE Directive violates the APA because it is "not in accordance with" ICE's statutory authority under the INA. According to Plaintiffs, ICE's statutory arrest authority "inherently contains within it the common-law limitation that parties, witnesses, and others attending court on official business are privileged from civil arrest." Compl. ¶ 101. For preliminary relief on Count One, Plaintiffs ask the Court to enjoin ICE "from implementing [the] Directive, and from arresting individuals attending court on official business, during the pendency of this suit." Mot. 20.

**ARGUMENT**

A.      *Plaintiffs Lack Article III Standing and Are Not Within the INA's Zone of Interests.*

Federal courts sit to decide cases and controversies, not to resolve disagreements about policy or politics. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Article III standing "is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992). To establish standing, a plaintiff must show that (1) it suffered an injury in fact to a legally protected interest; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

In Count One (the sole count on which Plaintiffs move for preliminary relief), Plaintiffs claim that the ICE Directive is not "in accordance with" the INA. Compl. ¶¶ 97-106. At the outset, all Plaintiffs lack a legally protected interest sufficient to establish an Article III injury because the alleged privilege against arrest applies, if at all, only to individuals conducting court business in specific litigation. The privilege, like any privilege, does not exist as an abstract legal right that any citizen or organization can invoke on behalf of non-litigants. *See* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2463.1 (3d ed. 2019) (party must invoke "a personal right or privilege"). The challenged policy applies only to certain aliens—generally those involved in criminal activity—who are subject to immigration detention to allow removal proceedings or removal efforts to be commenced. Thus, only a "person arrested by ICE in a Massachusetts courthouse" would have standing to invoke it. *See Matter of C. Doe*, No. SJ-2018-119 at 5 (Mass. Sept. 18, 2018), ECF No. 7-7, at 9–10; *cf. N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 63 (1st Cir. 2001) (rejecting, "[i]n lieu of a specific request for immunity" from process by a specific individual, a request "to fashion a broad, per se" rule of immunity unmoored

for a specific person's situation).  And even if Plaintiffs could assert the privilege, they would lack standing and not be within the statutory zone of interests.

### 1. ICE Has Not Prosecuted Plaintiffs or Threatened to Do So.

A party "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). That is because a third party "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *id.*, including "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984). Plaintiffs challenge a policy that articulates circumstances in which ICE *may* conduct enforcement actions against individual aliens. Plaintiffs, who are not individuals, do not face a threat that the Directive will be applied against them. Because they seek to "contest the policies of the prosecuting authority" as applied to others, their alleged incidental harms—increased costs and diverted resources—do not establish standing.[2] *Linda*, 410 U.S. at 619.

### 2. The DAs and Public Defenders Lack a Cognizable Injury in Fact.

The DAs and CPCS lack a judicially cognizable injury. They appear to assert standing on the basis that the ICE Directive increases their costs, diverts their resources, and makes their prosecutions more "time consuming and difficult." Compl. ¶¶ 80, 82. These alleged difficulties do not constitute a cognizable injury. In our system of dual sovereignty, state actors regularly incur

---

[2] Plaintiffs lack cognizable injury of their own, and so cannot establish standing to sue on behalf of third-parties. *See Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 351 (1st Cir. 2004); *Parinejad v. ICE*, 501 F. Supp. 2d 280, 283 n.3 (D. Mass. 2007). Also, Plaintiffs do not show that they have "a close relationship to the third party" aliens who may be arrested in courthouses, or "that some hindrance exists that prevents the third party from protecting its own interest." *Id.*

costs that result incidentally from federal action. *See New York v. United States*, 505 U.S. 144, 162-66 (1992). Such costs are not cognizable injuries under Article III. *See Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). Indeed, a state actor "possesses no legitimate interest in protecting its citizens from the government of the United States." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011). On this point, the DAs and CPCS allege that state defendants and "key witnesses" fear arrest by ICE; that these fears make defendants and witnesses less likely to attend court proceedings; and that when defendants and witnesses do not attend court, the DAs' and CPCS' duties become more difficult. Compl. ¶¶ 80, 82. For one, as will be explained below, the 2018 policy does not substantially impact ICE's policy relating to witnesses, which was promulgated in 2011. More importantly, these alleged difficulties do not suffice to establish standing because, if they did, a state prosecutor would have standing to challenge any federal criminal statute under which a state defendant or key witness feared arrest. A fugitive from federal criminal law-enforcement officials surely feels as "[un]comfortable attending court" as a fugitive from civil immigration arrest. Compl. ¶ 80. Defendants are not aware of any case in which a court found that a state prosecutor had standing to challenge a federal law on the basis that the law made her prosecutorial duties more difficult. A state prosecutor does not suffer an injury in fact merely because a federal law-enforcement action (or the threat of it) increases the time or costs associated with state prosecutions. Thus, the DAs and public defenders lack standing. [3]

