## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARIAN RYAN, et al.,

      Plaintiffs,

v.

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

      Defendants.

1:19-cv-11003-IT
Leave to file granted 5/17/2019

## BRIEF OF *AMICUS CURIAE* IMMIGRATION REFORM LAW INSTITUTE
## IN SUPPORT OF DEFENDANTS AND IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## INTEREST OF *AMICUS CURIAE*

The Immigration Reform Law Institute ("IRLI") is a not for profit 501(c)(3) public interest law firm incorporated in the District of Columbia.  IRLI is dedicated to litigating immigration-related cases on behalf of United States citizens, and also organizations and communities seeking to control illegal immigration and reduce lawful immigration to sustainable levels.  IRLI has litigated or filed *amicus curiae* briefs in many immigration-related cases before federal courts and administrative bodies, including *Trump v. Hawaii,* 138 S. Ct. 2392 (2018); *United States v. Texas*, 136 S. Ct. 2271 (2016); *City of El Cenizo v. Texas,* 890 F.3d 164 (5th Cir. 2018); *Arizona Dream Act Coal. v. Brewer*, 818 F.3d 101 (9th Cir. 2016); *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 74 F. Supp. 3d 247 (D.D.C. 2014); *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, No. 16-5287 (D.C. Cir., filed Sept. 28, 2016); *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016); and *Matter of C-T-L-*, 25 I. & N. Dec. 341 (B.I.A. 2010).  Because of IRLI's expertise in immigration law, the Board of Immigration Appeals has solicited briefs, drafted by IRLI staff, from IRLI's affiliate, the Federation for American Immigration Reform, for over twenty years.

## STATEMENT OF FACTS

*Amicus* adopts Defendants' statement of facts.

## SUMMARY OF THE ARGUMENT

Plaintiffs argue that Immigration and Customs Enforcement ("ICE") Directive 11072.1 ("Directive"), authorizing arrests of aliens in courthouses in some circumstances, violates federalism principles and constitutes commandeering of state resources in violation of the Tenth Amendment.  On the contrary, ICE, by making arrests in courthouses, is doing something that the Massachusetts courts cannot stop, or interfere with, without violating the Supremacy Clause

of the U.S. Constitution.  Since, then, ICE has a right under the Supremacy Clause to make arrests in state courthouses, its doing so cannot violate federalism, or constitute commandeering.

State interference with federal arrests in state courthouses would violate the Supremacy Clause in three ways.  First, any attempt by state court personnel to prevent ICE, whether by legal process or force, from entering courthouses, or from arresting aliens inside, would present the specter of direct conflict between state and federal officers—a specter that is foreclosed by the Supremacy Clause.  Also, a policy of preventing courthouse arrests by ICE often would compel court personnel to harbor illegal aliens, in violation of 8 U.S.C. § 1324, making it impossible for those personnel to obey both federal and state regulations.  And, of course, if the Massachusetts courts were to adopt a policy of hindering or blocking ICE from making arrests in courthouses, that policy would frustrate congressional purposes, and be obstacle preempted.

Because, in light of the supremacy of federal law, Massachusetts cannot block ICE from making arrests in courthouses, ICE is fully within its rights under the Supremacy Clause when it makes such arrests, and consequently cannot be acting in violation of federalism or the Tenth Amendment.

## ARGUMENT

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Under this clause, Congress has the power to preempt state and local laws.  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).

Preemption may be either express or implied, and implied preemption includes both field preemption and conflict preemption.  *Lozano v. City of Hazleton*, 724 F.3d 297, 302 (3d Cir.

2013) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).  Conflict

preemption can occur in one of two ways: where "compliance with both federal and state

regulations is a physical impossibility," or "where the challenged state law stands as an obstacle

to the accomplishment and execution of the full purposes and objectives of Congress."  *Lozano*,

724 F.3d at 303 (citing *Arizona*, 567 U.S. at 399) (internal quotation marks and citations

omitted).  "If the purpose of the act cannot otherwise be accomplished—if its operation within its

chosen field else must be frustrated and its provisions be refused their natural effect—the state

law must yield to the regulation of Congress within the sphere of its delegated power."  *Savage*

*v. Jones*, 225 U.S. 501, 533 (1912), *quoted in Hines v. Davidowitz*, 312 U.S. 52, 67 n.20 (1941).

The judgment of courts about what constitutes an unconstitutional impediment to federal law is

"informed by examining the federal statute as a whole and identifying its purpose and intended

effects."  *Crosby*, 530 U.S. at 373.

