UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARIAN RYAN, in her official capacity as &ast;
Middlesex County District Attorney; &ast;
RACHAEL ROLLINS, in her official capacity &ast;
as Suffolk County District Attorney; &ast;
COMMITTEE FOR PUBLIC COUNSEL &ast;
SERVICES; and the CHELSEA &ast;
COLLABORATIVE, INC., &ast;
&ast;
    Plaintiffs, &ast;
&ast;
&ast;
   v. &ast;  Civil Action No. 19-11003-IT
&ast;
&ast;
U.S. IMMIGRATION AND CUSTOMS &ast;
ENFORCEMENT; MATTHEW T. &ast;
ALBENCE, in his official capacity as Acting &ast;
Deputy Director of U.S. Immigration and &ast;
Customs Enforcement and Senior Official &ast;
Performing the Duties of the Director; TODD &ast;
M. LYONS, in his official capacity as &ast;
Immigration and Customs Enforcement, &ast;
Enforcement and Removal Operations, Acting &ast;
Field Office Director; U.S. DEPARTMENT &ast;
OF HOMELAND SECURITY; and KEVIN &ast;
McALEENAN, in his official capacity as &ast;
Acting Secretary of United States Department &ast;
of Homeland Security, &ast;
&ast;
    Defendants. &ast;

**MEMORANDUM & ORDER
GRANTING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

June 20, 2019

TALWANI, D.J.

  Middlesex County District Attorney Marian Ryan, Suffolk County District Attorney

Rachael Rollins, the Committee for Public Counsel Services ("CPCS"), and the Chelsea

Collaborative, Inc. (collectively "Plaintiffs") bring this lawsuit against U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), and several officials in their official capacity (collectively "Defendants"), challenging ICE's policy and practice of conducting civil immigration arrests inside of state courthouses in Massachusetts. In Count 1 of the Complaint [1], Plaintiffs challenge ICE Directive No. 11072.1, entitled "Civil Immigration Actions Inside Courthouses" (the "Courthouse Civil Arrest Directive"), dated January 10, 2018, under the Administrative Procedure Act, 5 U.S.C. § 706(2)(C). The APA commands a reviewing court to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Plaintiffs contend that at the time the Immigration and Naturalization Act ("INA") was enacted, all those appearing in court on official court business enjoyed a common law privilege against civil arrest. They argue that the INA does not explicitly extinguish this common law privilege and therefore must be interpreted to be constrained by it. Therefore, Plaintiffs contend, any ICE policies which permit civil courthouse arrests are in excess of the power granted by the INA and must be set aside by the court.

Defendants dispute the existence of a common law privilege against civil arrest in courthouses, and, alternatively, argue that any such privilege was superseded long before the codification of the current immigration scheme. Further, Defendants argue, if such a privilege existed in the past, Plaintiffs nonetheless lack both constitutional and prudential standing to bring this claim. Finally, the government contends that if Plaintiffs do have standing and the common law privilege exists, Congress nonetheless extinguished the privilege when it passed the INA.

Pending before the court is Plaintiffs' Motion for a Preliminary Injunction [5], which seeks to preliminarily enjoin Defendants from implementing the Courthouse Civil Arrest

Directive and from civilly arresting parties, witnesses, and others attending Massachusetts courthouses on official business while they are going to, attending, or leaving the courthouse. Finding that Plaintiffs have standing to bring this suit, are likely to succeed on the merits of their APA claim as to those not in federal or state custody when they arrive, and are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in Plaintiffs' favor, and that an injunction is in the public interest, Plaintiffs' Motion for a Preliminary Injunction [5] is ALLOWED. Defendants are enjoined from implementing the Courthouse Civil Arrest Directive and from civilly arresting parties, witnesses, and others attending Massachusetts courthouses on official business while they are going to, attending, or leaving the courthouse. The court's order does not limit ICE's criminal arrests of such individuals or its civil arrests of individuals who are brought to Massachusetts courthouses while in state or federal custody.

I.      Statutory and Regulatory Background

In 1952, Congress enacted the INA, governing, among other things, the presence of non-citizens (deemed "aliens" in the INA, 8 U.S.C. § 1101(a)(3)) in the United States and the associated procedures for removing those present in the United States without federal authorization. See INA, Pub. L. No. 82-414, 66 Stat. 163 (1952). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." Arizona v. United States, 567 U.S. 387, 396 (2012) (citing 8 U.S.C. § 1227); 8 U.S.C. § 1227 (a)(1)(B) (an alien present in the United States whose nonimmigrant visa has been revoked is deportable). "As a general rule, it is not a crime for a removable alien to remain present in the United States[,]" Arizona v. United States, 567 U.S. at 407, and removal proceedings are civil, not criminal, even where criminal activity underlies the reason for

removal. See id. at 396; see also 6 C. Gordon, S. Mailman, S. Yale-Loehr, & R.Y. Wada,

Immigration Law and Procedure § 71.01[4][a] (Matthew Bender, rev. ed. 2016) (acknowledging

"the uniform judicial view, reiterated in numerous Supreme Court and lower court holdings, ...

that [removal] is a civil consequence and is not regarded as criminal punishment").

Since first enacted, the INA has granted authority for arrests with and without warrants.

