UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARIAN RYAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CV-11003-IT |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS | ) | |
| ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

## INTRODUCTION

"[T]he formulation of policies pertaining to the entry of aliens and their right to remain here is entrusted exclusively to Congress." *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307 (1st Cir. 2000). Exercising that "plenary" and "pervasive" authority, *id.*, Congress has codified in the Immigration and Nationality Act ("INA") the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States to effectuate their removal. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1231, 1357.

U.S. Immigration and Customs Enforcement ("ICE") has long exercised its arrest authority in and around courthouses given its strong interest in removing aliens who engage in criminal activity, are in gangs, are national security threats, or have already had final judgments issued rendering them removable. On January 10, 2018, ICE promulgated Directive 11072.1: Civil Immigration Enforcement Inside Courthouses (Ex. A), articulating revised policy guidance for the exercise of ICE's discretionary arrest authority within federal and state courthouses. Per the Directive, ICE specifically targets aliens convicted of crimes, gang members, national security or public safety risks, aliens subject to final orders of removal, or aliens who have illegally reentered the country after being removed. Directive 11072.1 does not alter the prior ICE policy against "initiat[ing] removal proceedings against an individual known to be the immediate victim or witness to a crime," an individual in a "non-frivolous lawsuit[] regarding civil rights or liberties violations," or an individual "engaging in a protected activity related to civil or other rights (for example, ... complaining to authorities about ... housing conditions) who may be in a non-frivolous dispute with an employer, landlord, or contractor" absent "special circumstances or aggravating factors." ICE Directive 10076.1: Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs (June 17, 2011) (Ex. C).

Likewise, ICE Policy 10036.1: Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (Jan. 22, 2007) (Ex. D) remains in effect. Directive 10036.1 provides guidance to ICE employees with respect to the requirements of 8 U.S.C. § 1229(e). To wit, when an enforcement action leading to a removal proceeding is taken against an alien appearing in certain protected locations, including a courthouse, and that appearance was in connection with a specified activity, *i.e.*, a protection order case, child custody case, or other civil or criminal case relating to

domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty, *or* if the alien is described in subparagraph (T) or (U) of 8 U.S.C. § 1101(a)(15), the completion of a certificate of compliance with U.S.C. § 1367 is required to ensure that the protections intended for these specific types of victims have not been infringed.

Notwithstanding the Executive's "broad" and "undoubted power" to implement its statutory arrest authority, *Arizona v. United States*, 567 U.S. 387, 394 (2012), Plaintiffs — two Massachusetts District Attorneys (DAs), a public defender agency, and an organization — assert that Directive 11072.1 exceeds ICE's authority under 8 U.S.C. §§ 1226 and 1357, and therefore violates the Administrative Procedure Act (APA). Specifically, Plaintiffs contend that a purported "common-law privilege against civil courthouse arrests," Compl. ¶ 2, precludes the Executive from exercising its arrest authority under §§ 1226 and 1357, and that the Directive thus is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiffs also bring freestanding claims that the Directive violates the purported privilege, Compl. ¶¶ 107-11, that it violates the Tenth Amendment because it "impermissibly commandeer[s] the state criminal justice and judiciary systems," *id.* ¶¶ 112-17, and that it violates the "right of access to the courts in violation of" the Plaintiff organization's "rights under the First, Fifth and Fourteenth Amendments," *id.* ¶¶ 118-22.

The complaint should be dismissed for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or alternatively for failure to state a claim under Rule 12(b)(6). To start, Plaintiffs, none of whom are aliens subject to ICE arrest or detention, lack Article III standing and a cognizable cause of action. Moreover, the Directive is unreviewable under the APA because it is committed to agency discretion by law, and because it is not final agency action. 5 U.S.C. §§ 701(a)(2), 704. Further, Plaintiffs' APA and federal common law claims fail for two substantive reasons: (1) federal common law has never provided immunity from immigration enforcement; and (2) Congress abrogated any immunity by enacting a comprehensive immigration arrest and detention scheme. Plaintiffs' Tenth Amendment claim fails because the Directive does not command or compel state actors to act; and the access-to-the-courts claim fails because Plaintiffs make only general allegations and have not shown that the federal government has wrongfully blocked the filing of a specific lawsuit. For these reasons, this Court should dismiss the complaint.

**BACKGROUND**

*Federal law.* The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394; *see* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). The Executive Branch is tasked with enforcing the United States' immigration laws in the nation's interior, which it generally does through immigration removal proceedings initiated after arrest through the issuance of a Notice to Appear (NTA) filed with the immigration court. 8 C.F.R. §§ 1239.1(a), 1003.14, 1003.18.

The arrest is a critical component for initiating removal proceedings before an immigration judge. Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."[1] 8 U.S.C. § 1226(a). Congress also has provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). These statutes confer arrest authority that is generally plenary and unqualified.

