UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; and the CHELSEA COLLABORATIVE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Immigration and Customs Enforcement, Enforcement and Removal Operations, Acting Field Office Director; U.S. DEPARTMENT OF HOMELAND SECURITY; and CHAD WOLF, in his official capacity as Acting Secretary of United States Department of Homeland Security, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:19-cv-11003-IT |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

INTRODUCTION........................................................................................................................1

STANDARD OF REVIEW.........................................................................................................2

ARGUMENT...............................................................................................................................3

I.     As This Court Already Recognized, Plaintiffs Have Article III Standing To Challenge Defendants' Civil Courthouse Arrests. ............................................................................3

II.    As This Court Already Recognized, Plaintiffs' Allegations Establish That The Directive Violates The APA (Count I)...........................................................................................3

      A.    Plaintiffs' Claims Are Within The Relevant Zone of Interest. .........................4

      B.    Plaintiffs' Challenge Does Not Involve Conduct Committed To ICE's Discretion by Law. ......................................................................................................................4

      C.    The Directive Is Final Agency Action. ...........................................................6

      D.    The Common Law Privilege Exists And Precludes Civil Arrests In Courthouses.......9

III.    Plaintiffs Have Stated A Claim For Violation Of The Common Law Privilege Against Courthouse Arrest (Count II)...........................................................................................12

IV.    Plaintiffs have Stated A Claim That The Directive Violates The Tenth Amendment (Count III). ...............................................................................................................................12

V.    The Collaborative Has Stated A Claim For Violation Of The Right Of Access To Courts (Count IV)..................................................................................................................16

CONCLUSION..........................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page(s)**

*Am. Tort Reform Ass'n v. OSHA*,
   738 F.3d 387 (D.C. Cir. 2013) ........................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 2

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................................... 6, 8

*Bounds v. Smith*,
   430 U.S. 817 (1977) ..................................................................................................... 16, 18

*California Cmtys. Against Toxics v. Envtl. Prot. Agency*,
   934 F.3d 627 (D.C. Cir. 2019) ........................................................................................... 8

*Chappell v. Rich*,
   340 F.3d 1279 (11th Cir. 2003) ....................................................................................... 16

*Christopher v. Harbury*,
   536 U.S. 403 (2002) ............................................................................................... 16, 17, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................................... 4

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .................................................................................................... 4, 5

*Frozen Food Express v. United States*,
   351 U.S. 40 (1956) ............................................................................................................. 7

*Germany v. Vance*,
   868 F.2d 9 (1st Cir. 1989) ............................................................................................... 18

*INS v. Lopez-Mendoza*,
   468 U.S. 1036 (1984) ......................................................................................................... 6

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977) ......................................................................................................... 11

*J.L. v. Cissna*,
   341 F. Supp. 3d 1048 (N.D. Cal. 2018) ............................................................................ 7

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ..................................................................................................... 5, 6

*In re Justices of Superior Court Dep't of Mass. Trial Court,*
    218 F.3d 11 (1st Cir. 2000) ................................................................................... 13

*Kaufman v. Kaye,*
    466 F.3d 83 (2d Cir. 2006) .................................................................................... 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ................................................................................................ 4

*M.L.B. v. S.L.J.,*
    519 U.S. 102 (1996) .............................................................................................. 18

*Mackey v. Lanier Collection Agency & Serv., Inc.,*
    486 U.S. 825 (1988) .............................................................................................. 11

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ................................................................................................ 16

*Mayor & City Council of Baltimore v. Trump,*
    2019 WL 4598011 (D. Md. Sept. 20, 2019) .......................................................... 7

*McIntyre v. United States,*
    336 F. Supp. 2d 87 (D. Mass. 2004) ..................................................................... 18

*McLouth Steel Prod. Corp. v. Thomas,*
    838 F.2d 1317 (D.C. Cir. 1988) .............................................................................. 8

*In re Montreal, Maine & Atl. Ry., Ltd.,*
    888 F.3d 1 (1st Cir. 2018) ..................................................................................... 13

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ........................................................................ 12, 13, 14, 15

*N. H. Lottery Comm'n v. Barr,*
    386 F. Supp. 3d 132 (D.N.H. 2019) ....................................................................... 7

*Nat'l Min. Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ................................................................................ 8

*New York v. U.S. Immigration & Customs Enf't,*
    2019 WL 6906274 (S.D.N.Y. Dec. 19, 2019) ............................................... *passim*

*Payton v. New York,*
    445 U.S. 573 (1980) .............................................................................................. 10

*Penton v. Pool,*
    724 F. App'x 546 (9th Cir. 2018) ......................................................................... 18

*Perez v. Mortgage Bankers Association*,
    575 U.S. 92 (2015)................................................................................................8

*Printz v. United States*,
    521 U.S. 898 (1997)............................................................................................12

*R.F.M. v. Nielsen*,
    365 F. Supp. 3d 350 (S.D.N.Y. 2019)................................................................7

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015)......................................................................5

*Rainwater v. United States*,
    356 U.S. 590 (1958)..........................................................................................11

*Simmons v. Dickhaut*,
    804 F.2d 182 (1st Cir. 1986) ............................................................................16

*Stewart v. Ramsay*,
    242 U.S. 128 (1916)..........................................................................................19

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) .............................................................................8

*Tennessee v. Lane*,
    541 U.S. 509 (2004)..........................................................................................18

*U.S. Army Corps of Engr's v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) .................................................................................6, 7, 8

*United States v. Green*,
    305 F. Supp. 125 (S.D.N.Y. 1969) ...................................................................10

*United States v. Lopez*,
    514 U.S. 549 (1995)..............................................................................12, 13, 15

*United States v. Morrison*,
    529 U.S. 598 (2000)..............................................................................12, 13, 15

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990)..........................................................................................16

*Veterans for Common Sense v. Nicholson*,
    2008 WL 114919 (N.D. Cal. Jan. 10, 2008)....................................................16

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Services*,
    139 S. Ct. 361 (2018)..........................................................................................5

*Younger v. Harris,*
    401 U.S. 37 (1971) ................................................................................................ 12, 13, 14

**Statutes**

5 U.S.C. § 701(a)(2) ..................................................................................................... 4

5 U.S.C. § 706(2) ......................................................................................................... 5