_____

[3] The DAs may not invoke *parens patriae* standing. Although a state may sue on behalf of its citizens, a county or other political subdivision may not do so. *Aderholt v. Bureau of Land Mgmt.*, No. 7:15-CV-162, 2016 WL 3541857, at *7 (N.D. Tex. June 29, 2016) (collecting authorities). "The power of a political subdivision of a state is 'derivative and not sovereign,' and it may only sue to vindicate its own interests." *Prince George's Cty., Md. v. Levi*, 79 F.R.D. 1, 4 (D. Md. 1977).

3. <u>All Plaintiffs Lack Any Injury that Is Traceable to the Directive.</u>

Even if Plaintiffs alleged judicially cognizable injuries, those injuries would not be fairly traceable to the ICE Directive because they "result[] from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976). Like the DAs, CPCS alleges that the Directive causes defendants and witnesses to fear courthouse arrests, which makes CPCS's "representations . . . more difficult" and "force[s]" CPCS to expend additional resources." Compl. ¶ 82. The Collaborative similarly alleges that the Directive causes its members to fear courthouse arrests, which "forc[es] it to spend and divert resources." *Id.* ¶ 74. But these alleged injuries are caused by third-party aliens' decisions not to attend Massachusetts courts in an effort to evade arrest and removal proceedings. That evasive conduct breaks the chain of causation between the ICE Directive and Plaintiffs' putative injuries, "[b]ecause the opposing party must be the source of the harm," so "causation is absent if the injury stems from the independent action of a third party" *Katz v. Pershing*, LLC, 672 F.3d 64, 71–72 (1st Cir. 2012); *see Simon*, 426 U.S. at 42–43 (no standing where plaintiffs alleged that government policy harmed them, but alleged harm depended on speculation as to third-party conduct). Indeed, with or without the Directive, aliens may avoid courthouses in an effort to avoid arrest by ICE, so Plaintiffs cannot show that "invalidating [the Directive] will be reasonably likely to cause" third party aliens seeking to avoid arrest or removal to come to court. *See Renal Physicians Ass'n v. U.S. HHS.*, 489 F.3d 1267, 1276 (D.C. Cir. 2007). Moreover, aliens lack a cognizable interest in evading law enforcement, so a fortiori, Plaintiffs lack an injury that is traceable to the Directive. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) ("[A] person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'"); *Jadeja v. Redflex Traffic Sys*, 764 F. Supp. 2d 1192, 1196

(N.D. Cal. 2011) (no standing where party "alleg[ed] [city] fined him for running a red light, because he does not have a legally protected interest to break the law by running red lights").[4]

4. Plaintiffs Are Not Within the Zone of Interests of Sections 1226 or 1357

Plaintiffs also lack a cognizable cause of action under zone-of-interests principles. To be "aggrieved" under the APA for purposes of the zone-of-interests analysis, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987). The relevant statutes here are 8 U.S.C. §§ 1226 and 1357, which govern ICE's arrest authority and aliens' rights with respect to ICE arrests. Those statutes do not govern Plaintiffs' conduct or actions in any way, and do not create any entitlement or interest that Plaintiffs may invoke. When Justice O'Connor confronted a similar challenge brought by "organizations that provide legal help to immigrants," she concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project,* 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers); *see Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900–04 (D.C. Cir. 1996). Importantly, the INA provides a process, led by immigration courts, for addressing detention issues, and also provides individual aliens with a means to challenge their arrest and the initiation of removal proceedings,

---

[4] The Collaborative also lacks "associational standing" because "the claim asserted [and] the relief requested require[] the participation of individual members in the lawsuit" given that their claims turn entirely on the application of the Directive to *individual aliens* who are not before the Court. *See Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1375 (1st Cir. 1992).

*see* 8 U.S.C. § 1252, including a means to obtain review in the courts of appeals. But the INA provides Plaintiffs with no right of action. Accordingly, Plaintiffs do not fall within the zone of interests of the relevant statutes.