Plaintiffs argue that the Directive constitutes commandeering of state resources in

violation of the Tenth Amendment, and also violates federalism by preempting the historic

powers of the state and intruding onto its police powers in the absence of a clear statement of

such an intent by Congress.  Doc. 6 at 16-17.  If Plaintiffs' arguments were correct, however,

Massachusetts courts would be within their rights in adopting on their own the policy Plaintiffs

ask this Court to impose, that of forbidding ICE from making arrests in state courthouses.  But

that policy clearly would violate the Supremacy Clause in numerous ways.

### 1.  A No-Arrests Policy Would Lead To Conflict Between State And Federal Officers.

If Massachusetts courts enacted a policy of not allowing ICE to make arrests in state

courthouses, and if court officers tried to enforce that policy by forcibly preventing ICE officers

from entering those courthouses, or forcibly preventing ICE officers from taking custody of

aliens once inside, armed confrontations between state and federal officers, or attempts by each

to place the other under arrest, would be the inevitable result.  Needless to say, such a shocking

course would violate the Supremacy Clause, as the Supreme Court decided well over a century

ago in a case in which California arrested a federal marshal for killing a man while protecting a

U.S. Supreme Court justice:

> "If, when thus acting, and within the scope of their authority, [federal] officers can be arrested and brought to trial in a state court, for an alleged offence against the law of the State, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection—if their protection must be left to the action of the state court—the operations of the general government may at any time be arrested at the will of one of its members.  *The legislation of a State may be unfriendly.  It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws.  The state court may administer not only the laws of the State, but equally federal law, in such a manner as to paralyze the operations of the government.*  And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecution, *and the exercise of acknowledged federal power arrested*.  We do not think such an element of weakness is to be found in the Constitution.  The United States is a government with authority extending over the whole territory of the Union, acting upon the States and the people of the States.  While it is limited in the number of its powers, so far as its sovereignty extends it is supreme.  No state government can exclude it from the exercise of any authority conferred upon it by the Constitution; *obstruct its authorized officers against its will; or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it.*"

*In re Neagle*, 135 U.S. 1, 61-62 (1890) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879))

(emphases added).  *See generally* Seth P. Waxman & Trevor W. Morrison, *What Kind of*

*Immunity? Federal Officers, State Criminal Law, and the Supremacy Clause*, 112 Yale L.J.

2195, 2236-37 (2003) (discussing *Neagle*).

It follows that, under the Supremacy Clause, state officers may never use force or legal

process to block federal officers from performing their federal law enforcement duties by

assuming custody of removable aliens.  Accordingly, Massachusetts courts can have no

authority, under that clause, to forbid arrests by ICE in state courthouses.

### 2.  A No-Arrests Policy Would Compel State Officers To Commit Harboring.

What are generally referred to as the "anti-harboring" provisions of the Immigration and

Nationality Act ("INA")—located at Title II, Chapter 8, § 274 and codified at 8 U.S.C. §

1324—read in pertinent part:

> Bringing in and Harboring Certain Aliens
>
> (a) Criminal penalties.—
>
> (1) (A) Any person who—
> (iii)  knowing or in reckless disregard of the fact that an alien has come to, entered,
> or remains in the United States in violation of law, conceals, harbors, or shields
> from detection, or attempts to conceal, harbor, or shield from detection, such alien
> in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids
> or abets the commission of any of the preceding acts, shall be punished as provided
> in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom
> such a violation occurs—
>
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined
> under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization."  8

U.S.C. § 1101(b)(3).  "The term 'organization' means, but is not limited to, an organization,

corporation, company, partnership, association, trust, foundation or fund; and includes a group

of persons, whether or not incorporated, permanently or temporarily associated together with

joint action on any subject or subjects."  8 U.S.C. § 1101(a)(28).  Thus, § 1324 applies not only

to state court officers and personnel, but to those courts themselves, which, under the INA's

sweeping definition, are organizations, and thus persons.

By stopping ICE agents from entering courthouses, or stopping them from arresting aliens once inside, the Massachusetts courts would compel court officers to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii).  For example, if ICE agents arrived at or entered a courthouse to assume custody of an illegal alien, and court officers either refused them entry or refused to allow them to assume custody, the court officers would be preventing the alien from being taken out of the courthouse, and thus "harbor[ing]" the alien "in . . . a[] building." Accordingly, a policy by the Massachusetts courts of barring ICE from making arrests in courthouses would coerce court officers to violate the federal anti-harboring statute, and thus violate the Supremacy Clause by making compliance with both federal and state law impossible.