INA § 242(a), codified at 8 U.S.C. § 1226(a), provided that "[p]ending a determination of

deportability in the case of any alien . . . such alien may, upon warrant of the Attorney General,

be arrested and taken into custody." INA § 242(a).[1] INA § 287(a)(2), codified as 8 U.S.C. §

1357(a)(2), authorized an immigration officer without a warrant, "to arrest any alien who in his

presence or view is entering or attempting to enter the United States" unlawfully, or "to arrest

any alien in the United States if [the officer] has reason to believe that the alien so arrested is in

the United States in violation of any such law or regulation and is likely to escape before a

warrant can be obtained for his arrest." Id. § 287(a)(2).[2] "Although 8 U.S.C. § 1357(a)(2) does

---

[1] In 1996, the provision for an arrest with a warrant was replaced by a substantively similar
provision. Omnibus Consolidated Appropriations Act, 1997, PL 104–208, September 30, 1996,
110 Stat 3009. As amended in 1996, 8 U.S.C. § 1226(a) provides:

> On a warrant issued by the Attorney General, an alien may be arrested and detained
> pending a decision on whether the alien is to be removed from the United States. Except
> as provided in subsection (c) and pending such decision, the Attorney General--
>> (1) may continue to detain the arrested alien; and
>> (2) may release the alien on--
>>> (A) bond of at least $1,500 with security approved by, and containing
>>> conditions prescribed by, the Attorney General; or
>>> (B) conditional parole; but
>> (3) may not provide the alien with work authorization (including an "employment
>> authorized" endorsement or other appropriate work permit), unless the alien is
>> lawfully admitted for permanent residence or otherwise would (without regard to
>> removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a).

[2] Congress also amended this section in 1996 to add laws regulating the "removal of aliens" to
the list of applicable laws one could be violating upon "entering or attempting to enter the United

not, by its terms, reveal its 'civil' or 'criminal" character,'" the First Circuit has determined that such arrests are civil. U.S. v. Encarnacion, 239 F.3d 395, 398 (1st Cir. 2001).

"A principal feature of the removal system is the broad discretion exercised by immigration officials." Arizona v. United States, 567 U.S. at 396. ICE instructs its agents and employees on its discretionary enforcement priorities through publicly released memoranda from its director. On March 2, 2011, the then-director of ICE distributed a memorandum about civil immigration enforcement priorities (hereinafter the "2011 Civil Enforcement Priorities Memorandum") as they relate to the apprehension, detention, and removal of aliens. ICE Policy Number 10072.1, 2011 Civil Enforcement Priorities Memorandum (Mar. 2, 2011). That memorandum explained that ICE had resources to remove each year less than four percent of the estimated removable population, and thus would prioritize its resources. Id. According to ICE, its top civil enforcement priority was the removal of "Priority 1" aliens: "[a]liens who pose a danger to national security or a risk to public safety." Id. at 1.

> These aliens include, but are not limited to: aliens engaged in or suspected of
> terrorism or espionage, or who otherwise pose a danger to national security; aliens

---

States[.]" Omnibus Consolidated Appropriations Act, 1997, PL 104–208, September 30, 1996, 110 Stat 3009. Other than that change, 8 U.S.C. § 1357(a)(2), is the same as when the INA was first enacted in 1952, and provides:

(a)  Powers without warrant
Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

…

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States[.]

8 U.S.C. § 1357(a)(2).

convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders; aliens not younger than 16 years of age who participated in organized criminal gangs; aliens subject to outstanding criminal warrants; and aliens who otherwise pose a serious risk to public safety.

Id. at 1-2. The memorandum notes that the provision concerning those who otherwise pose a serious risk to public safety "is not intended to be read broadly, and officers, agents, and attorneys should rely on this provision only when serious and articulable public safety issues exist." Id. at 2, n. 1. After those "Priority 1" aliens, ICE prioritizes the apprehension and removal of "[r]ecent illegal entrants" and "[a]liens who are fugitives or otherwise obstruct immigration controls." Id. at 2.

On June 17, 2011, the then-director of ICE distributed a memorandum entitled "Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs" (hereinafter "Prosecutorial Discretion Memo"), Ex. C [28-3], directing ICE officers and attorneys to "exercise all appropriate prosecutorial discretion" in removal cases "to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice." Id. at 2. According to this memorandum, "it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime." Id. "Absent special circumstances, it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties." Id. at 3. The memorandum continued that "[t]o avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints." Id.

In 2014, ICE addressed the application of these 2011 policies to "[e]nforcement actions at or near courthouses." Enforcement Actions at or Near Courthouses Memorandum (hereinafter the "2014 Courthouse Memorandum") Ex. B [28-2]. In that memorandum, ICE specified that "[e]nforcement actions at or near courthouses will only be undertaken against Priority 1 aliens, as described in [the 2011 Enforcement Priorities Memorandum]." Id. Further, courthouse enforcement actions, would "only take place against specific, targeted aliens, rather than individuals who may be 'collaterally' present, such as family members or friends who may accompany the target alien to court appearances or functions." Id. at 2. The memorandum directed further that "whenever practicable," such actions will be taken outside of public areas of the courthouse. Id.

On January 25, 2017, the President issued an executive order, entitled "Enhancing Public Safety in the Interior of the United States." Exec. Order No. 13,768, 82 Fed. Reg. 8,799 (Jan. 30, 2017). Of particular relevance to this case, section five of the Executive Order orders the Secretary of Homeland Security to prioritize the removal of removable aliens who "[h]ave been charged with any criminal offense, where such charge has not been resolved" and "[a]re subject to a final order of removal, but who have not complied with their legal obligation to depart the United States." [3] Id. On February 20, 2017, the then-Secretary of Homeland Security

---

[3] The Executive Order also instructs the Secretary to prioritize the removal of aliens described in 8 U.S.C. §§ 1182 (a)(2), (a)(3), and (a)(6)(C), 1225, and 1227 (a)(2) and (4). These individuals are inadmissible or deportable due to criminal convictions, are in or attempting to enter the United States to commit espionage, attempted to obtain admission through fraud, or are subject to expedited removal. See 8 U.S.C. §§ 1182 (a)(2), (a)(3), and (a)(6)(C), 1225, and 1227 (a)(2) and (4). The Executive Order further instructs the Secretary to prioritize the removal of removable aliens who:

"(a) [h]ave been convicted of any criminal offense; . . . (c) [h]ave committed acts that constitute a chargeable criminal offense; (d) [h]ave engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency; (e) [h]ave abused any program related to receipt of public

implemented that Executive Order and issued a memorandum entitled "Enforcement of the Immigration Laws to Serve the National Interest" (hereinafter the "2017 Memorandum"). 2017 Memorandum Ex. 9 [7-9]. The 2017 Memorandum directed ICE to prioritize the removal of aliens in accordance with the Executive Order, including aliens who "have been charged with any criminal offense that has not been resolved" and "are subject to a final order of removal but have not complied with their legal obligation to depart the United States." Id. at 3. The 2017 Memorandum rescinded, with exceptions not relevant here, "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal . . . to the extent of the conflict [with the 2017 Memorandum]." Id.