*Prior Guidance and Directive 11072.1.* Since at least 2014, ICE policy has permitted courthouse arrests in certain circumstances. Enforcement Actions at or Near Courthouses (Mar. 19, 2014) (Ex. B). In the 2014 policy, ICE explained that arrests in and around courthouses were important to ensure that aliens convicted of crimes, gang members (16 years or older), and national security or public safety risks can be safely apprehended for removal. *Id.* The 2014 policy restricted enforcement actions against "collaterally" present aliens, "such as family members and friends" of the "target alien," and directed that enforcement actions should, "whenever practicable," "take place outside public areas of the courthouse," "be conducted in collaboration with court security and staff," and "utilize the court building's non-public entrances and exits." *Id.*

Massachusetts state courts generally cooperated with federal immigration enforcement efforts; however, in 2017, the Supreme Judicial Court of Massachusetts held that State judicial and law-enforcement officers lack authority to transfer detainees to the federal government in civil

---

[1] Congress has transferred immigration enforcement functions from the Attorney General to the Secretary of Homeland Security. 6 U.S.C. § 251; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

immigration matters. *Lunn v. Commonwealth*, 477 Mass. 517, 531 (2017); *see also* Mass. Executive Office of the Trial Court, Policy and Procedures Regarding Courthouse Interactions with the Department of Homeland Security (Nov. 8, 2017) ("Trial Court employees shall not hold any individual who would otherwise be entitled to release based solely on a civil immigration detainer or civil immigration warrant."). As a result, many dangerous aliens involved in criminal activity, who were previously transferred to ICE custody in secure locations like jails or prisons, are now released to the streets of Massachusetts, often immediately following state proceedings. ICE, FAQ on Sensitive Locations and Courthouse Arrests, ECF 1-3. Accordingly, Massachusetts law now leaves courthouses as one of the few places where "safety risks for the arresting officers, the arrestee, and members of the community are substantially diminished." *Id.*

In 2018, ICE promulgated Directive 11072.1 (the "Directive"), which revised the policy "regarding civil immigration enforcement actions" in courthouses. The Directive indicates that courthouse arrests may be necessary when local jurisdictions decline "to cooperate with ICE in the transfer of custody of aliens from" secure locations like "their prisons and jails" because, given that persons who enter courthouses are typically screened for weapons, "immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." *Id.* The Directive substantively differs from the 2014 policy in only three main respects. *First*, it focuses solely on civil immigration enforcement actions "inside" courthouses. *Second*, it adds two categories of targeted aliens: "aliens who have re-entered the country illegally after being removed" (a federal felony under 8 U.S.C. § 1326) and "aliens who have been ordered removed from the United States but have failed to depart." *Third*, it articulates "exceptional circumstances" in which ICE may arrest non-target aliens, such as "when the individual poses a threat to public safety or interferes with ICE's enforcement actions." ECF 1-4 at 1. As to witnesses and victims of crimes (including domestic violence), ICE policy and 8 U.S.C. § 1367 set additional limitations unchanged for nearly a decade. Ex. C. The Directive instructs ICE officers "generally [to] avoid enforcement actions in courthouses," and proscribes enforcement in areas "that are dedicated to non-criminal (e.g. family court, small claims court) proceedings." *Id.* at 2.

Under the Directive, when an enforcement action inside a courthouse is "operationally

necessary," it may be conducted with the approval of a high-level officer. *Id.* at 1. The Directive "has provisions that attempt to make enforcement actions within courthouses orderly, safe, and nondisruptive." *Matter of Doe*, No. SJ-2018-119 (Mass. Sup. Jud. Ct. Sept. 18, 2018), ECF 7-7 at 7 n.5. The Directive mandates that, "when practicable," ICE officers "conduct enforcement actions discreetly to minimize their impact on court proceedings." ECF 1-4 at 1. In line with prior policy, the Directive prioritizes non-public arrests when possible. *Id.* at 3. It directs ICE officers and agents to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," and requires them to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions." *Id.* Thus, the Directive strikes a balance between ICE's legitimate interests in enforcing immigration law; protecting the safety of its officers, the arrestee, and members of the public; and the goal of minimizing interference with judicial proceedings.

*Procedural Background.* On April 29, 2019, Plaintiffs filed their complaint and a motion for preliminary injunction, which is currently pending. ECF No. 6. Plaintiffs are: the Middlesex County and Suffolk County DAs (the "DAs"); the Committee for Public Counsel Services ("CPCS"), Massachusetts' public defender agency; and the Chelsea Collaborative (the "Collaborative"), "an organization dedicated to the needs of the community of Chelsea." Compl. ¶¶ 11, 12, 14, 16. The complaint asserts four claims: (1) a claim under the APA, (2) a freestanding claim asserting a violation of the common-law privilege against arrests, (3) a Tenth Amendment anti-commandeering claim, and (4) a claim asserting a violation of the right of access to the courts, brought solely by the Collaborative. *Id.* ¶¶ 97-122.

## ARGUMENT

A.   *This Court Lacks Subject-Matter Jurisdiction Under Fed. R. Civ. P. 12(b)(1) Because Plaintiffs Lack Article III Standing and Are Not Within the INA's Zone of Interests.*

For the reasons discussed in Defendants' Opposition to the Motion for Preliminary Injunction, ECF 28, Plaintiffs lack standing to bring this suit. *See* ECF 28 at 5-8. The government acknowledges that this Court has held otherwise, ECF 51 at 12-17, so it will not belabor the point. It preserves the question of standing for appeal, including that the privilege, to the extent it exists, is a personal right that cannot be asserted by organizations on behalf of third parties, *cf. N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 63 (1st Cir. 2001), that the parties lack standing because they are "neither

prosecuted nor threatened with prosecution," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and that state actors cannot have standing to sue to "protect[] its citizens from the government of the United States," *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011). The government further preserves the argument that the harm alleged arises from third-party action not traceable to the government.