8 U.S.C. § 1226(e) ....................................................................................................... 6

8 U.S.C. § 1229(e) ..................................................................................................... 11

8 U.S.C. § 1357(a) ..................................................................................................... 11

**Other Authorities**

Federal Rule of Civil Procedure12(b)(1) .................................................................. 4

Federal Rule of Civil Procedure Rule 12(b)(6) ...................................................... 2

## INTRODUCTION

Plaintiffs bring this action to restore the integrity of the judicial system and the right of free access to the courthouses of the Commonwealth.  Since implementing its courthouse-arrest policy, U.S. Immigration and Customs Enforcement ("ICE") has occupied courthouses in Massachusetts and across the country, forcing state officers to participate in federal immigration enforcement.  *See* Compl. ¶¶ 1-2, 6, 47-62, 76-80.  ICE Directive Number 11072.1 (the "Directive"), which for the first time formally authorized such arrests, has had a dramatic impact on immigrant communities in the Commonwealth.  ICE's threat of arrest of claimants, victims, witnesses and defendants appearing at courthouses under their own power has created widespread fear of going to court—the only place individuals used to be able to safely seek justice, vindication, protection, or exercise their constitutional right to a defense.  *See id.* ¶¶ 2-3, 63-72, 77-83.  State officers, including the District Attorney Plaintiffs and the Committee for Public Counsel Services, are forced to forego prosecutions and defense of their clients when victims, witnesses and defendants refuse out of fear or are unable to appear at courthouses due to ICE arrests.  *See id.* ¶¶ 3, 60, 77-80.  And, victims of civil and criminal violations no longer feel safe appearing in court to seek justice from abusers and wrong-doers.  *See id.* ¶¶ 3, 64-75, 119-22.

ICE's civil-courthouse-arrest policy not only has significant consequences for state law enforcement, criminal defense, and access to justice, it is also illegal.  The policy exceeds ICE's statutory authority, violating longstanding common-law principles, and infringing upon crucial constitutional rights.  Specifically, Plaintiffs have properly stated four claims, alleging that the Directive: (1) exceeds Defendants' authority under the Immigration and Nationality Act ("INA") in violation of the Administrative Procedure Act ("APA"); (2) violates the long-standing common-law privilege against civil courthouse arrest; (3) commandeers the state justice system for federal

immigration enforcement in violation of the Tenth Amendment; and (4) violates the right of access to the courts for Plaintiff Chelsea Collaborative Inc. (the "Collaborative") and its members.

In asking this Court to dismiss Plaintiffs' Complaint, Defendants devote all but four pages of their brief to Counts I and II, repeating arguments that this Court already rejected in granting Plaintiffs' motion for a preliminary injunction. *See generally* June 20, 2019 Preliminary Injunction Order, ECF 51 ("Order"). This Court's prior decision was correct, and Defendants offer no reason to revisit it. Indeed, in a recent decision, Judge Rakoff in the Southern District of New York adopted much of this Court's reasoning and denied the government's motion to dismiss claims largely identical to those Plaintiffs raise here. *New York v. U.S. Immigration & Customs Enf't*, 2019 WL 6906274 (S.D.N.Y. Dec. 19, 2019).

This Court should also reject Defendants' cursory arguments concerning Plaintiffs' constitutional claims (Counts III and IV), as Defendants apply incorrect legal standards and either ignore or do not treat as true many of Plaintiffs' allegations. Plaintiffs have properly stated a Tenth Amendment claim, as Defendants' practice commandeers the state justice system to participate in federal immigration enforcement. Indeed, Judge Rakoff in the *New York* case recently refused to dismiss a nearly identical Tenth Amendment claim. *New York*, 2019 WL 6906274, at *12. In addition, the Collaborative has properly stated a claim for right of access to the courts by describing specific claims its members would bring if not for the Defendants' practice of civil courthouse arrests and the Directive's formal authorization of that practice.

## STANDARD OF REVIEW

Under Rule 12(b)(6), Plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiffs plead "enough factual matter (taken as true)" to allow the court to draw the reasonable inference that the defendant is liable. *Id.* at 556.

# ARGUMENT

## I.   AS THIS COURT ALREADY RECOGNIZED, PLAINTIFFS HAVE ARTICLE III STANDING TO CHALLENGE DEFENDANTS' CIVIL COURTHOUSE ARRESTS.

Defendants correctly concede that the Court found in its June 20, 2019 Order that Plaintiffs

have Article III standing.[1]   MTD at 5-6.[2]   Defendants repeat the same standing arguments this Court

already rejected, and offer no basis for this Court to reconsider its well-reasoned prior ruling:

- Defendants argue that Plaintiffs are not targets of the Directive and cannot assert a claim on behalf of others.  PI Opp. at 6; MTD at 5-6.  The Court rejected that argument holding that "this is not the injury that Plaintiffs are claiming," and describing the direct injury alleged that satisfies the standing requirements.  Order at 13-15.

- Defendants argue that the harm alleged is not traceable to the government (PI Opp. at 6-8; MTD at 5-6), but the Court found that it is (Order at 16-17).

- Defendants argue that Plaintiffs fail to allege that clients do not appear in court because of civil arrests.  MTD at 6.  But, as the Court previously recognized, "CPCS is not complaining that its clients are voluntarily choosing not to attend court, but that ICE is civilly arrest[ing] their clients . . . ."  Order at 16-17; *see also* Compl. ¶ 77 ("Defendants sometimes refuse to appear for hearings and trials and sometimes are unable to appear due to ICE arrests . . . .").

The Court correctly rejected those arguments before, and it should do so again.  *See* Order at 13-18.

## II.   AS THIS COURT ALREADY RECOGNIZED, PLAINTIFFS' ALLEGATIONS ESTABLISH THAT THE DIRECTIVE VIOLATES THE APA (COUNT I).

When this Court granted a preliminary injunction based on Plaintiffs' APA claim, it rejected

(either explicitly or implicitly) every APA argument Defendants raise in their motion to dismiss.

Notably, Defendants raise none of these issues in their appeal of the preliminary injunction.

Defendants also make no effort here to explain why the Court should reverse course.  Instead,

Defendants simply repeat the same arguments this Court has already rejected, and that have now

---

[1] The allegations in Plaintiffs' Complaint do not differ in any way from the evidence Plaintiffs introduced in support of their motion for a preliminary injunction, which the Court found sufficient for Article III standing purposes. Defendants do not, and could not, argue otherwise.