B.       *Plaintiffs Lack a Valid Cause of Action under the APA to Challenge ICE's Arrest Policies.*

Plaintiffs also lack a cause of action under the APA, so this Court lacks any basis to enter an injunction on that claim.

First, the ICE Directive is policy guidance implementing prosecutorial decisions concerning when to institute enforcement actions, is therefore regarded as 'committed to agency discretion'" under the APA, *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), and is thus not subject to judicial review. *See* 5 U.S.C. § 701(a)(2) (waiving sovereign immunity only if agency action is not "committed to agency discretion by law"). The "initiation or prosecution of various stages in the deportation process," including the choice of when to "commence" a proceeding, is a "regular" and longstanding example of an action that is committed to agency discretion. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), an agency's decision to bring a specific type of civil enforcement action or to invoke a specific enforcement provision—like 8 U.S.C. § 1226 or § 1357—is generally immune from judicial scrutiny. *See Wayte v. United States*, 470 U.S. 598, 607-08 (1985) ("[T]he decision to prosecute is particularly ill-suited to judicial review"). Under these principles, the Directive is unreviewable because it provides guidance to immigration officers about how and when to exercise their discretion to arrest aliens who are properly subject to ICE's detention authority. And even where prosecutorial-discretion decisions are formalized through guidance documents, they are not subject to review if the ultimate decision is

discretionary. *See, e.g.*, *Morales de Soto v. Lynch*, 824 F.3d 822, 828 (9th Cir. 2016). ICE's decisions concerning what categories of aliens to arrest and in what circumstances inherently involve the exercise of prosecutorial discretion, so Plaintiffs cannot obtain review of the Directive under the APA.

Second, "[t]he APA only provides for judicial review of 'final agency action' and … statements of policy generally do not qualify because they are not finally determinative of the issues or rights to which [they are] addressed." *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013); *see* 5 U.S.C. § 704. The Directive "provides only internal ICE policy guidance," "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural," and places "no limitations … on the otherwise lawful enforcement or litigative prerogatives of ICE." Ex. A, ¶ 9. Because the Directive merely explains what ICE *may* do, and does not create substantive rules or rights, *see Perez v. Mort. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015), or "bind" ICE officers, *Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 246 (D.D.C. 2010), it is unreviewable.[5]

### C.     *Plaintiffs' APA Claim Is Not Likely to Succeed on the Merits.*

Plaintiffs' APA claim also fails on the merits. The INA unambiguously authorizes ICE to arrest any person who is in the United States in violation of immigration law and does not restrict the location of those arrests. There is no federal-common-law immunity from immigration enforcement for persons who are subject to ICE arrest. Plaintiffs' central contention — that "[f]or

---

[5] To be sure, if the policy were applied to an actual alien, it may be final agency action as to that alien. *See, e.g.*, *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014). But that alien could not challenge his arrest in federal court, and could only raise such claims in his removal proceedings. *See, e.g.*, 8 U.S.C. § 1252; *Rajah v. Mukasey*, 544 F.3d 427, 447 (2d Cir. 2008).

more than two centuries, courts, including the Supreme Court and this Court, have strictly enforced a well settled and absolute common-law privilege against civil arrest of those attending court on official business"—is simply incorrect. Mot. 1; *see id.* 3-4 (similar). And, even if an expansive common-law privilege existed, Congress has spoken clearly in establishing a uniform system of immigration, which dictates when and where immigration arrests are lawful, thereby abrogating any such privilege.

1. There Is No Common-Law Privilege Against Federal Immigration Enforcement in Courthouses.

Plaintiffs propound a novel theory of federal common law. They attempt to analogize immigration arrests—which concern the federal government's plenary authority over immigration law—with civil arrests in private suits when one has entered a jurisdiction to which he is not normally subject, which, in the modern context, has been superseded by immunity from service of process based on transient jurisdiction when attending court. *See, e.g.*, Mot. 1, 1-7. They claim that, because the federal-common-law immunity from civil arrests is "well-settled," Congress in the INA legislated against that background principle, *id.* at 13, and "invoke[d] a general common-law concept without specifying its precise scope." Mot. 13. This argument fails because it is based on two faulty premises about the nature of the privilege.