**3.   A No-Arrests Policy Would Frustrate Congressional Purposes.**

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly.  As the U.S. Court of Appeals for the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system.  The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals.  Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s).  The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding 8 U.S.C. § 1373 constitutional).

As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.  For example, in

passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRAIRA"), which

includes 8 U.S.C. § 1373, Congress intended unimpeded communication among federal, state,

and local governments in sharing immigration status information, as well as unobstructed

cooperation in ascertaining the whereabouts of illegal aliens.  The Senate Judiciary Committee

Report accompanying IIRAIRA makes this general intent clear:

> Effective immigration law enforcement requires a cooperative effort between all
> levels of government.  The acquisition, maintenance, and exchange of immigration-
> related information by State and Local agencies is consistent with, and potentially
> of considerable assistance to, the Federal regulation of immigration and the
> achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), *quoted in City of New York*, 179 F.3d at

32-33.  Thus, in drafting § 1373, Congress intended a cooperative effort among local, state, and

federal law enforcement to enforce immigration law.

A review of additional federal immigration provisions further underscores this intent.

Shortly before enacting IIRAIRA, Congress enacted the Personal Responsibility and Work

Opportunity Reconciliation Act of 1996 (PRWORA).  Entitled "Communication between State

and local government agencies and Immigration and Naturalization Service," Section 434 of this

law, now 8 U.S.C. § 1644, is nearly identical to § 1373.  This provision of PRWORA forbids any

prohibitions or restrictions on the ability of state or local governments to send to or receive from

the federal government information about the immigration status, lawful or unlawful, of an alien

in the United States.  Going further than the Senate Judiciary Committee Report accompanying

IIRAIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in

passing Section 434: to bar *any* restriction on local police in their communications with ICE.

The scope includes the *whereabouts* of illegal aliens, which obviously includes notice of their

release from detention.

> The conference agreement provides that no State or local government entity shall prohibit, or in any way restrict, any entity or official from sending to or receiving from the INS information regarding the immigration status of an alien or *the presence, whereabouts, or activities of illegal aliens*. It does not require, in and of itself, any government agency or law enforcement official to communicate with the INS.
>
> The conferees intend to give State and local officials the authority to communicate with the INS regarding *the presence, whereabouts, or activities of illegal aliens. This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS.* The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that *illegal aliens do not have the right to remain in the United States undetected and unapprehended.*

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), *quoted in City of New York*, 179 F.3d at 32 (emphases added).

Another federal statute also has the purpose of fostering cooperation in immigration enforcement.  In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States."  § 1357(g)(10)(A).  Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  § 1357(g)(10)(B).

A policy of the Massachusetts courts to prevent ICE from making arrests in courthouses would frustrate Congress's purpose of fostering state-federal cooperation in immigration law enforcement, and also Congress's purpose of apprehending and removing illegal aliens.  Indeed, the policy would be expressly designed to frustrate these purposes.  By thus standing as a

deliberate obstacle to central purposes of the INA, that policy would fly in the face of the

Supremacy Clause.

*         *         *

Because a policy by the Massachusetts courts to bar ICE from making arrests in

courthouses would violate the Supremacy Clause in the above ways, Massachusetts courts would

not be within their rights to adopt it.  Rather, because state courts may not stop ICE from making

arrests in state courthouses, ICE is clearly within its rights under the Supremacy Clause in

making such arrests, and thus, by so doing, cannot be violating either federalism or the Tenth

Amendment.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be

denied.

DATED: May 16, 2019

Respectfully submitted,

<u>s/Christopher J. Hajec</u>
**Christopher J. Hajec**
*Pro Hac Vice Counsel for Amicus Curiae*
Immigration Reform Law Institute
25 Massachusetts Avenue NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
Fax: (202) 464-3590
Email: chajec@irli.org

<u>s/Brad P. Bennion</u>
MA Bar No. 661222
*Local Counsel*
**Brad P. Bennion**
P.O. Box 890118
East Weymouth, MA 02189
Telephone: (617) 943-6164
Email: bradpbennion@gmail.com

10

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on May 16, 2019.

<u>*s/Brad P. Bennion*</u>
MA Bar No. 661222
*Local Counsel*
**Brad P. Bennion**
P.O. Box 890118
East Weymouth, MA 02189
Telephone: (617) 943-6164
Email: bradpbennion@gmail.com