On January 10, 2018, ICE issued Directive No. 11072.1, the Courthouse Civil Arrest Directive. Compl. Ex. D [1-4]. The Courthouse Civil Arrest Directive refers to the 2017 Memorandum and explains that ICE civil immigration enforcement actions inside courthouses include actions "against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed, when ICE officers or agents have information that leads them to believe the targeted aliens are present at that specific location." Id. at 2. According to the policy, ICE will not arrest aliens other than the "target alien . . . absent special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions." Id. The Courthouse Civil Arrest Directive explains that the purpose of this policy, in part, is to "reduce safety risks"

---

benefits; . . . or (g) [i]n the judgment of an immigration officer, otherwise pose a risk to public safety or national security."
Exec. Order No. 13,768, 82 Fed. Reg. 8,799 (Jan. 30, 2017).

because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." Id.

All of the foregoing relates to civil arrests for removal purposes, not criminal arrests. In 1990, the INA was amended to allow immigration officers to make warrantless criminal arrests. Pub.L. 101-649, Title V, § 503(a), (b)(1), Nov. 29, 1990, 104 Stat. 5048, 5049, codified at 8 U.S.C. 1357(a)(4). Those arrests, unlike arrests under § 1357(a)(2), require that the alien be brought before a magistrate judge, rather than an immigration officer. See U.S. v. Encarnacion, 239 F.3d at 398; see also Morales v. Chadbourne, 793 F.3d 208, 214-16 (1st Cir. 2015) (noting that "criminal custody" and ICE enforcement are different contexts). Plaintiffs' APA claim does not challenge ICE's authority to conduct criminal arrests.

II.   The Record Before the Court Concerning Courthouse Arrests in Massachusetts State Courts

In July 2017, the Massachusetts Supreme Judicial Court released a decision about civil immigration detainers, holding that "Massachusetts law provides no authority for Massachusetts court officers to arrest and hold an individual solely on the basis of a Federal civil immigration detainer, beyond the time that the individual would otherwise be entitled to be released from State custody." Lunn v. Commonwealth, 477 Mass. 517, 537 (2017).

The Massachusetts Trial Court subsequently promulgated a policy entitled "Policy and Procedures Regarding Interactions with the Department of Homeland Security ["DHS"]." Mass. Trial Ct. Policy at 16-18 [46-1], effective November 13, 2017. The Policy is directed to civil, not criminal, enforcement action, specifically noting that nothing in the policy abrogates a court officer's authority to detain an individual pursuant to a criminal detainer or a warrant authorizing the arrest of an individual for a criminal offense. Id. at 16. According to the policy, Massachusetts Trial Court employees are required to respond to DHS requests for information

about an individual's case or probation in the same manner as a request by any other member of the public. <u>Id.</u> DHS officials "may enter a courthouse and perform their official duties provided that their conduct in no way disrupts or delays court operations, or compromises safety or decorum." <u>Id.</u> As applicable to all law enforcement officers, when an armed DHS official enters a courthouse, courthouse security personnel are directed to ask him or her the official law enforcement purpose for entering the courthouse and the proposed enforcement action to be taken, and that information is to be transmitted to a judicial officer if DHS officials state an intent to take into custody a party or other participant in a case before a judge or magistrate, or a person attending to business in the courthouse. <u>Id.</u>

The Policy includes separate procedures for individuals in custody, and those not in custody. Under the policy, individuals who are brought into court in custody, and are subject to release after a court proceeding, should be processed in the normal course, even if there is an immigration detainer. <u>Id.</u> Court employees do not have the authority to comply with or serve civil immigration warrants, but DHS officials are permitted to enter the holding cell area to take custody if the DHS official presents a civil arrest warrant or detainer and the court officer supervisor determines that the DHS official would otherwise take custody of the individual inside or immediately outside of the courthouse. <u>Id.</u>

As to individuals coming to court who are not in custody, under the Policy, trial court employees may not impede or assist DHS in the physical act of taking such individuals into DHS custody. <u>Id.</u> DHS officials shall not be permitted to take an individual into custody pursuant to a civil immigration detainer or warrant in a courtroom, absent advance permission by a judicial officer. <u>Id.</u> The policy also requires court security personnel to draft an incident report for every instance in which DHS takes an individual into custody in the courthouse. <u>Id.</u>

In support of their motion, Plaintiffs submitted affidavits from the executive director of the Chelsea Collaborative, Vega Decl. Ex. 10 [7-10], an immigration law specialist from the Immigration Impact Unit at CPCS, Klein Decl. Ex. 11 [7-11], the Chief of Victim Witness Services for the Middlesex County DA's office, Foley Decl. Ex. 12 [7-12], the executive director of Lawyers for Civil Rights, an organization providing pro bono legal representation to immigrants, Espinoza-Madrigal Decl. Ex 13 [7-13], and a legal advocacy specialist with HarberCOV, an organization that provides services to people affected by abuse, Moshier Decl. Ex. 14 [7-14]. These affidavits aver that ICE is civilly arresting people at courthouses throughout Massachusetts. Espinoza-Madrigal Decl. ¶ 7, Ex. 13 [7-13]; Klein Decl. ¶ 6, Ex. 11 [7-11]. CPCS "regularly receives calls from defense counsel detailing incidents in which ICE arrests an individual outside the courthouse prior to entering the courthouse for their trial or pre-trial hearing." Klein Decl. ¶ 7, Ex. 11 [7-11]. Plaintiffs allege that these arrests are disruptive of civil and criminal proceedings. For example, Plaintiffs describe an arrest by two ICE officers at Somerville District Court as "look[ing] like a fistfight had broken out" and noting that court officers had to get involved to end the confrontation. Foley Decl. ¶ 7, Ex. 12 [7-12]. Plaintiffs report that prior to ICE targeting courthouses for enforcement actions, "noncitizen[s]…who were potentially removable" "did not express concern about appearing in court as plaintiffs, victims, or witnesses[,]" but now, noncitizens are reluctant to attend court in any capacity, "explicitly pointing to the presence of ICE in the courts." Vega Decl. ¶¶ 6-10, Ex. 10 [7-10]. The Middlesex Victim Witness Services office reports that "noncitizen victims and witnesses frequently express concerns about ICE's presence and deportation." Foley Decl. ¶ 6, Ex. 12 [7-12]. Individuals identified by the declarant as "permanent residents" have reported fear seeking the court's assistance for help with domestic violence concerns. Moshier Decl. ¶ 6, Ex. 14 [7-14].