Additionally, contrary to the Court's finding at the preliminary injunction stage, Plaintiffs have not alleged in their complaint that their clients are not "voluntarily choosing not to attend court, but [rather] ICE ... civilly arrested their clients when these individuals came to court to attend state proceedings against them."[2] ECF 51 at 17. They have not specifically identified any person in whom *they themselves* have an interest who is actually subject to the rule. Instead, they argue that the arrest of certain aliens has in essence created a chilling effect in participation for nontargeted aliens, like domestic violence victims, who are governed by another ICE policy. *See* Compl. ¶¶ 54-72.

For the reasons described in the Opposition to the Motion for Preliminary Injunction, ECF 28, Plaintiffs are also outside the INA's zone of interests. The government acknowledges that this Court has held otherwise, ECF 51 at 17-19, but wishes to preserve this issue, as the INA "clearly meant to protect the interests of undocumented aliens, not the interests of [public interest] organizations," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project,* 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers); *see Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996).

B.     *Plaintiffs Lack a Valid Cause of Action under the APA to Challenge ICE's Arrest Policies.*

Plaintiffs also lack a cause of action under the APA, which provides the only waiver of sovereign immunity available for Plaintiffs to pursue their claims.

"It is beyond cavil that, as the sovereign, the United States is immune from suit without its consent." *Muirhead v. Mecham*, 427 F.3d 14, 17 (1st Cir. 2005). The only general waiver of sovereign

---

[2] This Court may not make reference to those affidavits now in determining whether the complaint sufficiently states a claim. "[I]f evidence presented at a preliminary injunction hearing is to be relied on in deciding a motion to dismiss, the court must convert such motions into ones for summary judgment." *Rocket Learning, Inc. v. Rivera-Sanchez*, 851 F. Supp. 2d 384, 391 (D.P.R. 2012).

immunity to bring such claims is in the APA, at 5 U.S.C. § 702, and the scope of the Court's jurisdiction to hear such claims is thus cabined by the limitations on that waiver of immunity. *Cf. Fund for Animals v. Mainella*, 283 F. Supp. 2d 418, 429 (D. Mass. 2003) (considering NEPA claims through the APA). The APA provides for judicial review only of "final agency action," and does not apply if the challenged "action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Thus, all of Plaintiffs' claims are actually claims to "hold unlawful and set aside agency action, findings, and conclusions found to be ... contrary to constitutional right, power, privilege, or immunity" under the APA. 5 U.S.C. § 706(2)(B).

The APA provides no cause of action here. The ICE Directive is policy guidance implementing prosecutorial decisions. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); 5 U.S.C. § 701(a)(2). The "initiation or prosecution of various stages in the deportation process," including the choice of when to "commence" a proceeding, is an action that is committed to agency discretion. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999); *see United States v. Armstrong*, 517 U.S. 456, 464 (1996) (holding that "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion"); *Wayte v. United States*, 470 U.S. 598, 607-08 (1985) ("[T]he decision to prosecute is particularly ill-suited to judicial review"). The Directive is unreviewable because it provides guidance to immigration officers about how and when to exercise their discretion to arrest aliens who are properly subject to ICE's detention authority. And even where prosecutorial-discretion decisions are formalized through guidance documents, they are not subject to review if the ultimate decision is discretionary. *See, e.g., Morales de Soto v. Lynch*, 824 F.3d 822, 828 (9th Cir. 2016). ICE's decisions concerning what categories of aliens to arrest and in what circumstances inherently involve the unreviewable exercise of prosecutorial discretion.

Further, "[t]he APA only provides for judicial review of 'final agency action' and ... statements of policy generally do not qualify because they are not finally determinative of the issues or rights to which [they are] addressed." *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013); *see* 5 U.S.C. § 704. Policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position ... in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). The Directive does not require officers to exercise

discretion in any particular way. *See McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1319 (D.C. Cir. 1988). It "merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). The Directive "provides only internal ICE policy guidance," "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural," and places "no limitations ... on the otherwise lawful enforcement or litigative prerogatives of ICE." Ex. A, ¶ 9. Because the Directive merely explains what ICE *may* do as a general matter, and does not create substantive rules or rights, *see Perez v. Mort. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015), or "bind" ICE officers to a mandatory course of conduct, *Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 246 (D.D.C. 2010), it is unreviewable.[3]

C.      *In the Alternative, This Court Should Dismiss Plaintiffs' Claims Under Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim Upon Which Relief May Be Granted.*

Plaintiffs' APA claim also fails on the merits. The INA unambiguously authorizes ICE to arrest any person who is in the United States in violation of immigration law, and does not restrict the location of such arrests. There is no federal-common-law immunity from immigration enforcement for persons who are subject to ICE arrest. Plaintiffs' central contention — that a common-law privilege against civil arrest at courthouses receives "strict and absolute enforcement"— is simply incorrect. Compl. ¶ 28; *see id.* ¶¶ 1-2, 5, 23-32 (similar). And even if an expansive common-law privilege once existed, Congress spoke clearly in establishing a uniform system of immigration, which dictates when and where immigration arrests are lawful, thereby abrogating any such privilege.

1.      This Court Should Dismiss Counts I and II Because There Is No Common-Law Privilege Against Federal Immigration Enforcement in Courthouses.

Plaintiffs' theory of federal common law is novel.  It relies on analogy, not any clear historical privilege. *See, e.g.*, Compl. ¶¶ 23-32. Plaintiffs claim that, because the federal-common-law immunity from civil arrests is "well-settled," Congress in the INA legislated against that background principle, *id.* ¶¶ 33-35, and thus the INA contains an implicit "limitation privileging those attending court on official business from civil courthouse arrest[,]" *id.* ¶ 35. This argument fails for two main reasons.