[2] "MTD" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss, ECF 65; "PI Opp." refers to Defendants' Opposition to the Motion for Preliminary Injunction, ECF 28.

been rejected by another court as well. *See New York*, 2019 WL 6906274, at *8-11. This Court

should reject those arguments again.

### A.    Plaintiffs' Claims Are Within The Relevant Zone of Interest.

Defendants concede that the Court held that Plaintiffs fall within the INA's zone of interest

to satisfy the prudential requirements of standing under the APA claim. MTD at 6. Defendants

repeat their prior arguments (MTD at 6; PI Opp. at 8-9), despite the fact that the Court rightly

found that Plaintiffs "represent stakeholders affected by civil immigration arrests" and "Congress

nonetheless indicated its preference that federal immigration enforcement not impede state criminal

law enforcement" (Order at 17-18). The court in *New York* has now also held that nearly identical

claims fall within the relevant zone of interest. 2019 WL 6906274, at *3-4. This Court should

therefore deny the motion to dismiss on these grounds.[3]

### B.    Plaintiffs' Challenge Does Not Involve Conduct Committed To ICE's Discretion by Law.

Congress did not delegate unfettered and unreviewable discretion to conduct civil

immigration arrests at state and federal courthouses, as Defendants argue (MTD at 7). The APA's

narrow exception to judicial review for decisions "committed to agency discretion by law," 5 U.S.C.

§ 701(a)(2), applies only in the "rare instances" where Congress has provided "clear and convincing

evidence" that it vested an agency with unfettered discretion. *Citizens to Preserve Overton Park, Inc. v.

Volpe*, 401 U.S. 402, 410 (1971) (quotation marks omitted). The Supreme Court recently reaffirmed

that this exception to the presumption of reviewability should be applied "quite narrowly." *Dep't of

Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quotation marks omitted). Defendants have not

---

[3] To the extent Defendants suggest that the zone-of-interest question is part of a "standing" inquiry under Rule 12(b)(1) that applies beyond the APA claim, *see* MTD at 5-6, they are mistaken. While that inquiry has been described as "prudential standing," it is actually a means of determining who has a cause of action under a given federal *statute. See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 & n.3 (2014). It therefore has no bearing on Plaintiffs' common-law and constitutional claims.

met (and cannot meet) this stringent standard for establishing non-reviewability here—indeed, Defendants' argument directly conflicts with the Supreme Court's decision in *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018), which rejected a nearly identical argument by the government that a challenge to the scope of its detention authority was unreviewable.

The narrow exception the government invokes only applies when "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Services*, 139 S. Ct. 361, 370 (2018) (quotation marks omitted). That is not the case here, as the relevant standard is whether the INA authorizes ICE to *ever* conduct the challenged arrests. In fact, courts have expressly held they will not construe the INA "to immunize an allegedly unlawful DHS policy from judicial review." *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 177 (D.D.C. 2015). The agency action can and should be assessed "according to the general requirements of reasoned agency decisionmaking." *Dep't of Commerce*, 139 S. Ct. 2568-69.

Moreover, on the merits, the standards implemented to uphold the common-law privilege "would provide an obvious standard against which to evaluate the agency's exercise of discretion," as Judge Rakoff recently held in *New York*. 2019 WL 6906274, at *5 (rejecting the argument that the Directive is "committed to agency discretion by law"). This Court similarly found that the INA incorporated the well-settled common-law privilege against civil arrests. Order at 18-21; *see* Compl. ¶¶ 23-35; 97-106.

The Directive is not unreviewable as prosecutorial guidance as Defendants assert (MTD at 7). Plaintiffs do not challenge ICE's *exercise* of discretion in conducting a specific arrest, but instead argue that Congress did not authorize Defendants to conduct civil courthouse arrests *at all*. *See* 5 U.S.C. § 706(2) (instructing courts to "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations"); *New York*, 2019 WL 6906274, at *5 (holding that if the common law privilege, incorporated into the INA, does not allow for courthouse arrests, then

the Directive "would not be committed to unreviewable agency discretion"). Defendants have thus

failed to rebut the presumption of reviewability, and the Directive is reviewable under the APA.

Indeed, the Supreme Court has repeatedly rejected arguments nearly identical to those

advanced by Defendants. In *Jennings*, the Supreme Court found that "the extent of the

Government's detention authority under the 'statutory framework'" was reviewable, rejecting the

argument that the scope of authority could be a "'discretionary judgment'" under 8 U.S.C. § 1226(e).

138 S. Ct. at 841. Similarly, in *Zadvydas v. Davis*, the Supreme Court held that the plaintiffs could

"challenge the extent of the Attorney General's authority" under an immigration statute because

"the extent of that authority is not a matter of discretion." 533 U.S. 678, 688 (2001). Here,

Plaintiffs similarly challenge the extent of ICE's statutory authority under the INA; as a result, the

Directive is reviewable.[4] This Court should reject Defendants' remarkable attempt to immunize the

Directive—and the scope of ICE's congressionally-authorized power—from judicial review.[5]

## C.     The Directive Is Final Agency Action.

Under the "pragmatic" and flexible approach, the Court should find that the Directive

constitutes final agency action subject to APA review. *See U.S. Army Corps of Engr's v. Hawkes Co.*,

136 S. Ct. 1807, 1814-15 (2016). An agency action is "final" if it "mark[s] the 'consummation' of the

agency's decisionmaking process" and "[is] one by which 'rights or obligations have been

determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78

(1997) (citations omitted).

---

[4] Plaintiffs challenge the *scope* of ICE's statutory authority, not any individual exercise of prosecutorial discretion; therefore, the cases Defendants cite concerning individual prosecutorial decisions (MTD at 7) do not apply.

[5] Accepting Defendants' arguments would necessarily mean that there could be no review of Defendants' actions *at all* because an immigration judge generally has no authority to decide whether the arrest that initiated the proceedings was lawful. *See INS v. Lopez-Mendoza*, 468 U.S. 1036, 1040 (1984) ("The BIA correctly ruled that '[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding.'").