*First,* Plaintiffs assert an overbroad privilege that finds no support in Supreme Court precedent: a privilege against *all* civil arrests regardless of jurisdiction or arresting authority. The Supreme Court's cases recognize a much narrower privilege: the immunity from *service of process* in a civil suit based on transient jurisdiction, when the only reason that a person is in the jurisdiction is to attend a court proceeding as a witness or party. *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) (service on an Illinois resident when he was in the Northern District of Mississippi "in attendance

on the court"); *Page Co. v. MacDonald*, 261 U.S. 446, 446-47 (1923) (service on a Canadian resident who was in Massachusetts "in attendance before a special master appointed by the superior court"); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916) (service on a Colorado resident when in the Northern District of Illinois solely as a witness in a case).[6] As the Supreme Court made clear in *Stewart*, "[t]he true rule, well founded in reason and sustained by the weight of authority, is that suitors, as well as witnesses, *coming from another state or jurisdiction*, are exempt from the *service of civil process* while in attendance upon court, and during a reasonable time in coming and going." *Stewart*, 242 U.S. at 129 (emphasis added). Indeed, when a person is traveling to another state for court and is arrested by the federal government, a person cannot complain of "a violation of the rule of comity" when the arrest is from "the courts or the sovereignty which is [the] common superior." *Morse v. United States*, 267 U.S. 80, 82 (1925).

In no case has the Supreme Court applied the rule so broadly as to encompass persons who, even if they were not attending a court proceeding, would otherwise be subject to arrest or service of process in the relevant jurisdiction. And in no case has the Supreme Court or any other court suggested that this limited privilege would be applicable to immigration enforcement—where the United States clearly has authority to initiate process against the alien within the United States. To the contrary, the privilege applies only when a jurisdiction would *otherwise lack authority* over the person but for their appearance in it to attend a court proceeding. The subjects of the privilege would otherwise *lawfully* be able to avoid suit in the foreign jurisdiction by not entering that jurisdiction. The privilege's purpose is to "fill[] the gap only where it needs to be filled, that is, in

---

[6] Plaintiffs also cite dicta from *Long v. Ansell*, which addressed senators' constitutional privilege from arrest. 293 U.S. 76 (1934), but that case merely cites *Lamb* and is factually irrelevant. *Id.* at 83.

cases where a district court wishes to shield an individual from service of process *to encourage his or her travel to the forum state*."[7] *N. Light Tech*, 236 F.3d at 62 (emphasis added). Here, the alien is already in the jurisdiction that subjects him to immigration custody, so the rationale behind the common law rule has no applicability.

The process-immunity privilege is also narrower than the "absolute" privilege Plaintiffs assert. They cite *Page Co.* to suggest that the privilege is "inflexible," but that case did not go so far. Mot. 4. The privilege is limited if it impinges the "due administration of justice," *Lamb*. 285 U.S. at 227, and so "process immunity should be meted out sparingly." *N. Light Tech.*, 236 F.3d at 62. And "the public interest in apprehending" a person for violating immigration laws, like the interest in prosecution, "outweighs the public interests … in encouraging vindication of private rights and in preventing the interruption of judicial proceedings."[8] *Conley*, 80 F. Supp. at 701-02.

Service of process in private suits is entirely distinct from immigration enforcement, and Plaintiffs cite no case that applies that process immunity against federal immigration enforcement.

---

[7] Plaintiffs cite state common law, Mot. 6, but state common law has no application in federal court in a challenge to federal statutes because "federal courts may not use state common law to re-write a federal statute. *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) (citing *Workers Union of America v. Lincoln Mills of Alabama,* 353 U.S. 448, 456–57 (1957)).

[8] Plaintiffs rely on *Larned v. Griffin*, 12 F. 590 (D. Mass. 1882), which dealt with civil arrest. That case involved transient jurisdiction of a person present in one state to attend depositions in another. 12 F. at 590. The court used the phrase "absolute protection" to mean that the immunity covers "civil process," rather than merely permitting "common bail." *Id.* at 594. In doing so, the court rejected the "narrower view" that the privilege is "wholly the privilege of the court rather than of the suitor." *Id.* But the Supreme Court adopted the "narrower view" in *Lamb*. 285 U.S. at 225.