"[Chelsea] Collaborative members who have been victims of employer abuse and wage theft have also refused to seek court intervention because of their fears of ICE presence in the courthouses." Vega Decl. ¶ 14, Ex. 10 [7-10].

Defendants represented at the hearings on this motion that "generally" ICE is not arresting people prior to their participation in hearings and is not targeting witnesses or victims. Defendants did not submit any countervailing affidavits, but submitted a copy of responses posted on a DHS website to frequently asked questions on sensitive locations policy and courthouse arrests. ICE Frequently Asked Questions on Sensitive Locations and Courthouse Arrests, as printed on May 6, 2019 (hereinafter "FAQ Responses") [46-1]. According to the FAQ Responses, "ICE does not view courthouses as a sensitive location," ICE has "for some time had established practices in place related to civil immigration enforcement inside courthouses," and "the increasing unwillingness of some jurisdictions to cooperate with ICE in the safe and orderly transfer of targeted aliens inside their prisons and jails has necessitated additional at large arrests." FAQ Responses at 8-9 [46-1]. The FAQ Responses note further that "[f]ederal, state, and local law enforcement officials routinely engage in enforcement activity in courthouses throughout the country," that the actions "are consistent with longstanding law enforcement practices nationwide," and that because individuals entering courthouses are typically screened for weapons, "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." Id. at 9. The FAQ Responses state further that these arrests "are the result of targeted enforcement actions against specific aliens." Id. at 10. The FAQ Responses also state that "ICE makes every effort to ensure that the arrest occurs after the matter for which the alien was appearing in court has concluded." Id.

III.     Plaintiffs' Standing

"Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" Hollingsworth v. Perry, 570 U.S. 693, 704 (2013). Accordingly, the court turns first to Defendants' challenge to Plaintiffs' constitutional and prudential standing to bring their APA claim. Defs.' Br. at 6-11 [28].

### A. Plaintiffs' Constitutional Standing

In order to satisfy the "irreducible constitutional minimum" of Article III standing, Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548. "The injury need not be 'significant'; a 'small' stake in the outcome will suffice, if it is 'direct.'" Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1281 (1st Cir. 1996) (quoting U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n. 14 (1973)). "[A] federal court [may] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 41–42 (1976). The government argues that Plaintiffs lack an "injury in fact" and that the Plaintiffs' injuries are not traceable to the Courthouse Civil Arrest Directive. Defs.' Br. at 8-11 [34].

The court considers Plaintiffs' injury-in-fact first. Defendants argue that Plaintiffs do not face a threat that the Courthouse Civil Arrest Directive will be applied against them, and moreover, that they have no right to assert a claim against removal on behalf of others who may

be subject to such removal. Id. at 8. But this is not the injury that Plaintiffs are claiming.

Plaintiffs "are not asserting incidental injury from Defendants' general enforcement of the

immigration laws, but direct injury from Defendants' actions targeting courts for federal

immigration enforcement." Pls.' Rep. Br. at 9 [41]. Defendants aptly summarize the DAs'

complaints that "the ICE Directive increases their costs, diverts their resources, and makes their

prosecutions more 'time consuming and difficult.'" Defs.' Br. at 9 [34] (citing Compl. ¶¶ 80, 82

[1]). The DAs claim that ICE civil arrests *in state courthouses*, the sole forum in which they can

prosecute cases, are hindering the DAs' ability to carry out their primary functions as District

Attorneys, and Chelsea Collaborative claims that these civil arrests impair their members' ability

to protect themselves through the state courts from unlawful actions of other individuals. For

example, Plaintiffs allege that survivors of domestic abuse are "reluctant to file for civil

protective orders against abusive partners or appear [in] court as witnesses in criminal cases

against their abusers." Moshier Decl. ¶ 4, Ex. 14 [7-14]. Fears concerning ICE's presence from

victims and witnesses "have been more prevalent since the ICE policy was announced." Foley

Decl. ¶ 6, Ex. 12 [7-12]. Victim Witness Advocates can no longer advise victims that their fear

of arrest during the court process is unfounded. Foley Decl. ¶¶ 4-5, Ex. 12 [7-12].

Defendants argue that a state prosecutor does not suffer an injury in fact merely because a

federal law-enforcement action (or threat of it) increases the time or costs associated with state

prosecutions, and assert that they know of no case in which a court has found standing to

challenge a federal law on this basis. Defendant conflates two issues, however. Federal

prosecutions may well routinely burden state prosecutions (or vice versa), without there being a

legal claim that may be asserted. But the inquiry here is whether there is a cognizable injury for

purposes of Article III standing. The court agrees with Plaintiffs that being unable to reliably

secure the attendance of defendants, victims, and witnesses hinders the ability of the DAs to prosecute crimes and Chelsea Collaborative's members to secure their rights under state law and amounts to a particularized injury sufficient to constitute injury-in-fact. See Matter of C. Doe, No. SJ-2018-119 at 10-11 (Mass. Sept. 18, 2018), Ex. 7 [7-7] ("[T]he administration of justice in the Commonwealth suffers when litigants, witnesses, and others with business before the courts are afraid to come near a Massachusetts courthouse because they fear being arrested by immigration authorities.").