---

[3] To be sure, if the policy was applied to an actual alien, it could be final agency action as to that particular alien. *See, e.g.*, *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014).

*First,* Plaintiffs assert an overbroad privilege that finds no support in Supreme Court precedent: a privilege against *all* civil arrests regardless of jurisdiction or arresting authority. The Supreme Court's cases recognize a much narrower privilege: the immunity from *service of process* in a private civil suit based on transient jurisdiction when a person enters a jurisdiction solely to attend a court proceeding as a witness or party. *See Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) (service on an Illinois resident when he was in the Northern District of Mississippi "in attendance on the court"); *Page Co. v. MacDonald*, 261 U.S. 446, 446-47 (1923) (service on a Canadian resident who was in Massachusetts "in attendance before a special master appointed by the superior court"); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916) (service on a Colorado resident when in the Northern District of Illinois solely as a witness in a case).[4] As the Supreme Court made clear in *Stewart*, "[t]he true rule, well founded in reason and sustained by the weight of authority, is that suitors, as well as witnesses, *coming from another state or jurisdiction*, are exempt from the *service of civil process* while in attendance upon court, and during a reasonable time in coming and going." *Stewart*, 242 U.S. at 129 (emphasis added).

In the United States, the process-immunity privilege was an extension of the principle recognized in the Supreme Court's decision in *Pennoyer v. Neff*, 95 U.S. 714 (1877), that a state court can constitutionally assert personal jurisdiction over a defendant only if he voluntarily appears in the state court or is served with process while physically present in the forum state. *Id.* at 727, 733. Because physical presence was historically the key to state-court jurisdiction, potential defendants were incentivized not to attend court proceedings in states in which potential plaintiffs might seek to serve them with civil process. To negate this disincentive, courts accorded a civil-arrest privilege to litigants and witnesses who entered a jurisdiction solely to attend a court proceeding. *E.g.*, *Larned v. Griffin*, 12 F. 590, 590 (D. Mass. 1882) (according privilege "from arrest on civil process" to Illinois resident who entered Massachusetts solely to take a deposition). The Supreme Court disavowed the physical-presence requirement in *International Shoe*, holding that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316 (1945). And following *International Shoe*,

---

[4] Plaintiffs also cite dicta from *Long v. Ansell*, which addresses senators' constitutional privilege from arrest. 293 U.S. 76 (1934).  But that case merely cites *Lamb* and is factually irrelevant. *Id.* at 83.

states began to enact long-arm statutes, which extended state-court jurisdiction to (or near) the due-process limits that *International Shoe* had recognized. *See* Douglas D. McFarland, *Dictum Run Wild: How Long-Arm Statutes Extended to the Limits of Due Process*, 84 B.U. L. Rev. 491, 493-96 (2004). Once long-arm statutes proliferated, potential defendants could not necessarily avoid civil process by remaining outside a potential forum state.

Since the dawn of long-arm jurisdiction, the Supreme Court's cases have not mentioned the common-law privilege. Meanwhile, district courts have explained that when an out-of-state defendant is subject to civil process under a forum state's long-arm statute, the privilege does not apply. In *In re Arthur Treacher's Franchise Litigation*, for instance, the court declined to award the privilege to an out-of-state defendant, even though he had traveled to the forum state solely to testify in an unrelated proceeding. 92 F.R.D. 398, 405 (E.D. Pa. 1981). Because the defendant could have been served in his home state under the forum state's long-arm statute, he was not entitled to the privilege. The court reasoned that "it makes little sense to grant immunity to a person who can be served in his home jurisdiction under the forum's long-arm statute." *Id.* (quoting 4A Wright & Miller, *Federal Practice and Procedure: Civil* § 1076 (1969)). Likewise, in *Pavlo v. James*, the court similarly explained that "the reason for the immunity — encouraging voluntary appearances — disappears if a defendant is otherwise subject to the extra-territorial reach of [the forum state's long-arm statute]." 437 F. Supp. 125, 127 (S.D.N.Y. 1977). And in *United States v. Green*, the court held that the privilege was unavailable to out-of-state defendants who "could have been validly served with the subpoenas in question anywhere in the United States." 305 F. Supp. 125, 128 (S.D.N.Y. 1969). The *Green* defendants were not entitled to the privilege because "there [was] no jurisdiction in which [they] could have avoided service of process." *Id.*

Here, too, there is "no jurisdiction in which [aliens] could have avoided service of process." *See id.* The federal immigration scheme is a "comprehensive and unified system" maintained by a "single sovereign," "vested solely in the Federal Government." *Arizona*, 567 U.S. at 407, 409-10. Because the federal government has the sole authority over immigration, it has regulatory authority over all aliens within the United States, regardless of where they may be. Accordingly, aliens subject to immigration enforcement may be arrested *anywhere* in the country. *See* 8 U.S.C. § 1226(a) (providing

for arrests "[o]n a warrant" without jurisdictional limitation), § 1357 (providing for warrantless arrests without jurisdictional limitation); 8 C.F.R. § 287.5(c) (similar). Once ICE arrests an alien and initiates their removal proceedings through a notice to appear, those proceedings may occur anywhere in the country, such that an out-of-state alien does not "giv[e] up the 'safety' of one jurisdiction" when he attends a Massachusetts court proceeding. *Green*, 305 F. Supp. at 128; *see* 8 C.F.R. § 1003.14(a). Thus, "it makes little sense to grant immunity," because the person "can be served in his home jurisdiction," *In re Arthur Treacher's Franchise Litig.*, 92 F.R.D. at 405, or anywhere in the country. Because the privilege is not needed "to shield an individual from service of process to encourage his or her travel to the forum state," it "should not be enlarged beyond the reason upon which it is founded." *N. Light Tech., Inc.*, 236 F.3d at 62; *see id.* (rejecting, "[i]n lieu of a specific request for immunity" from process by a specific individual, a request "to fashion a broad, per se" rule of immunity). That purpose is to "fill[] the gap only where it needs to be filled, that is, in cases where a district court wishes to shield an individual from service of process *to encourage his or her travel to the forum state*."[5] *Id.* (emphasis added). That is not the issue here.