The Directive satisfies both prongs of the *Bennett* test. Defendants do not dispute that the Directive "mark[s] the 'consummation' of the agency's decisionmaking process." However, Defendants contend that the Directive is not final agency action because it "merely explains what ICE *may* do as a general matter, and does not create substantive rules or rights, or 'bind' ICE officers to a mandatory course of conduct." MTD at 8 (citations omitted). But agency action can be final even if it "ha[s] no authority except to give notice of how the [agency] interpreted the relevant statute, and would have effect only if and when a particular action was brought." *Hawkes*, 136 S. Ct. at 1814 (quotation marks omitted). Indeed, as the Court recognized in *Hawkes*, *id.* at 1815, the Court's prior decision in *Frozen Food Express v. United States*, 351 U.S. 40, 44-45 (1956), had held that an order from the Interstate Commerce Commission was final when it stated how the Commission intended to enforce a given statute because, though it did not formally bind anyone, it "warn[ed] every carrier" as to the type of enforcement the Commission believed it *could* take.

The Directive carries legal consequences for similar reasons. The Directive authorizes ICE to conduct civil courthouse arrests and notifies the public and state officials that noncitizens can be targeted for civil arrest when appearing in court. *See* Compl. ¶¶ 36-46. The agency's "denial of [the privilege's] safe harbor" against courthouse arrest creates "legal consequences" for purposes of finality. *See Hawkes*, 136 S. Ct. at 1814. In attempting to override the "ancient privilege" against civil courthouse arrests, the Directive "has legal consequences for the aliens who were not previously subject to potential enforcement actions at state courthouses, but who now are, as well as for the proper functioning of the state courts themselves." *New York*, 2019 WL 6906274, at *1, *6-7 (discussing *Hawkes*, 136 S. Ct. at 1812-15).[6] As in *Hawkes* and *Frozen Food Express*, the Directive "warns every" noncitizen that appearing in court could lead to a civil immigration arrest.

---

[6] Federal courts regularly hold that policy guidance like the Directive carries legal consequences and constitutes final agency action, including in the immigration context. *See, e.g.*, *Mayor & City Council of Baltimore v. Trump*, 2019 WL 4598011, *28 (D. Md. Sept. 20, 2019) (amendment to public charge criteria was final agency action because it eliminated

Finally, Defendants are wrong in arguing that the Directive is unreviewable because it is only a policy statement and not a legislative rule.  MTD at 7-8.  Defendants rely on outdated D.C. Circuit cases to suggest that only legislative rules are final.  However, the D.C. Circuit explicitly overturned that approach in *California Communities Against Toxics v. Environmental Protection Agency*, 934 F.3d 627, 634-35 (D.C. Cir. 2019).[7]  There, the D.C. Circuit held that the Supreme Court's decisions in *Hawkes* and *Perez v. Mortgage Bankers Association*, 575 U.S. 92 (2015), conclusively establish that "the finality analysis is distinct from the test for whether an agency action is a legislative rule."  *Id.* at 635 ("[I]f a rule is final it is not necessarily legislative . . . .").  The D.C. Circuit explained that *Hawkes* reaffirmed that the "two prong test" from *Bennett* "remains finality's touchstone."  *Id.* at 634.  As explained above, the Directive satisfies *Bennett*'s two-prong test.[8]  Moreover, even under Defendants' test (which no longer applies), the Directive is *still* final agency action because the Directive "embodies ICE's novel interpretation of its statutory authority to conduct courthouse arrests, and not merely case-by-case guidance to individual officers."  *New York*, 2019 WL 6906274, at *6.  It is not a policy statement, but rather an interpretive rule, thereby constituting final agency action.  *Id.* (the Directive "embodies a legally-consequential change to the agency's interpretation of the INA.").

---

a prior safe harbor); *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 376 (S.D.N.Y. 2019) (U.S. Citizenship and Immigration Services' legal guidance containing a novel interpretation of the Special Immigrant Juvenile statute was final agency action because the agency "relie[d]" on the new interpretation to "deny" SIJ petitions); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1068 (N.D. Cal. 2018) (same); *see also N. H. Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132, 145-46 (D.N.H. 2019) (Department of Justice opinion interpreting the Wire Act was final agency action because it increased the scope of prohibited conduct).

[7] The court in *California Communities* held that the agency's policy memorandum challenged there did not have direct legal consequences and therefore did not constitute final agency action, because (unlike here) neither the agency nor regulated entities could rely on the statements; either could ignore the statements without facing liability or penalty, and there were clear avenues to challenge agency decisions adopting the memorandum's reasoning.  934 F.3d at 638.

[8] Defendants rely on cases that do not apply here because: (i) the challenged action was legally "meaningless" and the regulated parties could "ignore" it "without facing any legal consequences" (*Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014)); (ii) the guidance had never been applied by the agency (*Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 406 (D.C. Cir. 2013)); or (iii) the cases involved notice-and-comment rulemaking not applicable here (*see generally Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997); *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)).

**D.** **The Common Law Privilege Exists And Precludes Civil Arrests In Courthouses.**

Turning to the merits of Count I, Plaintiffs have stated a claim that the Directive exceeds ICE's statutory authority because the INA incorporates, not abrogates, the common-law privilege against civil arrest of those attending court on official business. As set forth in Plaintiffs' Complaint and Motion for Preliminary Injunction, both state and federal common law privileges have protected individuals from civil arrest when appearing in courthouses on official business long before Congress enacted the INA in 1952. Indeed, this Court already ruled that such a privilege "remained present at common law when Congress enacted the provisions at issue here," and that the INA incorporates that privilege as a limitation on the civil-arrest authority it grants. Order at 20-25. Judge Rakoff's opinion in *New York* reached a similar conclusion. *New York*, 2019 WL 6906274, at *8-11. Defendants spend considerable time reasserting arguments this Court has already rejected without addressing or acknowledging this Court's careful analysis. *Compare* MTD at 8-17, *with* Order at 18-25. The Court should reaffirm its prior ruling, and reject Defendants' arguments.