The now-defunct privilege from extra-jurisdictional arrest involved arrests to initiate civil suits by *private parties*. Those private parties were not enforcing a public law and could not claim superior rights over the public interest. Meanwhile, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). "This authority rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization.'" *Id.* (quoting Const. art. I, § 8, cl. 4). "The federal power to determine immigration policy is well settled[,]" and "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.* at 396. That discretion—including arrest authority—is "plenary" and "pervasive," and "is uniquely a matter of federal, not local, concern." *Herrera-Inirio*, 208 F.3d at 307. Accordingly,  a court's authority over an alien under its jurisdiction "and detention of a removable alien pursuant to the INA are separate functions that serve separate purposes and are performed by different authorities." *United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019). When ICE detains an alien for the purpose of removal, it thus "does not infringe upon the judiciary's role in criminal proceedings." *Id.* That reasoning applies to all instances of immigration detention for purposes of removal and to all types of judicial proceeding. *See id*; *United States v. Veloz-Alonso*, 90 F.3d 266, 270 (6th Cir. 2018)*.

*Second*, any privilege against civil arrest was superseded by the process-immunity privilege long before the codification of the current immigration scheme. By the time that Congress established the comprehensive immigration-arrest statutory scheme, any privilege against extra-jurisdictional civil arrest was a mere historical artifact referenced in cases only to provide historical context for the modern process-immunity privilege. Plaintiffs cite no Supreme Court case that even applies the alleged privilege against civil arrest. *See* Mot. 3-7, 9-10. Indeed, *Page Co.* and *Lamb*

do not even contain the word "arrest." The only reference to "arrest" in the Supreme Court's decisions on the privilege comes in *Stewart*, a case from 1916. 242 U.S. at 130. The Court made that reference in discussing a case from 1809, more than 200 years ago and already ancient when *Stewart* was decided in 1916. *Id.* Thirty-six years after *Stewart*, when Congress first codified civil immigration arrests, the privilege had been completely superseded by the process-immunity privilege against transient jurisdiction. 8 U.S.C. § 1231 (enacted June 27, 1952). But a civil immigration arrest is not "service of process." *Id.* The arrest statutes cannot have codified the purported privilege, given that such a privilege had never been formally recognized by the Supreme Court, evidently had only ever been applied in federal court to bar a finding of transient jurisdiction, apparently had never been applied to limit federal executive-branch law enforcement, and had long since been replaced with a privilege against service of process.

Plaintiffs do not argue—nor can they—that aliens are not subject to federal law-enforcement jurisdiction anywhere within the United States' borders. [9] *See* 8 U.S.C. § 1226(a) (providing for arrests "[o]n a warrant" without jurisdictional limitation), § 1357 (providing for warrantless arrests without jurisdictional limitation). Neither can Plaintiffs argue that aliens have a right to evade immigration enforcement. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1239 (no legally protected right to violate immigration law); 8 U.S.C. § 1226 (dictating when detention is required or optional), § 1231 (mandating detention of aliens with final removal orders). And the principles of comity that undergird the service-of-process rules do not apply to the federal law enforcement. *Cf. Morse*, 267 U.S. at 82.

---

[9] The Supreme Court has made clear that federal laws are the state's: "When Congress, in the exertion of the power confided to it by the Constitution, adopted [an] act, it spoke for all the people and all the states, and thereby established a policy for all." *Testa v. Katt*, 330 U.S. 386, 392 (1947).

Because a broad privilege against immigration enforcement in courthouses did not exist when Congress codified the civil immigration arrest authority, this Court is foreclosed from creating that rule now. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981). "The enactment of a federal rule in an area of national concern ... is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Id.* Courts must "start with the assumption that it is for Congress, not the federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *Id.* "Courts do not, of course, have free rein to impose rules ... , as a matter of policy, when the interpretation of a statute is at hand." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). And, as the First Circuit has noted, "[a]ccompanying the courts' repeated recognition of the validity of the party/witness immunity exception ... has been a persistent acknowledgement of the exception's limitations." *N. Light Tech.*, 236 F.3d at 62. The First Circuit stressed that *Lamb* explicitly dictates that the "[process-immunity] privilege should not be enlarged beyond the reason upon which it is founded." *Id.* It emphasized that the privilege's reason is to "fill[] the gap only where it needs to be filled, that is, in cases where a district court wishes to shield an individual from service of process *to encourage his or her travel to the forum state*, but would be unable to do so absent the power to grant immunity." *Id.*