CPCS alleges that ICE's implementation of the Courthouse Civil Arrest Directive and the fear generated by courthouse arrests is impeding CPCS' representation of its clients and its ability to manage its expenses. CPCS's core function of representing criminal defendants is impeded when its clients are apprehended by ICE prior to appearing in court and proceedings are interrupted or altogether cannot continue. That alone is enough to constitute injury-in-fact. Further, CPCS declares that "time and resources have been consumed by…assisting defense attorneys whose clients have been impacted by this ICE enforcement policy." Klein Decl. ¶ 4, Ex. 11 [7-11]. CPCS has alleged a concrete and particularized injury sufficient to constitute injury-in-fact.

Though Defendants cite to several cases in support of their challenge to Plaintiffs' standing, none are applicable here.[4] The court finds that the injuries alleged by the Plaintiffs satisfy the Article III injury-in-fact requirements.

---

[4] New York v. United States, 505 U.S. 144 (1992), does not address the requirements for standing. In Massachusetts v. Mellon, 262 U.S. 447 (1923), the Court held that the state did not have standing to sue because the provisions in the challenged statute were voluntary. Plaintiffs here are not suing under similar circumstances. Virginia ex rel. Cuccinelli v. Sebelius, 656 F.3d 253 (4th Cir. 2011), is also inapplicable, because, in that case, Virginia passed a "non-binding declaration," id. at 270, declaring its opposition to a federal statute and then sued based on the conflict between its declaration and the federal law.

As to traceability, the government argues that each Plaintiff's injury is not traceable to the Courthouse Civil Arrest Directive because it results from "third-party aliens' decisions not to attend Massachusetts courts in an effort to evade arrest and removal proceedings." Defs.' Br. at 10 [34]. "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." Bennett v. Spear, 520 U.S. 154, 168–69 (1997). The unwillingness of those at risk of ICE civil arrest to visit courthouses injures the DAs and Chelsea Collaborative members and is alleged be a direct result of the Courthouse Civil Arrest Directive. The DAs report that concerns from witnesses and victims about ICE's presence "have been more prevalent since the ICE policy was announced." Foley Decl. ¶ 6, Ex. 12 [7-12]. Before ICE began civilly arresting people at courthouses, Chelsea Collaborative helped members file suit, and helped members in litigation by filling courtrooms with supporters. Vega Decl. ¶ 6, Ex. 10 [7-10]. Now, Chelsea Collaborative struggles to persuade noncitizen members to go to court as victims, witnesses, or supporters. Vega Decl. ¶ 9, Ex. 10 [7-10]. According to Chelsea Collaborative, the "reluctance to attend court began soon after ICE's increase in targeted enforcement actions in courthouses." Id. The Courthouse Civil Arrest Directive "has caused a strain both on [Chelsea Collaborative's] personnel and [their] budget such that [they] are unable to effectively carry out many of [their] other goals and missions." Vega Decl. ¶ 22, Ex. 10 [7-10]. The injuries alleged by the DAs and Chelsea Collaborative are traceable to the Courthouse Civil Arrest Directive. Accordingly, the DAs and Chelsea Collaborative each have standing to bring this case.

The government argues that CPCS's "alleged injuries are caused by third-party aliens' decisions not to attend Massachusetts courts in an effort to evade arrest and removal proceedings." Defs.' Br. at 11 [34]. However, CPCS is not complaining that its clients are

16

voluntarily choosing not to attend court, but that ICE is civilly arrested their clients when these individuals come to state court to attend state proceedings against them. These arrests cause CPCS to expend resources to respond to civil courthouse immigration enforcement. CPCS contends that defense attorneys inside courthouses regularly discover that clients are arrested prior to entering the courthouse to appear at criminal proceedings, causing a default judgment to enter. Klein Decl. ¶ 7, Ex. 11 [7-11]. CPCS's cognizable injuries are traceable to ICE's courthouse arrest policy, and not to a third party. Therefore, CPCS also has standing to bring this case.

### B. *Plaintiffs' Prudential Standing*

"The doctrine of standing also includes prudential concerns relating to the proper exercise of federal jurisdiction." Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1281 (1st Cir. 1996). "The interest [Plaintiffs] assert[] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [Plaintiffs allege] was violated." Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 224-25 (2012) (noting that the prudential standing test "is not meant to be especially demanding") (internal citation omitted). "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987). Plaintiffs, therefore, need not be the target of ICE civil arrests or enforcement, but merely have interests that are more than "marginally related" to ICE enforcement in courthouses. The Plaintiffs here, as participants in the state civil and criminal justice systems, represent stakeholders affected by civil immigration arrests in state courthouses. Though no specified Congressional intent to include Plaintiffs in the

zone of interest of the INA is needed, Clarke, 479 U.S. at 399-400, Congress nonetheless

indicated its preference that federal immigration enforcement not impede state criminal law

enforcement. The INA specifies that the federal government "may not remove an alien who is

sentenced to imprisonment until the alien is released from imprisonment." 8 U.S.C. § 1231

(a)(4)(A). Considering this provision as an example, the low threshold necessary to satisfy the

zone of interest test, and the plain interests of prosecutors, criminal defense attorneys, and an

organization serving immigrants in the proper enforcement of immigration laws within

courthouses, the court finds that Plaintiffs are within the statute's zone of interest and therefore

have standing to pursue this case.