Moreover, the privilege against civil arrest applied in *private* suits, not actions brought by the federal government. Supreme Court case law makes clear that the government vindicates public interests that outweigh any private interest that a person has in avoiding service. When a person is traveling to another state for court and is arrested by the federal government, he cannot complain of "a violation of the rule of comity" when the arrest is from "the courts or the sovereignty which is [the] common superior." *Morse v. United States*, 267 U.S. 80, 82 (1925). The Supreme Court has time and again recognized the public interest in law enforcement as outweighing one's objections to arrest — even allowing criminal cases to go forward when a person is brought to a jurisdiction through kidnapping: "The law will not permit a person to be kidnapped and decoyed within the jurisdiction for the purpose of being compelled to answer to a mere private claim, but in criminal cases the interests of the public override that which is, after all, a mere privilege from arrest." *Ex*

---

[5] Plaintiffs cite state common law cases, Compl. ¶¶ 27-32, but state common law has no application in federal court in a challenge to federal statutes because "federal courts may not use state common law to re-write a federal statute." *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986) (citing *Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-57 (1957)).

*Parte Johnson*, 167 U.S. 120, 126 (1897). That rule "rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized [sic] of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie v. Collins*, 342 U.S. 519, 522 (1952). And "the public interest in apprehending" a person for violating immigration laws, like the interest in prosecution, "outweighs the public interests ... in encouraging vindication of private rights and in preventing the interruption of judicial proceedings."[6] *United States v. Conley*, 80 F. Supp. 700, 701-02 (D. Mass. 1948). Indeed, the courthouse-arrest privilege is limited if it impinges the "due administration of justice," *Lamb*, 285 U.S. at 227.

The federal government's authority over immigration is "plenary" and "pervasive," and "is uniquely a matter of federal, not local, concern." *Herrera-Inirio*, 208 F.3d at 307. Accordingly, a court's authority over an alien under its jurisdiction "and detention of a removable alien pursuant to the INA are separate functions that serve separate purposes and are performed by different authorities." *United States v. Vasquez-Benitez*, 919 F.3d 546, 552 (D.C. Cir. 2019); *see United States v. Lett*, No. 18-749, ECF 72-1 (2d Cir. Dec. 12, 2019) (same). When ICE detains an alien for the purpose of removal, it thus "does not infringe upon the judiciary's role in criminal proceedings." *Vasquez-Benitez*, 919 F.3d at 552. The courts cannot "order the Executive Branch to choose between criminal prosecution or removal." *Lett*, ECF 72-1 at 8. That reasoning applies to all instances of immigration detention for purposes of removal and to all types of judicial proceedings. *Vasquez-Benitez*, 919 F.3d at 552; *United States v. Veloz-Alonso*, 90 F.3d 266, 270 (6th Cir. 2018). Indeed, even federal courts have no "authority to compel another sovereign or judge in federal administrative proceedings to release or detain a defendant." *Lett*, ECF 72-1 at 10 (quoting *United States v. Soriano Nunez*, 238 F.3d 240, 246 (3d Cir. 2019)).

---

[6] Plaintiffs rely on *Larned v. Griffin*, 12 F. 590 (D. Mass. 1882), which dealt with civil arrest. That case involved transient jurisdiction of a person present in one state to attend depositions in another. 12 F. at 590. The court used the phrase "absolute protection" to mean that the immunity covers "civil process," rather than merely permitting "common bail." *Id.* at 594. In doing so, the court rejected the "narrower view" that the privilege is "wholly the privilege of the court rather than of the suitor." *Id.* But the Supreme Court adopted the "narrower view" in *Lamb* which was decided 40 years later. 285 U.S. at 225.

*Second*, any privilege against civil arrest was superseded by the process-immunity privilege long before the codification of the current immigration scheme. By the time that Congress established a comprehensive immigration-arrest statutory scheme, any privilege against extra-jurisdictional civil arrest was a historical artifact. The Supreme Court in *Erie R. Co. v. Tompkins* years prior had disclaimed the creation of federal common law. 304 U.S. 64, 78 (1938) ("There is no federal general common law."). Moreover, the arrest statutes cannot have codified the purported privilege, given that such a privilege had never been formally recognized by the Supreme Court, evidently had been applied in federal court only to bar a finding of transient jurisdiction, apparently had never been applied to limit federal executive-branch law enforcement, and had long since been replaced with a privilege against service of process.

This Court is thus foreclosed from creating a new privilege. "Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981). "The enactment of a federal rule in an area of national concern ... is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Id.* Courts must "start with the assumption that it is for Congress, not the federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *Id.* "Courts do not, of course, have free rein to impose rules ... as a matter of policy" while interpreting a statute. *Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991).