*First*, this Court previously found that "courts in the United States have recognized that 'justice requires the attendance of witnesses cognizant of material facts, and hence that no unreasonable obstacles ought to be thrown in the way of their freely coming into court to give oral testimony.'" Order at 20 (quoting *Diamond v. Earle*, 217 Mass. 499, 501 (1914)) (rejecting Defendants' arguments raised again at MTD at 8-13). Despite the changing methods of obtaining a civil defendant's presence, "state and federal courts recognized the need for that privilege's continued applicability" even where methods of service had become "less intrusive." *Id.* at 20. The Court thus held that the privilege remained when Congress enacted the INA in 1952, noting that "[s]uch an 'absolutely indispensable' privilege so fundamental to the functioning of both federal and state judiciary, cannot be assumed to have disappeared simply with the passage of time." *Id.* at 20-21

(citations omitted).[9]   Defendants have not offered any basis for this Court to revisit its decision.

Indeed, this Court's opinion was recently reinforced by Judge Rakoff in *New York*.  2019 WL

6906274, at *9-10.  Judge Rakoff's opinion emphasized that the policy objectives, to encourage

parties to come forward voluntarily and to enable efficient judicial administration, "apply equally to

modern-day immigration arrests."  *Id.* at *10.

*Second*, Defendants' counterarguments are not persuasive.  Defendants attempt to limit the

privilege, relying in part on inapplicable case law regarding criminal arrests where the privilege does

not apply.  MTD at 10-13.  Many of the cases Defendants cite involve criminal arrest warrants or

individuals in criminal custody.  Those cases do not apply here where Plaintiffs do not challenge

criminal arrests, but rather only *civil* arrests for immigration enforcement.  *See* Compl. ¶ 50.  Because

immigration enforcement is civil in nature (Order at 3 (citing *Arizona v. United States*, 567 U.S. 387,

396 (2012)), the underlying reason for the privilege against civil arrest—to protect the integrity and

functioning of the courts—remains the same.  Moreover, Defendants assertion that noncitizens may

be arrested anywhere in the country, MTD at 10, ignores not only common law but also

constitutional limitations on such arrests.  *See, e.g., Payton v. New York*, 445 U.S. 573, 576 (1980)

(Fourth Amendment requires judicial warrant to enter home without consent to effectuate arrest).[10]

The Court also held that "Defendants' attempt to [rely on safety concerns to] justify civil

courthouse arrests" (which they repeat here, MTD at 11-12) "ignores a critical distinction regarding

the challenged arrests.  Plaintiffs here seek only to enjoin civil, not criminal arrests."  Order at 28;

Compl. ¶ 50; *see also New York*, 2019 WL 6906274, at *9 n.10 (rejecting similar arguments).

---

[9] For all these reasons, and contrary to Defendants' assertion (MTD at 14), the Court has not created a new privilege, but rather, it has upheld the "privilege [that] *remained present* at common law when Congress enacted the [INA] provisions at issue here."  *See* Order at 20-21 (emphasis added).

[10] Defendants also claim the *civil* arrest privilege is unavailable because no jurisdiction exists in which immigrants could have avoided service of process in immigration enforcement actions.  MTD at 10.  However, the case Defendants cite, *United States v. Green*, 305 F. Supp. 125 (S.D.N.Y. 1969), involved the service of a criminal grand jury subpoena not any civil arrest like those at issue here.

The Court also rejected Defendants' argument that Congress abrogated the privilege (even if it existed) when it occupied the field of immigration enacting the INA. *Compare* MTD at 13-17, *with* Order at 22-25. In the Court's words: "[e]ven with the comprehensive immigration law system devised by Congress, there are still some limits to how and where the government can arrest those it seeks to remove, including the limits written into the statute itself." Order at 22-23. One such limit is the common law privilege against courthouse arrests. Order at 25.

This Court has also rejected, and should again reject, Defendants' argument that Congress's 2006 amendment to the INA in the Violence Against Women and Department of Justice Reauthorization Act ("VAWA")—codified, as relevant here, at 8 U.S.C. § 1229(e)—shows that Congress intended to vitiate the privilege against civil courthouse arrest (Order at 23-24; MTD at 16-17). In addition to the fact that, as this Court recognized (Order at 23-25), the 2006 Congress's interpretation of the statute has "little bearing" on interpreting the 1952 Congress's intent,[11] section 1229(e) does not establish that those enacting VAWA in 2006 understood the INA to allow *civil* courthouse arrests. Rather, as Judge Rakoff recognized, Congress may have been contemplating *criminal* arrests in limiting the information used to initiate removal actions against abuse victims.[12] *New York*, 2019 WL 6906274, at *11. Plaintiffs do not challenge these types of criminal arrests or arrests of those brought into court while in state criminal custody. Compl. ¶ 50. Thus, section 1229(e) implies, at most, that those enacting VAWA understood that *some* "enforcement action[s]"

---

[11] Specifically, this Court held that "[t]he 2006 enactment of [VAWA] has little bearing on the court's interpretation of congressional intent regarding courthouse arrests in 1952, and certainly does not amount to a clearly stated intent to abrogate the common law privilege." Order at 24. Rightly so; in interpreting a statutory provision "[i]t is the intent of the Congress that enacted the section that controls." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 839-40 (1988) (quotation marks and alterations omitted); *Rainwater v. United States*, 356 U.S. 590, 593 (1958); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 354 n.39 (1977).

[12] A criminal arrest under sections 1357(a)(4) and (5) is plainly an "enforcement action." *E.g., id.* § 1357(a) (using "enforcement activities" to encompass criminal arrests). So is a civil arrest of a party brought to court in state custody (*e.g.*, if domestic partners bring criminal cross complaints), which Plaintiffs also do not challenge.

can be taken at courthouses; it does *not* imply a belief that *any civil arrest* can be conducted at a courthouse.

For all these reasons, and those set forth by the Court in its Order, the INA does not authorize ICE to conduct civil arrests of those appearing in court on official business.

## III.   PLAINTIFFS HAVE STATED A CLAIM FOR VIOLATION OF THE COMMON LAW PRIVILEGE AGAINST COURTHOUSE ARREST (COUNT II).

Defendants make no argument for dismissing Count II beyond their argument that there was and is no common-law privilege against civil courthouse arrests.  For the reasons discussed above, and because such a privilege does exist, this Court should not dismiss Count II.