Without any evidence of a privilege against immigration enforcement, Plaintiffs ask this Court to adopt a policy measure under the guise of federal common law. Plaintiffs dictate their own terms about who should be privileged from arrest and who should not. *See* Mot. 20 (requesting an injunctions for all persons "attending court on official business"); *id.* 3 (not challenging arrests

of persons in state custody). Plaintiffs do not seek individualized determinations in individual cases, but rather a blanket injunction notwithstanding the judicial proscriptions against it, *see infra*, Section E. Plaintiffs recognize that ICE has made its own determination about when to pursue courthouse arrests, limiting them only as to aliens who are top enforcement priorities, absent exceptional circumstances. Mot. 8-9. Plaintiffs disagree with that policy determination and seek to enjoin a policy that largely has been in place for years. *See* Ex. B. In essence, Plaintiffs ask this Court to engage in lawmaking. This Court lacks the power to do so. *See, e.g.*, *Milwaukee*, 451 U.S. at 312. Because there is no federal common law right to evade federal immigration enforcement, this Court should deny Plaintiffs' motion.

2. Congress Established a Comprehensive Immigration Detention Scheme that Supplants any Prior Common Law on Civil Immigration Enforcement.

Even if a federal-common-law privilege against civil arrest existed in the unprecedented, broad form that Plaintiffs claim, the federal statutory immigration scheme comprehensively speaks to how Congress intended the federal government to enforce federal immigration law, thus supplanting any prior federal common law on the issue. In determining whether a statutory scheme displaces federal common law, courts do not examine a single statute in isolation, but rather consider the entire statutory scheme. *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). If federal common law applies on an issue, the "question" in determining whether Congress meant to displace the common law is "whether the legislative scheme spoke directly to a question." *Milwaukee*, 451 U.S. at 315-17 (internal quotation marks omitted); *see Texas*, 507 U.S. at 534 (similar). "This interpretive presumption is not . . . one that entails a requirement of clear statement, to the effect that Congress must state precisely the intention to overcome the presumption's application to a given statutory scheme." *Astoria*, 501 U.S. at 108. That question is

different from, and less strict than, that which applies when determining preemption because "the States are represented in Congress but not in the federal courts." *Milwaukee*, 451 U.S. at 316. No "clear and manifest congressional purpose" to displace federal common law is required. *Am. Elec. Power Co.*, 564 U.S. at 423.

The congressional scheme shows that Congress spoke to the issue of immigration arrests, thus displacing any federal common law. The federal immigration scheme is a "comprehensive and unified system" maintained by a "single sovereign." *Id.* at 401. As the Supreme Court has stressed, "[t]he federal statutory structure instructs when it is appropriate to arrest an alien during the removal process." *Id.* at 407. "'The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.'" *Id.* at 409-10 (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)); *see infra* 13. Any state attempt to alter Congress' comprehensive removal scheme "creates an obstacle to the full purposes and objectives of Congress" and is thus "preempted by federal law."[10] *Id.* at 411.

Because the federal government has the sole authority over immigration, it has regulatory authority over all aliens within the United States. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."). Congress thus has the power to create a system that permits arrests of aliens notwithstanding the status of federal or state court proceedings. *See Herrera-*

---

[10] Congress has occupied the field of federal immigration arrest authority, so Plaintiffs cannot rest on state common law in the absence of federal common law; nor could state courts prohibit the federal government from acting. *In re Tarble*, 80 U.S. 397 (1871); *M'Culloch v. Maryland*, 17 U.S. 316, 436 (1819).

*Inirio*, 208 F.3d at 307-08 ("[I]n areas in which plenary federal power exists, 'the Supremacy Clause permits no other result,' notwithstanding that Congress may enact laws that 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.'") (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290 (1981)); *cf. Vasquez-Benitez*, 919 F.3d at 548 (ICE may arrest alien even while criminal proceedings are pending and after a judge orders release on bond).

Congress has done just that: ICE may arrest all aliens except aliens who are in state criminal custody *serving a criminal sentence*. The INA provides a comprehensive scheme governing DHS arrests of aliens. Under 8 U.S.C. § 1226(a), "on a warrant issued" by DHS attesting to an alien's removability, "an alien may be arrested and detained" during the pendency of removal proceedings, and the Secretary's "discretionary judgment regarding the application of this section shall not be subject to review." *Id.* § 1226(e). Under 8 U.S.C. § 1231(a)(2), DHS "shall detain the alien." Certain aliens, including ones who are a "risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period." 8 U.S.C. § 1231(a)(6). The relevant statutes set only one limitation on DHS's broad detention authority: the INA, mindful of "cooperative federalism" concerns, limits DHS's authority to take into custody an alien who is currently serving a criminal sentence, requiring DHS to await the completion of the alien's criminal imprisonment. 8 U.S.C. § 1226(c); *see* 8 U.S.C. § 1231. A fortiori, there is not a non-textual, unwritten limit on arrest authority for aliens in the vicinity of state courthouses. Instead, Congress has authorized DHS to detain removable aliens whenever they are released from state imprisonment "without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the

same offense." 8 U.S.C. § 1226(c). When DHS arrests an alien on a warrant, the statute imposes no limitations on that authority. *Id.* § 1226(a).