IV.     Plaintiffs' Motion for a Preliminary Injunction

Having found that Plaintiffs have standing to bring their APA claim, the court turns to

Plaintiffs' motion. "A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

A.   Likelihood of Success on the Merits

1.   Common Law Privilege Against Civil Courthouse Arrests

In England, for many centuries prior to the founding of the United States, civil litigants

commenced their suits by having a civil defendant arrested. See Clinton W. Francis, Practice,

Strategy, and Institution: Debt Collection in the English Common-Law Courts, 1740-1840, 80

Nw. U. L. Rev. 807, 810 (1986); see also Nathan Levy, Jr., Mesne Process in Personal Actions at

Common Law and the Power Doctrine, 78 Yale L. J. 52, 61 (1968) (In England, "arrest [was] the

usual mode of beginning suit"). "[P]ersons so charged [in civil litigation] could be arrested

anywhere in England and brought within the custody of the [court]." Nathan Levy, Jr., <u>Mesne Process in Personal Actions at Common Law and the Power Doctrine</u>, 78 Yale L. J. 52, 62 (1968). "At common law, the writ of *capias ad respondendum* directed the sheriff to secure the defendant's appearance by taking him into custody." <u>Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.</u>, 526 U.S. 344 (1999). The courts recognized that permitting arrests at courthouses of those attending court on other matters could chill attendance at those other proceedings. <u>See The King v. Holy Trinity in Wareham</u>, 99 Eng. Rep. 531 (1782) ("for the purposes of justice" those attending court proceedings were privileged from being arrested on civil process); <u>Meekins v. Smith</u>, 126 Eng. Rep. 363 (1791) (same).

The United States imported that procedure of civil arrest and that common law privilege against civil arrest at courthouses into its judicial system. <u>See Stewart v. Ramsay</u>, 242 U.S. 128, 130 (1916) ("[The privilege] is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify.") (quoting <u>Parker v. Hotchkiss</u>, 18 F. Cas. 1137, 1138 (C.C.E.D. Pa. 1849)). "It has long been settled that parties and witnesses attending in good faith any legal tribunal, with or without a writ of protection, are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." <u>Larned v. Griffin</u>, 12 F. 590, 590 (C.C.D. Mass 1882). The United States Constitution recognizes a similar privilege from civil arrest during legislative proceedings, stating that members of Congress are "privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same." U.S. CONST. art. I, § 6, cl. 1. In explaining this clause in his treatise on the Constitution, Justice Storey underscored the fundamental nature of the privilege against

courthouse arrests, noting that "[t]his privilege is conceded by law to the humblest suitor and witness in a court of justice." Williamson v. United States, 207 U.S. 425, 443 (1908) (quoting JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, (1883)). Indeed, courts in the United States have recognized that "justice requires the attendance of witnesses cognizant of material facts, and hence that no unreasonable obstacles ought to be thrown in the way of their freely coming into court to give oral testimony." Diamond v. Earle, 217 Mass. 499, 501 (1914).

The writ of *capias ad respondendum* eventually gave way to personal service of summons or other form of notice. International Shoe Co. v. Wash., 326 U.S. 310, 316 (1945). As the preferred means for obtaining a civil defendant's presence in a lawsuit changed from a civil arrest to a summons and civil process, state and federal courts recognized the need for that privilege's continued applicability, though this procedure was even less intrusive than a civil arrest. See Page Co. v. MacDonald, 261 U.S. 446, 448 (1923) (recognizing the importance of this privilege and the "necessity of its inflexibility"); Stewart v. Ramsay, 242 U.S. 128, 130 (1916) (citing with approval Parker v. Hotchkiss, 18 F. Cas. at 1138 and applying the privilege against arrest in a courthouse to being served with a summons while attending a court proceeding); Diamond v. Earle, 217 Mass. 499, 501 (1914) (exempting courthouse attendees from service of civil process). Such an "absolutely indispensable"  privilege, Williamson, 207 U.S. at 443 (quoting JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1883)), so fundamental to the functioning of both federal and state judiciary, cannot be assumed to have disappeared simply with the passage of time. The court therefore concludes that a privilege

against civil arrest remained present at common law when Congress enacted the provisions at issue here.[5]

## 2.  *Merits of the Administrative Procedures Act Claim*

Plaintiffs argue that this common law privilege against civil arrests of court attendees was not abrogated by Congress and that the Courthouse Civil Arrest Directive therefore exceeds ICE's authority and must be invalidated under the Administrative Procedure Act, 5 U.S.C. § 706 (2)(C). The APA instructs a reviewing court to "hold unlawful and set aside agency action…found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706 (2)(C).

"Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." United States v. Texas, 507 U.S. 529, 534 (1993) (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952)) (quotation marks and alterations omitted). "In such cases, Congress does not write upon a clean slate." Id. (citing Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108, 111 (1991)). "This presumption is, however, no bar to a construction that conflicts with a common-law rule if the statute speaks directly to the question addressed by the common law." Pasquantino v. United States, 544 U.S. 349, 359 (2005) (internal quotation marks, citations, and alterations omitted). Compare In re Gitto Glob. Corp., 422 F.3d 1, 8 (1st Cir. 2005) ("Because [statute at issue] speaks directly to the question of public access, however, it supplants the common law for purposes of determining public access to papers filed

---

[5] The court notes, however, that the privilege is tied to the voluntary attendance of parties, witnesses and others in the courthouse and to the necessities of judicial administration. Plaintiffs offer no authority for the proposition that this privilege extends to individuals who are brought to the courthouse in federal or state custody.

in a bankruptcy case.") <u>with</u> <u>Beck v. Prupis</u>, 529 U.S. 494, 504 (2000) (Holding that Congress intended to "adopt…well-established common-law…principles" where the statute offered no indication to the contrary).

The INA, as passed in 1952, did not "speak[] directly" to the common law privilege against civil arrest at the courthouse, nor did any subsequent amendments to the statute. The civil arrest provisions, detailed above, provide for two types of civil arrest: with and without a warrant. When the ICE has secured a warrant, the civil arrest provision permits that "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Nothing in this provision or section of the statute speaks to courthouse arrests in any way. <u>See</u> <u>United States v. Texas</u>, 507 U.S. at 534-35 (holding that the Debt Collection Act does not speak directly to the government's common law right to collect prejudgment interest where the statute at issue uses the term "person" and does not specify that "person" includes states).