Because there is no federal common law right to evade federal immigration enforcement, this Court should dismiss Counts I and II.

2. This Court Should Dismiss Counts I and II Because Congress Established a Comprehensive Immigration Detention Scheme that Supplants any Prior Common Law on Civil Immigration Enforcement.

Even if a federal-common-law privilege against civil arrest existed in the unprecedented, broad form that Plaintiffs claim, the federal statutory immigration scheme comprehensively speaks to how Congress intended the federal government to enforce federal immigration law, thus supplanting any prior federal common law on the issue. In determining whether a statutory scheme displaces federal common law, courts do not examine a single statute in isolation, but rather consider the entire

statutory scheme. *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011). As the Supreme

Court has explained, "'a specific policy embodied in a later federal statute should control ...

construction of the [earlier] statute, even though it ha[s] not been expressly amended.'" *FDA v. Brown*

*& Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *United States v. Estate of Romani*, 523 U.S.

517, 530-31 (1998)).  If federal common law applies, the "question" in determining whether Congress

meant to displace the common law is "whether the legislative scheme spoke directly to a question."

*Milwaukee*, 451 U.S. at 315-17 (internal quotation marks omitted); *see United States v. Texas*, 507 U.S.

529, 534 (1993) (similar). "This interpretive presumption is not ... one that entails a requirement of

clear statement, to the effect that Congress must state precisely the intention to overcome the

presumption's application to a given statutory scheme." *Astoria*, 501 U.S. at 108. That question is

different from, and less strict than, that which applies when determining preemption because "the

States are represented in Congress but not in the federal courts." *Milwaukee*, 451 U.S. at 316. No "clear

and manifest congressional purpose" to displace federal common law is required. *Am. Elec. Power Co.*,

564 U.S. at 423.

The statutory scheme shows that Congress spoke to the issue of immigration arrests, thus

displacing any federal common law and preempting state common law. Federal immigration law is a

"comprehensive and unified system" maintained by a "single sovereign." *Arizona*, 567 U.S. at 401. As

the Supreme Court has stressed, "[t]he federal statutory structure instructs when it is appropriate to

arrest an alien during the removal process." *Id.* at 407. "'The authority to control immigration — to

admit or exclude aliens — is vested solely in the Federal Government.'" *Id.* at 409-10 (quoting *Truax*

*v. Raich*, 239 U.S. 33, 42 (1915)). Any State attempt to alter this comprehensive removal scheme

"creates an obstacle to the full purposes and objectives of Congress" and is thus "preempted by federal

law." *Id.* at 411. Congress has occupied the field of federal immigration arrest authority. Plaintiffs

cannot rest on state common law; nor could state courts prohibit the federal government from acting.

*In re Tarble*, 80 U.S. 397 (1871); *M'Culloch v. Maryland*, 17 U.S. 316, 436 (1819).

Because the federal government has the sole authority over immigration, it has regulatory

authority over all aliens within the United States. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S.

341, 347 (2001) ("[T]he relationship between a federal agency and the entity it regulates is inherently

federal in character because the relationship originates from, is governed by, and terminates according to federal law."). Congress thus has the power to create a system that permits arrests of aliens notwithstanding the status of federal or state court proceedings. *See Herrera-Inirio*, 208 F.3d at 307-08 ("[I]n areas in which plenary federal power exists, 'the Supremacy Clause permits no other result,' notwithstanding that Congress may enact laws that 'curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important.'") (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290 (1981)); *cf. Vasquez-Benitez*, 919 F.3d at 548 (ICE may arrest alien even while criminal proceedings are pending and after a judge orders release on bond).

Congress has done just that. The comprehensive statutory scheme shows that Congress has spoken completely to ICE's arrest authority and provided no limitations on courthouse arrests. ICE may arrest all aliens except aliens who are in state criminal custody *serving a criminal sentence*. *See Herrera-Inirio*, 208 F.3d at 307-08. The INA provides a comprehensive scheme governing DHS arrests of aliens. Under 8 U.S.C. § 1226(a), "on a warrant issued" by DHS attesting to an alien's removability, "an alien may be arrested and detained" during the pendency of removal proceedings, and the Secretary's "discretionary judgment regarding the application of this section shall not be subject to review." *Id.* § 1226(e). Under 8 U.S.C. § 1231(a)(2), DHS "shall detain the alien" during the removal period and certain aliens who are a "risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period." *Id.* § 1231(a)(6).

The relevant statutes set only one limitation on DHS's broad detention authority: the INA, mindful of "cooperative federalism" concerns, limits DHS's authority to take into custody an alien who is currently serving a criminal sentence, requiring DHS to await the completion of the alien's criminal imprisonment. *Id.* § 1226(c); *see id.* § 1231. Congress has authorized DHS to detain removable aliens whenever they are released from state imprisonment "without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense." *Id.* § 1226(c). When DHS arrests an alien on a warrant, the statute imposes no limitations on that authority. *Id.* § 1226(a).