## IV.   PLAINTIFFS HAVE STATED A CLAIM THAT THE DIRECTIVE VIOLATES THE TENTH AMENDMENT (COUNT III).

As Judge Rakoff's opinion in *New York* recently recognized, 2019 WL 6906274, at *12, the Tenth Amendment prevents Defendants from harnessing the resources of the state judicial system and thereby forcing state actors to participate in federal immigration enforcement.  *See, e.g.*, Compl. ¶¶ 1-2, 6, 47-62, 76-80.  The Supreme Court has repeatedly "made clear that the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1474-78 (2018).  "[U]sing the States as the instruments of federal governance [is] both ineffectual and provocative of federal-state conflict."  *Printz*, 521 U.S. at 919. Moreover, the Supreme Court has long recognized limitations on Defendants' authority where it improperly encroaches on matters expressly reserved to the states—specifically, the state's police power to effectively operate its civil and criminal justice systems.  *See United States v. Morrison*, 529 U.S. 598, 618 (2000); *United States v. Lopez*, 514 U.S. 549, 564, 567 (1995); *Younger v. Harris*, 401 U.S. 37, 43 (1971).

While the Supreme Court in *Garcia v. San Antonio Metropolitan Transit Authority* eliminated the need for courts to grapple with "whether a particular governmental function is [an] 'integral' or 'traditional'" state function, it did not remove the issue from the Tenth Amendment analysis altogether. 469 U.S. 528, 546-47 (1985). Instead, courts should look to the constitutional limitations of federal authority rather than simply relying on "a sacred province of state autonomy." *Id.* at 546-47, 550. In fact, in reaching its decision in *Garcia*, the Supreme Court considered concerns of intrinsic state functions as part of its analysis, holding: "[W]e perceive nothing in the [statute] that is destructive of state sovereignty or violative of any constitutional provision." *Id.* at 554.

That is exactly how the Supreme Court has construed the teachings of *Garcia* in subsequent cases. In *United States v. Morrison*, and *United States v. Lopez*, the Supreme Court found Tenth Amendment violations and reaffirmed the long-standing recognition that there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618; *see Lopez*, 514 U.S. at 564 (discussing "areas such as criminal law enforcement . . . where states historically have been sovereign"). In addition, the abstention doctrine recognizing a "policy against federal court interference with state judicial proceedings," *Younger*, 401 U.S. at 43, remains in full effect following *Garcia. See In re Justices of Superior Court Dep't of Mass. Trial Court*, 218 F.3d 11, 16-17 (1st Cir. 2000); *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006) ("[U]nder the principle known as comity a federal district court has no power to intervene in the internal procedures of the state courts." (quotation marks omitted)). Unlike in other cases where the line between "core" state functions is blurred, there is no difficult question here. What the federal government seeks to do— by interfering with state judicial proceedings—undoubtedly exceeds the limits of federal authority under the Constitution and tramples rights expressly reserved to the states under the Tenth

13

Amendment, namely the right to have a state justice system free from federal government encroachment.

The Directive impermissibly compels states to act *and* to refrain from acting. *See Murphy*, 138 S. Ct. at 1478. Plaintiffs allege[13] that Defendants' implementation of the Directive usurps the state judicial system for its own federal immigration enforcement activities, forcing state officials conducting business in state courthouses to participate in a federal trap for noncitizens. *See, e.g.,* Compl. ¶¶ 1-2, 6, 47-62, 76-80. This includes using state court officers to secure the safety of federal officers and the public during civil immigration arrests and court clerks to provide information to Defendants regarding enforcement targets, among others. *See, e.g.,* Compl. ¶¶ 37-38, 51-61, 115-117. In addition, Defendants' installation of federal officers in state courthouses thwarts the normal operation of the state judicial system, a right reserved to the states, forcing state actors to forego prosecution or defense of cases because victims, witnesses, and criminal defendants are either arrested before appearing in court or refuse to appear out of fear of courthouse arrest. Compl. ¶¶ 60, 77-80. The Tenth Amendment protects against these exact forms of government encroachment. *See Murphy*, 138 S. Ct. at 1478 (telling the state legislature it cannot do something is "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals. A more direct affront to state sovereignty is not easy to imagine."); *Younger*, 401 U.S. at 43 (recognizing a "policy against federal court interference with state judicial proceedings"); *see also New York*, 2019 WL 6906274, at *12 (denying motion to dismiss where district attorney-plaintiffs state a Tenth Amendment challenge to the Directive).

Defendants' arguments to defeat Plaintiffs' claim are unavailing. First*,* Defendants argue that Plaintiffs' Tenth Amendment claim must fail because the Directive, on its face, does not

---

[13] Plaintiffs' allegations must be accepted as true at this stage. *See In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d 1, 6 (1st Cir. 2018) (quoting *González v. Vélez*, 864 F.3d 45, 50 (1st Cir. 2017)).

command or direct state officials to act.  MTD at 17.  However, the Supreme Court has held that the distinction between compelling action versus inaction is an "empty" one and that either may constitute commandeering in violation of the Tenth Amendment.  *Murphy*, 138 S. Ct. at 1478; *see also New York*, 2019 WL 6906274, at *12.  Plaintiffs have alleged how the courthouse-arrest policy compels state participation in federal immigration enforcement and prevents state operation of its judicial system.  *See supra*, at 12-14.

In addition, Plaintiffs allege that the Directive interferes with core sovereign functions and shifts the political accountability for immigration enforcement to the states.  Compl. ¶¶ 116-17. Defendants challenge these allegations and seem to argue that federal officials, or the arresting ICE officers, would be "the face of the federal government's policy," thereby removing the core concern of anticommandeering.  MTD at 18.  However, Defendants ignore Plaintiffs' allegations that "it becomes difficult for members of the public to attribute responsibility for the arrests" and "victims and witnesses often do not differentiate between state prosecutors and federal ICE officials." Compl. ¶¶ 78, 116.  These allegations, which must be taken as true at this stage, establish the link between the very concern anticommandeering seeks to address and the impact of the Directive in the Commonwealth, thereby stating a claim under the Tenth Amendment.  *See Murphy*, 138 S. Ct. at 1477-78.