So, too, Congress was explicit when it delineated limitations on DHS's warrantless arrest authority. Under 8 U.S.C. § 1357(a)(2), Congress gave immigration officers broad authority "to arrest any alien in the United States" without a warrant if they "have reason to believe that the alien so arrested is in the United States in violation" of "any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens" and "is likely to escape before a warrant can be obtained for his arrest." Congress provided even broader arrest authority within a "reasonable distance from any external boundary of the United States" to "board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance or vehicle." *Id.* § 1357(a)(3). When Congress wanted to restrict immigration officers' powers, it did so explicitly, authorizing "access to private lands" within "twenty-five miles" of the border, but limiting access to "dwellings" and restricting warrantless entry to "the premises of a farm or other outdoor agricultural operation." *Id.* § 1357(a)(3), (e). These provisions show Congress knew how to limit DHS's arrest authority and made conscious—but limited— choices about when to do so. Because Congress specifically delineated DHS's immigration-arrest authority and authorized arrests by warrant without limitation, any federal-common-law privilege from arrest, even if it existed, would have been overridden by the congressional scheme. *See, e.g.*, *Am. Elec. Power Co.*, 564 U.S. at 424.

3. Courthouse Arrests Do Not Raise Constitutional Concerns.

Plaintiffs argue that ICE's statutory arrest authority should be interpreted in a way that avoids constitutional concerns. But the canon of constitutional avoidance comes into play only when a statute is ambiguous. *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). Sections 1226(a)

and 1357(a)(2) unambiguously authorize ICE to arrest aliens without any limitation relevant here, so it does not apply. Even if § 1226(a) or 1357(a)(2) were ambiguous, courthouse arrests do not raise the concerns Plaintiffs allege under the Tenth Amendment or the right of access to the courts. Mot. 14-17.

     *Tenth Amendment*. Plaintiffs vaguely assert that the ICE Directive cannot "commandeer the state criminal justice and judiciary systems," Compl. ¶ 115; *see* Mot. 16. Under the Tenth Amendment, "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). Put another way, the Tenth Amendment prohibits the federal government from "commandeering" state executive or legislative actors. *Id.* The ICE Directive does not implicate the Tenth Amendment because it does not command or compel state actors to take any action at all. Massachusetts "courthouses are public spaces that are open to all persons," including "DHS employees." Mass. Executive Office of the Trial Court, Policy and Procedures Regarding Courthouse Interactions with the Department of Homeland Security (Nov. 8, 2017). ICE officers can freely enter State courthouses without the consent or cooperation of State actors. ICE courthouse arrests do not require *any* action by state officers and nothing in the Directive compels employees of the state criminal justice or judiciary systems to take action or refrain from taking action at all. So the Directive raises no Tenth Amendment issues.[11] *See Murphy v. NCAA*, 138 S.Ct. 1461, 1482 (May 14, 2018).

---

[11] Even were that not so, "[w]hen the state judiciary enforces federal law … as the Supremacy Clause requires it to do … [t]here is no 'commandeering' of the State's resources where the State is asked to do no more than enforce federal law." *Alden v. Maine*, 527 U.S. 706, 801 n.34 (1999).

_Right of Access to the Courts._ The right of access to the courts prohibits "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits." _Christopher v. Harbury_, 536 U.S. 403, 413 (2002). Although the Constitution guarantees the right "to bring to court a grievance," the Supreme Court has explicitly disclaimed the existence of a constitutional right "to _litigate effectively_ once in court." _Lewis v. Casey_, 518 U.S. 343, 354 (1996) (emphasis in original).