The provision for warrantless civil arrests includes a specified list of when such arrests are appropriate. An ICE officer or employee may civilly arrest, without a warrant, "any alien…if he has reason to believe that the alien so arrested is in the United States in violation of [an immigration law or regulation] and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357 (a)(2). Like § 1226(a), this section does not address courthouse arrests or provide any basis for finding that Congress abrogated the common law privilege against civil arrests in courthouses.

The government argues that the INA supersedes all common law, that immigration law preempts state law, and that the federal government has the sole authority to control immigration. Defs.' Br. at 20-22 [34]. The government's arguments presume that Plaintiffs are seeking to alter

the removal process, but that is not the relief Plaintiffs seek. Plaintiffs are not arguing for any change in removal proceedings, but are simply contending that civil arrests at state courthouses are outside of the statutory authority granted to the government. Even with the comprehensive immigration law system devised by Congress, there are some limits to how and where the government can arrest those it seeks to remove, including the limits written into the statute itself.[6]

At the second day of hearing, the government argued that 8 U.S.C. § 1229(e) demonstrates Congress's intent that the INA abrogate the privilege against courthouse arrests.[7] Section 1229(e)(1) requires that, "[i]n cases where an enforcement action leading to a removal proceeding was taken against an alien at any of the locations specified in paragraph (2), the Notice to Appear shall include a statement that the provisions of section 1367 of this title have been complied with." 8 U.S.C. § 1229(e)(1).[8] One of those specified locations is "a courthouse…if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is

---

[6] The DHS website answers the question "is it legal to arrest suspected immigration violators at a courthouse," with the assertion that "ICE officers and agents are expressly authorized by statute to make arrests of aliens where probable cause exists to believe that such aliens are removable." [46-1]. In fact, warrantless civil arrests further require that the arresting officer believe the person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357 (a)(2).

[7] The cited paragraph is found in a section of the code entitled "Initiation of Removal Proceedings," and not in either section 8 U.S.C. § 1226, entitled "Apprehension and detention of aliens," where the provision concerning arrests with a warrant is found, or 8 U.S.C. § 1357, entitled "Powers of immigration officers and employees," where provisions concerning warrantless arrests are found.

[8] Section 1367, entitled "Penalties for disclosure of information," prohibits ICE and other enforcement agencies from "mak[ing] an adverse determination of admissibility or deportability…using information solely furnished by…a spouse or parent who has battered the alien or subjected the alien to extreme cruelty or others potentially complicit in the abuse of the alien or their family."

described in subparagraph (T) or (U) of section 1101(a)(15) of this title." 8 U.S.C. § 1229(e)(2)(B).

These provisions were added in 2006. See Violence Against Women and Department of Justice Reauthorization Act, PL 109–162, January 5, 2006, 119 Stat 2960. "The views of a subsequent Congress, however, form a hazardous basis for inferring the intent of an earlier one." Bilski v. Kappos, 561 U.S. 593, 645 (2010) (quoting United States v. Price, 361 U.S. 304, 313 (1960)) (internal quotation marks omitted). "When a later statute is offered as an expression of how the Congress interpreted a statute passed by another Congress a half century before, such interpretation has very little, if any, significance." Bilski, 561 U.S. at 645 (citing Rainwater v. United States, 356 U.S. 590, 593 (1958)) (internal quotation marks and alterations omitted). The 2006 enactment of the Violence Against Women and Department of Justice Reauthorization Act has little bearing on the court's interpretation of Congressional intent regarding courthouse arrests in 1952, and certainly does not amount to a clearly stated intent to abrogate the common law privilege. See, e.g., Pasquantino, 544 U.S. at 359 (requiring Congress to clearly state its intent to abrogate the common law).

The government also argues that "ICE has long exercised its arrest authority at and around courthouses…." Defs.' Br. at 4 [34]; see also 2014 Courthouse Memorandum [28-2]. And the provisions of the Violence Against Women and Department of Justice Reauthorization Act do signal that immigration courthouse arrests were occurring by 2006, that Congress was aware that those arrests were occurring, and that Congress did not legislate to cease those arrests. "But the significance of subsequent congressional action or inaction necessarily varies with the circumstances, and finding any interpretive help in congressional behavior here is impossible." United States v. Wells, 519 U.S. 482, 495 (1997). See also Star Athletica, L.L.C. v. Varsity

Brands, Inc., 137 S. Ct. 1002, 1015 (2017) (quoting Pension Benefit Guaranty Corporation v. LTV Corp., 496 U.S. 633, 650 (1990)) ("'Congressional inaction lacks persuasive significance' in most circumstances."). That this practice has been ongoing and that Congress has not halted courthouse civil arrests does not alter the court's understanding of the common law privilege against civil courthouse arrests at the time the INA civil arrest provisions were enacted, and the absence of any clearly stated intent to abrogate that privilege at that time. Accordingly, the court finds that Plaintiffs have a strong likelihood of success on the merits of their claim that Courthouse Civil Arrest Directive exceeds the authority granted to ICE by the Congress in the civil arrest provisions of the INA and should be invalidated pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

   B.  *Irreparable Harm*

   "Irreparable injury in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005) (internal quotation marks omitted). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). "'District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.'" K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) (quoting Wagner v. Taylor, 836 F.2d 566, 575–76 (D.C.Cir.1987)).

   Plaintiffs argue they are suffering ongoing and irreparable harm. Pls.' Mem at 17 [6]. Specifically, Chelsea Collaborative argues the Courthouse Civil Arrest Directive forces the

diversion of resources from their normal activities to "an extra-judicial mediation and dispute-resolution system." Id. at 18. Chelsea Collaborative's members are afraid to use the courts to vindicate their rights when they are victimized by employers, landlords, family members, and others. Vega Decl. ¶ 9-10, Ex. 10 [7-10]. Chelsea Collaborative's mediation program redirects efforts from other causes and, as a result, Chelsea Collaborative is "unable to effectively carry out many of [its] other goals and missions." Id. at ¶ 22.