So too, Congress was explicit when it delineated limitations on DHS's warrantless arrest authority. Under 8 U.S.C. § 1357(a)(2), Congress gave immigration officers broad authority "to arrest

any alien in the United States" without a warrant if they "have reason to believe that the alien so arrested is in the United States in violation" of "any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens" and "is likely to escape before a warrant can be obtained for his arrest." Congress provided even broader arrest authority within a "reasonable distance from any external boundary of the United States" to "board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance or vehicle." *Id.* § 1357(a)(3). When Congress wanted to restrict immigration officers' powers, it did so explicitly, authorizing "access to private lands" within "twenty-five miles" of the border, but limiting access to "dwellings" and restricting warrantless entry to "the premises of a farm or other outdoor agricultural operation." *Id.* § 1357(a)(3), (e). These provisions show that Congress knew how to limit DHS's arrest authority and made conscious—but limited—choices about when, where, and how to do so. Because Congress specifically recognized ICE's ability to conduct courthouse arrests in a provision simply providing conditions on that action, delineated DHS's immigration-arrest authority, and authorized arrests by warrant without limitation, any federal-common-law privilege from arrest, even if it once existed, was overridden by the congressional scheme. *See, e.g.*, *Am. Elec. Power Co.*, 564 U.S. at 424.

The INA specifically discusses courthouse enforcement actions in a provision on the disclosure of information. That provision describes what information can be used from "an enforcement action ... taken against an alien ... [a]t a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been subject to extreme cruelty or if the alien is described" in the U- and T-visa statutory provisions. 8 U.S.C. § 1229(e)(2). By explicitly referencing aliens attending court proceedings, Congress clearly contemplated and authorized ICE to arrest aliens at courthouses.  In § 1229(e)(2), Congress placed no limits on ICE's arrest authority; rather, Congress merely restricted what can happen with information collected during certain types of proceedings. *Id.*; *see id.* § 1367.

ICE's arrest authority must be read in light of the entire statutory scheme notwithstanding that the arrest provisions in § 1357 were codified prior to § 1229. *See Brown & Williamson Tobacco Corp.*, 529

U.S. at 133. "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* Thus, even if the privilege against courthouse arrest existed in general, Congress's later amendment in 2006 clearly shows that Congress contemplated and authorized courthouse arrests. Thus, Counts I and II should be dismissed.

   3. <u>The Court Should Dismiss Count III Because the Directive Does Not Command or Compel State Actors to Act.</u>

   Plaintiffs' Tenth Amendment claim also must be dismissed for failure to state a claim because the Directive in no way directs state officials to act.

   The Tenth Amendment is a "mirror image[]" of the constitutional delegation of power to Congress. *New York v. United States*, 505 U.S. 144, 156 (1992). "It is settled beyond peradventure that if Congress properly acts pursuant to one of its enumerated powers, its work product does not offend the Tenth Amendment." *United States v. Meade*, 175 F.3d 215, 224 (1st Cir. 1999). As the First Circuit has held, "the proposition 'that the formulation of ... policies [pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.'" *Herrera-Inirio*, 208 F.3d at 307-08 (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)) (alteration in original). Thus, in light of Congress's plenary power over immigration, this Court has "no license to employ freestanding conceptions of state sovereignty when measuring congressional authority" to act under that authority. *Town of Johnston v. Fed. Hous. Fin. Agency*, 765 F.3d 80, 86 (1st Cir. 2014) (quoting *Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 550 (1985). The "anticommandeering" principle "is simply the expression" of "the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).

   Plaintiffs assert that the Directive violates the Tenth Amendment because it "commandeer[s] the state criminal justice and judiciary systems for the purposes of carrying out the federal government's civil immigration policy." Compl. ¶ 115. But the Directive does not command or compel State actors to take or refrain from taking any action. Massachusetts "courthouses are public spaces that are open to all persons," including "DHS employees." Mass. Executive Office of the Trial Court, Policy and Procedures Regarding Courthouse Interactions with the Department of Homeland Security

(Nov. 8, 2017).[7] ICE officers can freely enter State courthouses without consent or cooperation from State actors. And nothing in the Directive "issue[s] orders directly to the States." *Murphy*, 138 S. Ct. at 1475. Courthouse immigration arrests thus do not commandeer State actors.[8]

Plaintiffs argue that the "effect" of the courthouse-arrest policy is to "order state district attorneys, public defenders, and judges to provide ICE with lists of people who the state officers know are scheduled to appear in court" and "make those people available for ICE arrest," in contravention of *Murphy*'s prohibition against commandeering. Compl. ¶ 115. But the courthouse-arrest policy in no way mandates or prohibits action on the part of state court officials. Nor does it equate to installing federal officers in state legislative chambers to provide prior restraint on legislation. *Id.* Thus, this case is distinguishable from *Murphy*, which involved a law that "unequivocally dictates what a state legislature may and may not do." *See Murphy*, 138 S. Ct. at 1478. Because the Directive does not regulate any state action, Plaintiffs' Tenth Amendment claim fails, and this Court's inquiry should stop there.[9]

Plaintiffs' additional assertions that the Directive "shifts the political accountability to the states" and that it "interfere[s] with ... core sovereign functions," Compl. ¶¶ 116-17, are unavailing. First, the "political accountability" concern with anticommandeering focuses on the fact that a local officer, and "not some federal official," would be the face of the federal government's policy if the federal government required a state to enact a policy as if it were its own. *Printz v. United States*, 521 U.S. 898, 930 (1997). Here, ICE officers, not local officials, enforce federal policy in public spaces. Second, the Supreme Court has explicitly overruled prior precedent considering as relevant "traditional governmental functions" and "'fundamental' elements of state sovereignty" in Tenth Amendment analyses. *Garcia*, 469 U.S. at 548. "With rare exceptions" not identified here, "the Constitution does not carve out express elements of state sovereignty that Congress may not employ

---

[7] "When ... a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16-17 (1st Cir. 1998)) (second alteration in original).