Finally, Defendants argue that "traditional governmental functions" are no longer properly considered in a Tenth Amendment analysis and that the "Supreme Court has thus disclaimed [such] 'judicially created limitations on federal power,'" citing the Supreme Court in *Garcia.*  MTD at 18-19. Tenth Amendment claims have not been construed so narrowly on either issue.  For the reasons described above, *Garcia* did not preclude courts from considering traditional or historical state functions.  *See supra,* at 12-13.  And, since *Garcia*, the Supreme Court has clarified that the judiciary retains the authority under separation of powers to interpret the constitutional limits of federal

powers, and is not limited as Defendants would have the court believe.  *See Morrison*, 529 U.S. at 617-

18 & n.7 (2000) ("[T]he limit of Congressional authority is not solely a matter of legislative grace.");

*Lopez*, 514 U.S. at 575-79 (Kennedy, J., concurring).

## V.      THE COLLABORATIVE HAS STATED A CLAIM FOR VIOLATION OF THE RIGHT OF ACCESS TO COURTS (COUNT IV).

The Collaborative has stated a claim for violation of its members' right of access to state

courts.  *See* Compl. ¶¶ 64-75, 119-22.  The right is "derived from various constitutional sources,"

*Simmons v. Dickhaut*, 804 F.2d 182, 183 (1st Cir. 1986), and is designed to ensure "meaningful access"

to the courts, *see Bounds v. Smith*, 430 U.S. 817, 824 (1977), and to "provide [plaintiffs with] some

effective vindication for a separate and distinct right to seek judicial relief for some wrong,"

*Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002).[14]  The Collaborative asserts a forward-looking

claim alleging "that systemic official action [presently] frustrates . . . plaintiff[s] . . . in preparing and

filing suits," rather than a backward-looking claim that targets "specific cases that cannot now be

tried . . . no matter what official action may be in the future."  *Christopher*, 536 U.S. at  413-15.  Thus,

the Collaborative's allegations must establish that it seeks to place its members "in a position to

pursue . . . separate claim[s] for relief once the frustrating condition has been removed."  *Id.* at 413.

To state a claim, the Collaborative must allege "'nonfrivolous,' 'arguable' underlying claim[s]" and

the official acts "frustrating th[e] litigation."  *Id.* at 413-15.

The allegations in the Complaint plainly satisfy that standard.  The Collaborative has alleged

a forward-looking claim that "[f]orcing noncitizens potentially subject to removal to risk civil arrest

to access the courts creates . . . an impermissible frustration" of its members' ability to prepare and

---

[14] Because one source of the right is the First Amendment, *Christopher*, 536 U.S. at 415 n.12, Defendants argue that undocumented immigrants may not enjoy court-access rights.  MTD at 19 n.10.  The case Defendants cite is not a court access case and makes only passing reference to the First Amendment rights of noncitizens, and its holding applies only to the reach of the Fourth Amendment for searches of noncitizens' property outside the United States.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261, 265 (1990).  Moreover, the court-access right also stems from other constitutional provisions, including the Fifth and Fourteenth Amendments, *Chappell v. Rich*, 340 F.3d 1279, 1282 (11th Cir. 2003), that *do* apply to all noncitizens, including those without lawful status, *Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

file meritorious lawsuits.  Compl. ¶ 121; *see also id.* ¶¶ 64-75.[15]  The Collaborative maintains that

ICE's "official action" is "presently denying" its members "an opportunity to litigate" their claims.

*See Christopher*, 536 U.S. at 413; Compl. ¶¶ 67-75, 119-22.  Specifically, the Complaint details claims

by:

- Abuse-victim members who would seek orders of protection under Massachusetts General Laws ch. 209A (Compl. ¶ 67);

- Victims of a fraudulent investment scheme, which has cost Collaborative members hundreds of thousands of dollars (*Id.* ¶ 69);

- Victims of a church embezzlement scheme who would seek to recover embezzled funds (*Id.* ¶ 70);

- A member who would seek minimum wage and overtime payments from her former employer who violated wage and labor laws (*Id.* ¶ 71); and

- A victim of landlord-tenant violations who would seek judicial relief (*Id.* ¶ 72).

In every case, the member-victims fear civil arrest at courthouses, preventing them from

bringing their claims.  *Id.* ¶¶ 64-72.  Each of these allegations gives "fair notice" as to the

"underlying cause[s] of action" that would be brought absent ICE's "systemic official action," *see*

*Christopher*, 536 U.S. at 413, 416, and thus sufficiently state a court access claim.

Defendants not only ignore Plaintiffs' claims and the factual allegations about specific suits

that have not been brought because of the Directive, but they also apply the wrong standard.

Defendants focus on *backward*-looking claims, though Plaintiffs do not assert such claims.  MTD at

19.  Moreover, even if the heightened, backward-looking standard were applied, dismissal would still

be inappropriate.  To bring a backward-looking claim, the claimant must allege the existence of an

---

[15] The government takes issue with the fact that the Collaborative has not "name[d] specific members . . . who were subjected to a courthouse arrest" such that they are "now unable to pursue" their claims.  MTD at 20.  But this conflates the Collaborative's forward-looking claim with a backward-looking one; the Collaborative's access claim is not premised on the idea that its members' claims are lost for all time, but instead seeks to remove frustrating conditions so they can be brought in the future.  *See infra*, at 16-17.  The Collaborative identified members' meritorious claims, describing how the Directive frustrates pursuit of those claims sufficient to satisfy the pleading standards to survive a motion to dismiss.  *See, e.g.,* Compl. ¶¶ 67-72; *cf. Veterans for Common Sense v. Nicholson*, 2008 WL 114919, at *3, 17 (N.D. Cal. Jan. 10, 2008).

otherwise unavailable remedy in addition to pleading the requirements for a forward-looking claim. *See Christopher*, 536 U.S. at 413-15.[16] As discussed, the Collaborative has alleged a forward-looking claim (*see supra*, at 16-17), and therefore it need not establish this additional element. And even if the Collaborative brought a backward-looking claim, it *has* identified the requisite "remedy that may be awarded that is unique to the denial of access claim," *McIntyre v. United States*, 336 F. Supp. 2d 87, 133 (D. Mass. 2004), specifically a permanent injunction of ICE's courthouse arrest policy. *See* Compl. p. 47 ¶ C; *see also Penton v. Pool*, 724 F. App'x 546, 550 (9th Cir. 2018).

Defendants also incorrectly seek to limit the scope of the right to official actions that prevent "preparing and filing meaningful legal papers" "with the goal of blocking individuals from filing suits." MTD at 19-20 (quotation marks and alterations omitted). According to Defendants, the Constitution places no limits on the government's ability to prevent the litigation of a filed claim.