The Collaborative alleges that the Directive violates its members' right of access because the Directive "forc[es] noncitizens potentially subject to removal to risk civil arrest to access the courts." Compl. ¶ 121. But the possibility that an unlawful alien will be arrested in a state courthouse does not limit his ability to prepare or file a lawsuit. Notwithstanding the Directive, an unlawful alien is free "to bring to court a grievance," which is the only process that the right of access guarantees. _Lewis_, 518 U.S. at 354. And to the extent that the Directive discourages aliens from attending court proceedings, that effect is irrelevant to the constitutional inquiry, given that litigants lack any right to litigate effectively once in court. _Id._ Indeed, the Collaborative seeks to extend the right of access beyond its limited scope. If Plaintiffs' theory was correct, _any_ federal law authorizing criminal or civil enforcement would be unconstitutional because each such law creates a disincentive for some subset of the populace to attend court proceedings. Because the Directive does not prevent unlawful aliens from preparing or filing grievances, it does not implicate the right of access to the courts.

D.      _The Other Preliminary-Injunction Factors Weigh in Defendants' Favor._

Plaintiffs also cannot show that they are "likely to suffer irreparable harm in the absence of preliminary relief," that the "balance of equities" tips in their favor, or than an injunction is "in the public interest." _Winter v. Nat. Res. Def. Council, Inc._, 555 U.S. 7, 20 (2008). Plaintiffs allege

that they would suffer "financial harm" and "ha[ve] to divert significant resources responding to [the] Directive." Mot. 17–18. But these alleged harms pale in comparison to the harms that the public and the federal government would suffer if ICE was unable to arrest fugitive aliens at the one place at which it can reliably find them in Massachusetts. *See* ICE, FAQ on Sensitive Locations and Courthouse Arrests, ECF No. 1-3 The federal government and the public have a strong interest in "law enforcement and public safety," *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers); *see Nken v. Holder*, 556 U.S. 418, 435 (2009), and "it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative," *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Whereas Plaintiffs' alleged "money, time and energy" harms carry little weight, *Sampson v. Murray*, 415 U.S. 61, 90 (1974), the government and the public have a "pressing" interest in the enforcement of federal law. *United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir. 1985), especially when Plaintiffs themselves are not the subject of the immigration enforcement they seek to thwart.

E.      *Plaintiffs Seek an Overbroad Injunction.*

Even if Plaintiffs were likely to satisfy the preliminary injunctive factors, they would not be entitled to injunctive relief, given that they have only moved for an injunction on their APA claim. The normal remedy in an APA case is to "set aside" the agency action. But Plaintiffs ask for much more: an injunction preventing ICE from "arresting individuals attending court on official business." That is far beyond any permissible relief where they only seek relief based on their APA claim. And even were Plaintiffs somehow entitled to declaratory and injunctive relief, they would not entitled to an order enjoining the Directive of ICE arrest authority in full. Under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Thus, even if Plaintiffs could seek relief on behalf of

third parties or the tangential effects on Plaintiffs of ICE actions towards those parties, any relief must be tailored to remedying the Plaintiffs' putative harms in cases before the state courts in Middlesex and Suffolk Counties, and must be limited to specific aliens who seek to avail themselves of the privilege. *See, e.g.*, *Langlois v. Abington Housing Authority*, 207 F.3d 43, 49 (1st Cir. 2000); *see City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244–45 (9th Cir. 2018) (reversing nationwide injunction where plaintiffs' "tendered evidence [was] limited to the effect of the" challenged conduct on them alone). Anything more violates the principle that an injunction should "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' motion for preliminary injunction.

//

//

Dated: May 20, 2019                    Respectfully submitted,

JOSEPH H. HUNT                         ANDREW E. LELLING
Assistant Attorney General             United States Attorney
Civil Division

                                       */s/ Rayford A. Farquhar*
WILLIAM C. PEACHEY                      RAYFORD A. FARQUHAR
Director, Office of Immigration Litigation   BBO No. 560350
District Court Section                 Assistant U.S. Attorney
                                       U.S. Attorney's Office
EREZ REUVENI                           1 Courthouse Way, Suite 9200
Assistant Director                     Boston, MA 02210
                                       (617) 748-3100
FRANCESCA GENOVA                       rayford.farquhar@usdoj.gov
JULIAN KURZ
Trial Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2019, I electronically transmitted the foregoing document to the Clerk's Office using the U.S. District Court for the District of Massachusetts' Electronic Document Filing System (ECF), which will serve a copy of this document upon all counsel of record.

By: */s/ Rayford A. Farquhar*
      RAYFORD A. FARQUHAR