Plaintiffs claim the Courthouse Civil Arrest Directive interferes with the District Attorney's ability to prosecute specific cases because victims and witnesses are scared to participate in the proceedings, Pls.' Mem at 18-19 [6], and because ICE civilly arrests many non-targeted individuals at courthouses. Klein Decl. ¶ 6, Ex. 11 [7-11]. For example, survivors of domestic violence fear utilizing the court system in responding to abuse because of a fear of immigration authorities at courthouses. Moshier Decl. ¶ 3, Ex. 14 [7-14]. Domestic violence perpetrators reinforce this fear when talking to survivors. Foley Decl. ¶ 5, Ex. 12 [7-12]. As a result, survivors are "reluctant to file for civil protective orders against abusive partners." Moshier Decl. ¶ 4, Ex. 14 [7-14]. Even complaints successfully filed may not be pursued if survivors fear returning to court to testify in their own cases. Id. at ¶ 6.

CPCS argues the Courthouse Civil Arrest Directive shifts their staff focus to assist criminal defense attorneys in the process of navigating the potential immigration consequences of their client's circumstances, often including helping counsel locate their client in ICE civil detention. Pls.' Mem at 19 [6]. CPCS expends resources "responding to the effects of courthouse arrests, and… assisting defense attorneys whose clients have been impacted by this ICE enforcement policy." Klein Decl. ¶ 4, Ex. 11 [7-11]. Further, when defendants with pending charges are arrested in the courthouse before they can appear before a judge, a default is entered

against them. Id. at ¶ 9. A default can, among other things, cause "the denial of release on immigration bond and denial of relief from removal." Id. at ¶ 10.

None of the financial costs alleged by Plaintiffs could be recovered from the government in the event Plaintiffs succeed at trial. Further, Plaintiffs have made an unrebutted showing that each day that the threat of ICE civil arrests looms over Massachusetts courthouses impairs the DAs and CPCS ability to successfully perform their functions within the judicial system, and Chelsea Collaborative's members' ability to enforce legal rights, and that absent an injunction, some state criminal and civil cases may well go unprosecuted for lack of victim or witness participation. CPCS will continue to incur costs as defendants are civilly arrested when attempting to respond to criminal complaints. Criminal defendants will be unable to vindicate their rights if they are taken into ICE custody prior to appearing in court or if witnesses in their defense are too fearful to visit a courthouse. None of these harms can be remedied after the conclusion of this litigation. Therefore, the court finds that the Plaintiffs have alleged irreparable harm sufficient to warrant and injunction.

C.  *Balance of Harms and Weighing of the Public Interest*

Plaintiffs accurately argue that when the government is the defendant in a case for which a preliminary injunction is sought, the court may aggregate its consideration of the balance of harms and weighing of the public interest. Pls.' Br. at 19 [6] (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

Plaintiffs contend that without an injunction, victims and witnesses will continue to avoid using the state courts, leading to a failure of state civil and criminal proceedings, ultimately harming the rule of law. Over two days of hearing on this preliminary injunction, counsel for the government repeatedly argued that ICE was not conducting courthouse arrests in the manners

described by Plaintiffs. Specifically, counsel represented that "generally" ICE does not arrest civil litigants, witnesses, or victims at courthouses. If this is the case, then to enjoin the applicability of the Courthouse Civil Arrest Directive as to civil arrests of courthouse attendees other than criminal defendants will cause no significant harm to the government. Plaintiffs, in comparison, and the public in general will suffer harm each day that witnesses and victims refuse to participate in proceedings, as detailed above.

Plaintiffs also contend that without an injunction, state criminal defendants who are arrested by ICE coming or leaving the courthouse will be prevented from attending proceedings against them, impairing the DAs ability to prosecute cases and increasing CPCS's costs in representing criminal defendants. According to Defendants' counsel, ICE's general policy is not to arrest criminal defendants until the conclusion of the hearing that they are attending in state court. Counsel acknowledged, however, that ICE would make courthouse arrests before the targeted individuals leave the courthouse. They contend that ICE's inability "to arrest fugitive aliens at the one place at which it can reliably find them in Massachusetts" would harm both the public and the federal government, and that arrestees, officers and the public would be safer if arrests are conducted in courthouses where individuals are screened for weapons. Defs.' Opp. at 26 [34].

The court credits Defendants' safety concerns, as well as the public's need to be protected from dangerous criminal aliens. But Defendants' attempt to justify civil courthouse arrests on these grounds, and on the fact that Massachusetts courts do not recognize civil detainers, and that Federal, state and local law enforcement activity concerning criminal matters "routinely" occurs in courthouses, ignores a critical distinction regarding the challenged arrests. Plaintiffs here seek only to enjoin civil, not criminal, arrests. Where ICE has an alternative route

regarding targeted and dangerous aliens, namely, to pursue a criminal, rather than a civil arrest, see 8 U.S.C. § 1357(a)(4), the balance of harm and public interest support issuance of the injunction against civil arrests.

V.      Conclusion

Having found that Plaintiffs have standing to bring this suit, and that they have demonstrated a likelihood of success on the merits of Count 1 of their Complaint [1], that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in Plaintiffs' favor, and that an injunction is in the public interest, the court GRANTS Plaintiffs' Motion for a Preliminary Injunction [5]. The court will issue a preliminary injunction enjoining Defendants from implementing ICE Directive No. 11072.1, "Civil Immigration Actions Inside Courthouses," dated January 10, 2018, in Massachusetts and from civilly arresting parties, witnesses, and others attending Massachusetts courthouses on official business while they are going to, attending, or leaving the courthouse.

IT IS SO ORDERED.

June 20, 2019                                                   /s/ Indira Talwani
                                                               United States District Judge