[8] Further, Plaintiffs' requested relief is broader than the alleged commandeering harm, seeking a halt even of arrests on public streets so long as a person is coming to or returning from the courthouse.

[9] Indeed, any state attempt to prohibit the federal government from entering a public space would run afoul of the doctrine of intergovernmental immunity. *See United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019).

its delegated powers to displace." *Id.* at 550. The Supreme Court has thus disclaimed "judicially created limitations on federal power." *Id.* at 552.

Plaintiffs' Tenth Amendment claim should be dismissed because the courthouse-arrest Directive does not directly regulate the State or State actors.

> 4. The Court Should Dismiss Count IV Because the Directive Does Not Prevent Aliens from Preparing or Filing Lawsuits.

This Court should dismiss Count IV because Plaintiffs fail to state a denial-of-access claim.[10] To sufficiently allege a denial-of-access claim, a plaintiff must identify a "nonfrivolous" underlying claim and allege that "official acts" frustrated his ability to "bring [that claim] to court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *see Lewis v. Casey*, 518 U.S. 343, 354 (1996).[11] "[T]he right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415. Thus, a complaint must state the underlying claim "in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued." *Christopher*, 536 U.S. at 417. For backward-looking claims involving prior acts, "the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* at 415. That is because "[it] is the role of the courts to provide relief to claimants ... who have suffered ... harm; it is not the role of the courts, but that of the political branches, to shape the institutions of government" so that "official interference with the presentation of claims will not occur." *Lewis*, 518 U.S. at 349. To the extent that an injunction has provisions directed beyond remedying the scope of the harm to the specific plaintiffs asserting the right, they are "not the proper object of [a] District Court's remediation." *Id.* at 358.

Moreover, the "right to bring to court a grievance" means that the government may not wrongfully obstruct a prospective plaintiff from "prepar[ing] and filing" meaningful legal papers. *Lewis*, 518 U.S. at 354; *id.* at 346 (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). But the Supreme

---

[10] The Supreme Court has been unclear about which amendment confers this right. *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002). If it arises from the First Amendment Petition Clause, it may not apply to unlawfully present aliens. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

[11] In addition to the Tenth Amendment and the right of access, Plaintiffs invoke the Sixth Amendment without bringing a claim under it. Compl. ¶ 104. But "Sixth Amendment rights … are personal in nature and cannot be asserted vicariously." *United States v. Sabatino*, 943 F.2d 94, 96 n.1 (1st Cir. 1991).

Court has explicitly disclaimed the existence of a right "to *litigate effectively* once in court." *Id.* at 354 (emphasis in original). In fact, the Supreme Court has recognized right-of-access claims for "inmates to pursue direct appeals from the convictions for which they were incarcerated," and "extended this universe of claims only slightly to ... actions under 42 U.S.C. § 1984," *Lewis*, 518 U.S. at 354, and claims for waivers of court filing fees. *Christopher*, 536 U.S. at 413. It has also recognized appellate cases involving police cover-ups. *Id.* But it has never recognized a right like the Plaintiffs fashion.

The Collaborative alleges that the Directive violates its members' right of access to the courts because it "forc[es] noncitizens potentially subject to removal to risk civil arrest to access the courts." Compl. ¶ 121. But no alien has the right to evade law enforcement. *See Turner v. Cty. of Cook*, No. 05-cv-2890, 2005 WL 3299822, at *15 (N.D. Ill. Dec. 2, 2005) (holding that "[t]he right of reasonable access to the courts does not entail immunity from arrest warrants issued by lawful process"); *Cooper v. City of Plano*, No. 4:10-CV-689, 2011 WL 4100721, at *5 (E.D. Tex. Aug. 19, 2011), *report and recommendation adopted*, 2011 WL 4101160 (E.D. Tex. Sept. 13, 2011) (dismissing a denial-of-access claim where plaintiff alleged that "there were outstanding warrants for [his] arrest" and "he feared arrest should he appear at the courthouse"). And the Collaborative fails to allege that the Directive has blocked its own ability to prepare or file meaningful legal papers — rather, it alleges that the Directive has had a chilling effect on members' willingness to file cases. Compl. ¶¶ 70-72. There is no allegation that the government has acted with the goal of blocking individuals from filing suits.

Hence the Collaborative seeks to extend the right of access beyond its limited scope. Courthouse arrests do not frustrate a prospective plaintiff's ability "to bring to court a grievance," which is the only process that the right of access guarantees. *Lewis*, 518 U.S. at 354. The Collaborative also has failed to sufficiently allege an underlying claim that it wishes to pursue or name specific members who attempted to file a specific case but who were subjected to a courthouse arrest and are now unable to pursue them. Because the Collaborative has not satisfied the "underlying claim" element, and because courthouse arrests do not frustrate prospective plaintiffs' ability to prepare or file grievances, Count Four fails to state a denial-of-access claim and should be dismissed.

## CONCLUSION

Thus, for the foregoing reasons, this Court should dismiss the complaint in full.

Dated: December 13, 2019

ANDREW E. LELLING
United States Attorney

RAYFORD A. FARQUHAR
Assistant U.S. Attorney

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation

EREZ REUVENI
Assistant Director

*/s/ Francesca Genova*
FRANCESCA GENOVA
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-1062
Fax: (202) 305-7000
Email: Francesca.M.Genova@usdoj.gov

JULIAN KURZ
Trial Attorney

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I, Francesca Genova, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on December 13, 2019.

*/s/ Francesca Genova*