But Defendants' argument is belied by existing Supreme Court precedent and would render the court-access right effectively meaningless, as filing a claim that cannot be meaningfully pursued is equivalent to not filing a claim at all. As the Supreme Court has acknowledged, the right prohibits not only policies that ban access outright, but also those that obstruct it in more subtle ways, such that courts in the past have struck down official action "effectively foreclos[ing]" court access. *See Bounds*, 430 U.S. at 822, 824-25 (noting governments may be shouldered with "affirmative obligations to assure . . . meaningful access to the courts," which requires a "reasonably adequate opportunity to present" one's claims); *see also, e.g., M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996) ("access to judicial processes" may not "turn on ability to pay" in certain cases); *Tennessee v. Lane*, 541 U.S. 509, 523, 532-33, (2004) (courthouse inaccessibility for individuals with disabilities implicated court

---

[16] Defendants wrongly assert that any claim involving "prior acts" is backward-looking. MTD at 19. A claim is only backward-looking if it not only involves "prior acts," but also "cannot now be tried . . . no matter what official action may be in the future." *Christopher*, 536 U.S. at 413-14. In any event, Plaintiffs are not challenging a "prior act," but instead seek to enjoin ICE's *current* practice of targeting noncitizens at state courthouses—a practice that would assuredly continue if the preliminary relief this Court awarded Plaintiffs is not made permanent.

access right); *cf. Germany v. Vance*, 868 F.2d 9, 15 (1st Cir. 1989) ("[T]he underlying right . . . involves not simply a right of prisoners to prepare and dispatch papers but a more general right of . . . access to the courts that is 'adequate, effective, and meaningful.'").  Therefore, it is of no import that the government may not be acting "with the goal of blocking individuals from filing suits."  MTD at 20. Because the Directive targets noncitizens for courthouse arrests, thereby deterring them from filing meritorious claims, it "effectively foreclose[s]" their "meaningful access to the courts," *Bounds*, 430 U.S. at 822, 824, in violation of the long-recognized right of access to courts.

Defendants further argue that the Collaborative's court-access claim fails because it has not alleged that the Directive blocks its *own* ability as an organization to prepare or file meaningful legal papers, and has not identified an underlying claim of its *own* that was blocked, necessitating dismissal.  MTD at 20 (citing Comp. ¶¶ 70-72).  Defendants are incorrect.  The fact that the Collaborative has identified the "'nonfrivolous,' 'arguable' underlying claim[s]" claims of its *members* and the official acts "frustrating the[ir] litigation" is sufficient to state a claim.  *See Christopher*, 536 U.S. at 413, 415.  But also, the Collaborative has specifically alleged its own inability to prepare and file meaningful claims.  Compl. ¶¶ 64-66.  As part of its mission, it regularly assists members with litigation in Massachusetts state courts, and even brings claims in its own right to advocate for its community.  *Id.* ¶ 64-65.  As detailed in the Complaint, the Directive has thwarted those efforts since the Collaborative can no longer convince its noncitizen members to appear in court as witnesses, claimants, victims, or supporters.  *Id.* ¶ 66.

Finally, the government argues that the court-access right does not give noncitizens the "right to evade law enforcement."  MTD at 20.  This argument misconstrues the Collaborative's claim.  The Collaborative asserts that noncitizens, like all others, should be afforded the constitutional right of access to meaningfully pursue meritorious claims in state courts.  In addition, noncitizens should receive the protection of the common-law privilege against civil arrest when

bringing such claims—a privilege that "is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted," in its absence. *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916). For these same reasons, it protects noncitizens and courts alike from ICE's warrantless civil arrest practices in state courthouses.

To support its argument, Defendants conflate the civil and criminal enforcement contexts, citing cases rejecting court-access claims where criminal arrest warrants were at issue. MTD at 19-20. As discussed above, Plaintiffs do not challenge Defendants' ability to arrest individuals based on criminal warrants. Compl. ¶ 50. However, in the *civil* arrest context, noncitizens should be able to assert their constitutional right to bring claims in courts without interference from Defendants' courthouse arrest practices. *See, e.g.*, *Id.* ¶¶ 119-22.

The Collaborative has thus properly pled a court-access claim by identifying the underlying claims that the Directive is currently frustrating, seeking to remove this barrier so its members and the Collaborative may bring them.

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied. To the extent the Court is inclined to grant Defendants' motion to dismiss on any claim, Plaintiffs respectfully submit that such dismissal be without prejudice to allow Plaintiffs to amend the Complaint in response.

Dated: January 31, 2020

Respectfully submitted,

/s/ David J. Zimmer
David J. Zimmer (BBO# 692715)
    Special Assistant Attorney General
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine Dacey (pro hac vice)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KDacey@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com

Attorneys for Plaintiffs Marian Ryan, in her official
capacity as Middlesex County District Attorney, and
Rachael Rollins, in her official capacity as Suffolk
County District Attorney

/s/ Wendy S. Wayne
Wendy S. Wayne (BBO# 555665)
Committee for Public Counsel Services
Immigration Impact Unit
21 McGrath Highway, Somerville, MA 02143
(617) 623-0591
wwayne@publiccounsel.net

Attorney for Plaintiff the Committee for Public
Counsel Services

/s/ Oren N. Nimni
Oren N. Nimni (BBO# 691821)
Lawyers for Civil Rights
61 Batterymarch St., 5th Floor
Boston, MA 02110
(617) 482-1145
onimni@lawyersforcivilrights.org

David J. Zimmer (BBO# 692715)
Daryl L. Wiesen (BBO# 634872)
Alicia Rubio-Spring (BBO# 692640)
Katherine Dacey (pro hac vice)
Katherine M. Fahey (BBO# 699003)
Christopher J.C. Herbert (BBO# 703492)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
DZimmer@goodwinlaw.com
DWiesen@goodwinlaw.com
ARubio-Spring@goodwinlaw.com
KDacey@goodwinlaw.com
KFahey@goodwinlaw.com
CHerbert@goodwinlaw.com

Attorneys for Plaintiff Chelsea Collaborative, Inc.

21

## CERTIFICATE OF SERVICE

I, David J. Zimmer, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on January 31, 2020.

_/s/ David J. Zimmer_