## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIAN RYAN, in her official capacity as Middlesex County District Attorney; RACHAEL ROLLINS, in her official capacity as Suffolk County District Attorney; COMMITTEE FOR PUBLIC COUNSEL SERVICES; and the CHELSEA COLLABORATIVE, INC., <br><br> Plaintiffs, <br><br>   v. <br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, MATTHEW T. ALBENCE, in his official capacity as Acting Deputy Director of U.S. Immigration and Customs Enforcement and Senior Official Performing the Duties of the Director; TODD M. LYONS, in his official capacity as Immigration and Customs Enforcement, Enforcement and Removal Operations, Acting Field Office Director; U.S. DEPARTMENT OF HOMELAND SECURITY; and CHAD WOLF, in his official capacity as Acting Secretary of United States Department of Homeland Security, <br><br> Defendants. | No. 1:19-cv-11003-IT |

**BRIEF OF PROFESSOR NIKOLAS BOWIE AND THE HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**LEAVE TO FILE GRANTED FEBRUARY 19, 2020**

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................... 1

ARGUMENT .............................................................................................................. 3

I.    The Constitution does not empower the federal government to regulate immigration in a manner that disrupts proceedings in state courthouses or interferes with a state's duty to provide access to its courts. ................................ 3

    A.    Congress's power to regulate immigration domestically rests in the Necessary and Proper Clause. ..................................................................... 4

    B.    The Necessary and Proper Clause does not authorize Congress to exercise implied powers that are *unnecessary*, because they are too attenuated from an enumerated power, or that are *improper*, because they invade state sovereignty. ....................................................... 8

    C.    The implied power on which the federal government relies is not necessary. ...................................................................................................... 9

    D.    The implied power on which the federal government relies is improper. ...................................................................................................... 12

        1.    Such a power would improperly limit Massachusetts's ability to conduct its courthouse proceedings. ............................ 12

        2.    Such a power would improperly limit Massachusetts's duty to protect the right of its residents to access its courts. ................ 13

        3.    Such a power would improperly violate the federalism principles underlying the anticommandeering doctrine. .............. 15

II.    Congress has not clearly authorized the federal government to regulate immigration in a manner that would disrupt proceedings in state courthouses or interfere with a state's duty to provide access to its courts. ........ 17

CONCLUSION ....................................................................................................... 200

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012).................................................................................................. 8

*Boddie v. Connecticut,*
    401 U.S. 371 (1971)................................................................................................ 14

*Bond v. United States,*
    572 U.S. 844 (2014)......................................................................................... 18, 20

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011)................................................................................................ 14

*Chick Kam Choo v. Exxon Corp.,*
    486 U.S. 140 (1988)................................................................................................ 13

*Chinese Exclusion Case,*
    130 U.S. 581 (1889).......................................................................................... 1, 6, 10

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988).......................................................................................... 3, 18

*Ex parte Virginia,*
    100 U.S. 339 (1879)................................................................................................ 19

*Faretta v. California,*
    422 U.S. 806 (1975)................................................................................................ 15

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893).......................................................................................... 7, 10

*Galarza v. Szalczyk,*
    745 F.3d 634 (3d Cir. 2014) ................................................................................. 12

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991)........................................................................................ passim

*In re Justices of Superior Court Dept. of Massachusetts Trial Court,*
    218 F.3d 11 (1st Cir. 2000)................................................................................... 13

*In re Oliver,*
    333 U.S. 257 (1948)................................................................................................ 15

*Keller v. United States,*
    213 U.S. 138 (1909).......................................................................................... 2, 8

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................................................................ 7

*Lunn v. Commonwealth*,
    78 N.E.3d 1143, 1152 (Mass. 2017). .................................................................................. 12

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819) ......................................................................................... 7, 9

*New York v. U.S. Immigration & Customs Enf't*,
    2019 WL 6906274 (S.D.N.Y. 2019) .................................................................................. 21

*New York v. United States*,
    505 U.S. 144, 161 (1992) ................................................................................................... 16

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................................... passim

*Pierson v. Ray*,
    386 U.S. 547 (1967) .......................................................................................................... 20

*Ponzi v. Fessenden*,
    258 U.S. 254 (1922) .......................................................................................................... 13

*Press-Enterprise Co. v. Superior Court of Cal. for Riverside Cty.*,
    478 U.S. 1 (1986) .............................................................................................................. 15

*Prigg v. Pennsylvania*,
    41 U.S. (16 Pet.) 539 (1842) ............................................................................................ 16

*Redgrave v. Boston Symphony Orchestra, Inc.*,
    855 F.2d 888, 909 (1st Cir. 1988) .................................................................................... 18

*Ryan v. U.S. Immigration & Customs Enf't*,
    382 F. Supp. 3d 142 (D. Mass. 2019) .............................................................................. 20

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966) .......................................................................................................... 13

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) .......................................................................................................... 14

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ........................................................................................... 3, 14, 15, 19

*The Lottery Case*,
    188 U.S. 321 (1903) ....................................................................................................... 2, 8

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Toll v. Moreno*,
    458 U.S. 1 (1982).................................................................................................. 8

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)....................................................................................... 7

*Turner v. Williams*,
    194 U.S. 279 (1904)........................................................................................... 7

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950)........................................................................................... 7

*United States v. Bass*,
    404 U.S. 336 (1971)......................................................................................... 18

*United States v. Comstock*,
    560 U.S. 126 (2010).................................................................................. passim

*United States v. Female Juvenile*,
    A.F.S., 377 F.3d 27 (1st Cir. 2004).............................................................. 12, 20

*United States v. Jin Fuey Moy*,
    241 U.S. 394 (1916)......................................................................................... 18

*United States v. Negron-Sostre*,
    790 F.3d 295 (1st Cir. 2015)............................................................................ 15

*United States v. Watson*,
    423 U.S. 411 (1976)......................................................................................... 11

*Washington v. Texas*,
    388 U.S. 14 (1967)........................................................................................... 15

*Watts v. United States*,
    394 U.S. 705 (1969)......................................................................................... 11

*Wong Wing v. United States*,
    163 U.S. 228 (1896).................................................................................... 8, 11

**Statutes**

1 Stat. 570 ........................................................................................................... 5

1 Stat. 571 ........................................................................................................... 5

18 Stat. 477 ......................................................................................................... 6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

1843 Mass. Acts 33 .................................................................................................... 16

1858 Cal. Stat. 295 ...................................................................................................... 5

22 Stat. 214 ................................................................................................................. 6

22 Stat. 58 ................................................................................................................... 6

22 Stat. 59 ................................................................................................................... 6

23 Stat. 332 ................................................................................................................. 6

24 Stat. 414 ................................................................................................................. 6

25 Stat. 504 ................................................................................................................. 6

27 Stat. 25 ................................................................................................................... 7

42 U.S.C. § 1983 ....................................................................................................... 20

8 U.S.C. § 1226(a) .............................................................................................. 3, 19

8 U.S.C. § 1229(e) .............................................................................................. 3, 19

8 U.S.C. § 1357(a)(2) ......................................................................................... 3, 19

**Other Authorities**

Daniel J. Tichenor & Alexandra Filindra, *Raising* Arizona v. United States*:
Historical Patterns of American Immigration Federalism*, 16 Lewis & Clark L.
Rev. 1215 (2012) .................................................................................................. 11

Indictment, *United States v. Joseph*, No. 19-cr-10141 (D. Mass. Apr. 25, 2019). ..................... 16

Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power over
Immigration*, 86 N.C. L. Rev. 1557 (2008) .............................................................. 5

Kelly Lytle Hernández, *Migra: A History of the U.S. Border Patrol* 19–21 (2010) ................. 11

Report of 1800 (Jan. 7, 1800), *in* 17 The Papers of James Madison, *supra*, at 303–
51 .................................................................................................................... 5, 11

*The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85
(1954) ................................................................................................................... 5

U.S. Immigration & Customs Enf't, Directive No. 11072.1, Civil Immigration
Enforcement Actions Inside Courthouses (2018) ................................................... 17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Virginia Resolutions (Dec. 12, 1798), *in* 17 *The Papers of James Madison* 185–91
   (William T. Hutchinson et al. eds., 1991)............................................................................ 4, 5

**Constitutional Provisions**

Cal. Const. of 1879, art. XIX, § 4 ................................................................................................. 5

U.S. Const. art. I, § 8.................................................................................................................... 5

U.S. Const. pmbl......................................................................................................................... 21

U.S. Const., Art. I, § 8, cl. 3................................................................................................... 8, 10

U.S. Const., Art. I, § 8, cl. 4................................................................................................... 8, 10

## INTEREST OF AMICUS CURIAE

Nikolas Bowie is a historian and an assistant professor of law at Harvard Law School, where he teaches and writes about federal constitutional law, state constitutional law, and local government law. He has an interest in the sound development of this body of law.

The Harvard Immigration and Refugee Clinical Program ("HIRC") is a clinical program at Harvard Law School that advocates for immigrant justice through clinical education, legal representation, litigation, and community outreach. Both HIRC and its clients have an interest in immigrants' ability to access justice in the courts of this Commonwealth and the United States.

## SUMMARY OF THE ARGUMENT

The Constitution gives Congress many powers, but it says nothing about a power to regulate immigration. Instead, for a little over a century, this sovereign power has been implied from the constitutional provisions that authorize Congress to "regulate Commerce with foreign Nations," to "establish an uniform Rule of Naturalization," to declare war and to ratify treaties, and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." *See Chinese Exclusion Case*, 130 U.S. 581, 604 (1889). Although these provisions are broad, they do not permit Congress to do anything it wishes in the name of policing immigration. Yet that is what the federal government suggests when its agents claim the statutory authority to invade state courthouses and arrest immigrants without a warrant—disrupting proceedings, intimidating witnesses, and scaring away seekers of justice.

When the Supreme Court has surveyed the outer limits of Congress's implied powers, it has asked whether a particular power would be "necessary and proper" for exercising an enumerated power. The Court has considered an implied power unnecessary when it would be "too attenuated" from an enumerated power, and improper when it would "invade state sovereignty or

1

otherwise improperly limit the scope of 'powers that remain with the States.'" *United States v. Comstock*, 560 U.S. 126, 144–46 (2010); *see NFIB v. Sebelius*, 567 U.S. 519, 559–60 (2012). Although the Court has acknowledged that Congress appropriately exercises its sovereign powers when it regulates immigration at or beyond the international border—where it is "subject, generally speaking, to no implied or reserved power in the states"—the Court has cautioned that "laws which would be necessary and proper [in those circumstances] would not be necessary or proper" in others. *The Lottery Case*, 188 U.S. 321, 333 (1903). The Court has rejected claims that Congress possesses a "police power" disconnected from its enumerated powers that would authorize "an almost unlimited body of legislation" over "the great mass of personal dealings with aliens." *Keller v. United States*, 213 U.S. 138, 148–49 (1909).

Not even this nonexistent police power could justify the federal government's literal invasion of state facilities here. Its courthouse arrests improperly disregard Massachusetts's "legitimate, indeed compelling, interest in maintaining a judiciary fully capable of performing the demanding tasks that judges must perform." *Gregory v. Ashcroft*, 501 U.S. 452, 472 (1991). The arrests improperly interfere with Massachusetts's duty to protect its residents' fundamental right to access state courts, including their rights to compel the testimony of witnesses, to receive a public trial, and to fully participate in judicial proceedings. *See Tennessee v. Lane*, 541 U.S. 509, 522–23 (2004). And the arrests improperly raise the same federalism concerns underlying the Supreme Court's anticommandeering doctrine. *See Murphy v. NCAA*, 138 S. Ct. 1461 (2018).

Because nothing in the Constitution permits Congress to authorize such warrantless arrests in state courthouses, it is unlikely that Congress has authorized them. At the very least, the authorization cannot be hiding in broad statutory language, because "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will

construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). This principle applies with even more force when important state interests are involved, because when "Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory*, 501 U.S. at 460.

Here, the federal government claims that three provisions of the Immigration and Nationality Act justify its conduct. *See* United States' Motion to Dismiss ("MTD") at 15–17. Two permit federal agents "to arrest any alien in the United States." 8 U.S.C. §§ 1226(a), 1357(a)(2). A third contains the word "courthouse" but does not expressly authorize arrests there. *Id.* § 1229(e). These provisions do not come close to making it clear that Congress intended to authorize arrests of immigrants in any place and at any time, including in a manner that would disrupt state courthouse proceedings and interfere with a commonwealth's duty to provide access to its courts. They do not even show that Congress intended to authorize arrests in state courthouses as opposed to in federal courthouses. This lack of clarity confirms that neither the Constitution nor Congress anticipated what the federal government is asserting now: that its sovereign powers over immigration can transgress even the most conspicuous boundaries of federalism.

## ARGUMENT

**I.      The Constitution does not empower the federal government to regulate immigration in a manner that disrupts proceedings in state courthouses or interferes with a state's duty to provide access to its courts.**

The federal government claims that the Immigration and Nationality Act gives it authority "to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States[,] . . . within federal and state courthouses." MTD at 1. But if such

statutory authority exists, the Constitution did not give Congress the power to enact it. The only provision of the Constitution that could potentially support such legislative authority is the Necessary and Proper Clause. The Supreme Court has interpreted that Clause to permit Congress to exercise implied powers that are *necessary*, meaning not too attenuated from an enumerated power, and *proper*, meaning they do not invade state sovereignty. It is neither necessary nor proper for Congress to authorize federal agents to conduct warrantless arrests of immigrants in a manner that disrupts state courthouse proceedings and interferes with Massachusetts's duty to provide access to its courts.

### A.  Congress's power to regulate immigration domestically rests in the Necessary and Proper Clause.

James Madison once observed that the power to regulate immigration is a "power no where delegated to the federal government." Virginia Resolutions (Dec. 12, 1798), *in* 17 *The Papers of James Madison* 185–91 (William T. Hutchinson et al. eds., 1991). Instead, the Constitution grants Congress the powers to "regulate Commerce with foreign Nations," to "establish an uniform Rule of Naturalization," to declare war and to make treaties, and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." U.S. Const. art. I, § 8. Based on these powers, the First Congress, of which Madison was a member, passed the Naturalization Act of 1790, 1 Stat. 103. But while this Act regulated the procedure by which a "free white person" could become a U.S. citizen, neither it nor any other early federal statute regulated who could lawfully enter or remain in the United States. *Id.*

That changed with the notorious Alien and Sedition Acts of 1798, one of which permitted the President to cause certain noncitizens "to be arrested and sent out of the United States." 1 Stat. 570, 571. This "Act Concerning Aliens" was so controversial that it was never enforced, in part because Madison argued successfully that Congress lacked power to enact it. *See* Virginia

4

Resolutions, *supra*; James Morton Smith, *The Enforcement of the Alien Friends Act of 1798*, 41 Miss. Valley Hist. Rev. 85 (1954). Madison pointed out that the Constitution gave Congress the power to regulate immigration from a hostile country as part of a declared war, but during peacetime Congress had no such "absolute power over . . . aliens." Report of 1800 (Jan. 7, 1800), *in* 17 *The Papers of James Madison*, *supra*, at 303–51.

In the meantime, states filled the gap by passing laws that were openly hostile to immigrants. *See* Juliet P. Stumpf, *States of Confusion: The Rise of State and Local Power over Immigration*, 86 N.C. L. Rev. 1557, 1566–69 (2008). In 1858, California became the first of many states to declare that persons "of the Chinese or Mongolian races, shall not be permitted to enter this state." 1858 Cal. Stat. 295.  In 1879, when California adopted its current constitution, it gave the state and local governments "all necessary power . . . for the removal of Chinese." Cal. Const. of 1879, art. XIX, § 4.

In this xenophobic climate, Congress enacted its second-ever immigration law, the Page Act of 1875, which authorized federal port officials to exclude any immigrants from "China, Japan, or any Oriental country" who the officials believed were immigrating for "lewd and immoral purposes." 18 Stat. 477. Congress expanded these restrictions with the Chinese Exclusion Act of 1882, which authorized port officials to exclude "the coming of Chinese laborers to the United States." 22 Stat. 58, 59. Later acts excluded other unwanted immigrants, including "any convict, lunatic, idiot, or any person unable to take care of himself or herself without becoming a public charge." 22 Stat. 214; *see also* 23 Stat. 332; 24 Stat. 414; 25 Stat. 504.

When federal officials enforced these acts to prohibit a Chinese resident of San Francisco from disembarking in the United States after a short trip to China, the Supreme Court upheld their constitutionality in the *Chinese Exclusion Case*, 130 U.S. 581 (1889). "While under our

5

Constitution and form of government the great mass of local matters is controlled by local authorities," the Court explained, "the United States, in their relation to foreign countries and their subjects or citizens, are one nation, invested with powers which belong to independent nations." *Id.* at 604. The Court identified these "sovereign powers delegated by the constitution" as "[t]he powers to declare war, make treaties, suppress insurrection, repel invasion, regulate foreign commerce, secure republican governments to the States, and admit subjects of other nations to citizenship." *Id.* at 604, 609. Disagreeing with Madison, the Court held that these powers were sufficient to justify Congress's adoption of legislation that excluded "foreigners of a different race in this country, who will not assimilate with us"—even if the United States was not at war. *Id.* at 606. But the Court emphasized that it was upholding only the power to exclude immigrants entering the country, not the "entirely different" domestic powers at issue in the earlier Act Concerning Aliens. *Id.* at 610–11.

Citing the *Chinese Exclusion Case*, the Supreme Court has repeatedly upheld Congress's power to exclude noncitizens at the border. It has also continued to explain this power as both "inherent in sovereignty" and as an exercise of "the power to regulate commerce with foreign nations, which includes the entrance of ships, the importation of goods, and the bringing of persons into the ports of the United States." *Turner v. Williams*, 194 U.S. 279, 289–90 (1904); *see, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Indeed, the power to exclude is now so well-established that it has been described as "plenary," *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972), and courts often defer to the political branches' decisions to exclude noncitizens at the border, *see, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–20 (2018).

But just as the *Chinese Exclusion Case* distinguished the frontier power to exclude from the domestic powers to arrest and expel, the Court has been careful to ground Congress's domestic powers over immigration in a different source: the Necessary and Proper Clause. In the first case to analyze these domestic powers, *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), the Court upheld an amendment to the Chinese Exclusion Act that authorized federal officials to arrest and expel "any Chinese laborer, within the limits of the United States," who failed to obtain a certificate of residence. 27 Stat. 25. Over a dissent that quoted James Madison's criticism of the Act Concerning Aliens, the Court explained that Congress's power to order the expulsion of noncitizens was not an independent power, but a necessary and proper means of executing its power to exclude noncitizens. *Fong Yue Ting*, 149 U.S. at 707–13 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 423 (1819)); *see id.* at 748 (Field, J., dissenting). Three years later, the Court added that the powers to arrest and detain noncitizens were similarly "part of the means necessary to give effect to the provisions for . . . exclusion or expulsion." *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). More recently, the Court has explained that all of Congress's domestic authority over immigration can be understood as a necessary and proper means of enforcing its powers "[t]o establish [a] uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, "[t]o regulate Commerce with foreign Nations," *id.*, cl. 3, and to conduct the nation's foreign affairs. *Toll v. Moreno*, 458 U.S. 1, 10 (1982); *see also Arizona v. United States*, 567 U.S. 387, 394–95 (2012).

But Congress's domestic authority over immigration is not plenary like its power to exclude noncitizens at the border. Rather, because it is grounded in the Necessary and Proper Clause, the authority extends only as far as it is necessary and proper to enforce one of Congress's enumerated powers. And as the Supreme Court has repeatedly emphasized, what is necessary

and proper at the border may not be necessary or proper within the country's interior. When Congress legislates beyond the border, it is "clothed . . . with that power over international commerce, pertaining to a sovereign nation in its intercourse with foreign nations, and subject, generally speaking to no implied or reserved power in the States." *The Lottery Case*, 188 U.S. 321, 373 (1903). But when Congress legislates domestically, it must consider the powers reserved to the states by the Tenth Amendment: "The laws which would be necessary and proper in the one case would not be necessary or proper in the other." *Id.* So too with immigration. Within the country's borders, even when Congress legislates with respect to noncitizens, "there is in the Constitution no grant to Congress of the police power." *Keller v. United States*, 213 U.S. 138, 148 (1909).

**B. The Necessary and Proper Clause does not authorize Congress to exercise implied powers that are *unnecessary*, because they are too attenuated from an enumerated power, or that are *improper*, because they invade state sovereignty.**

The Supreme Court has evaluated the outer limits of the Necessary and Proper Clause using a variety of tests over the years, from the poetic ("Let the end be legitimate . . . .") to the multifactor.  Its two most recent tests are in the latter genre. In *NFIB v. Sebelius*, 567 U.S. 519 (2012), Chief Justice Roberts interpreted the Necessary and Proper Clause literally, writing that a law must be both "necessary" and "proper" to be a valid exercise of the Clause. *Id.* at 559. To be *necessary*, a law must be "convenient, or useful," "narrow in scope," and "incidental" to the beneficial exercise of an enumerated power. *Id.* at 559–60. It cannot, by contrast, create a "'great substantive and independent power' beyond those specifically enumerated." *Id.* at 559–60 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 411, 413, 418, 421). To be *proper*, a law must be "consist[ent] with the letter and spirit of the constitution." *Id.* It cannot compromise "essential

attributes of state sovereignty . . . by the assertion of federal power." *Id.* (quoting *United States v. Comstock*, 560 U.S. 126, 153 (2010) (Kennedy, J., concurring)).

The standard endorsed by Chief Justice Roberts in *NFIB* overlaps substantially with the "five considerations" that a majority of the Court found important in *United States v. Comstock*, 560 U.S. 126 (2010). Consistent with *NFIB*'s analysis of whether an implied power is *necessary*, the Court in *Comstock* considered [1] whether the link between the asserted power and an enumerated power is "too attenuated," [2] whether the asserted power fits among other examples of Congress's "broad authority to enact federal legislation," and [3] whether there are "sound reasons" for the exercise of the power. *Id.* at 133–49. Consistent with *NFIB*'s analysis of whether an implied power is *proper*, *Comstock* considered [4] whether it "invade[s] state sovereignty or otherwise improperly limit[s] the scope of powers that remain with the States," and [5] whether there is "a longstanding history of related federal action." *Id.*

The two basic questions under either test are whether an implied power is too attenuated from an enumerated power to be reasonably necessary for exercising it and whether it properly accommodates state interests. Here, the federal government's asserted power to conduct warrantless courthouse arrests is not reasonably necessary for exercising any enumerated power, and the resulting disruption of state court proceedings and interference with the Commonwealth's duty to provide access to its courts fails to properly accommodate state interests.

**C.  The implied power on which the federal government relies is not necessary.**

As the federal government almost concedes, a "broad" and "undoubted power" to conduct warrantless arrests in state courthouses, MTD at 2, would be a "great substantive and independent power." *NFIB*, 567 U.S. at 560. Not only would such a power be "too attenuated" to

9

be necessary for exercising an enumerated power, but it would also impermissibly "work a substantial expansion of federal authority." *Id.*

Consider how far removed the federal government's alleged power is from the text of the Constitution. The Constitution empowers Congress "[t]o establish [a] uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4, "[t]o regulate Commerce with foreign Nations," *id.*, cl. 3, and to declare war, ratify treaties and the like. Conceding that Congress legitimately exercises these powers when it excludes noncitizens and regulates the conditions by which they may enter the country, *Chinese Exclusion Case*, 130 U.S. at 609, the Supreme Court purposefully took one step away from this text when it authorized Congress to arrest or expel noncitizens already within the United States, *Fong Yue Ting*, 149 U.S. at 707. The Court then took a second step away from the text by allowing Congress to establish a federal law enforcement agency to enforce its statutes. *See* Kelly Lytle Hernández, *Migra: A History of the U.S. Border Patrol* 19–21, 127–30 (2010); Daniel J. Tichenor & Alexandra Filindra, *Raising Arizona v. United States: Historical Patterns of American Immigration Federalism*, 16 Lewis & Clark L. Rev. 1215, 1239 (2012). The Court took another step away from the text by allowing Congress to empower federal officers to detain noncitizens after arresting them on a warrant. *Wong Wing*, 163 U.S. at 235. Already, therefore, Congress's acknowledged domestic power over immigration is three steps removed from Article I's text.

Now, the federal government is asking this Court to take a fourth step—and then a final leap. The fourth step is the government's alleged "warrantless arrest authority" of people suspected of violating immigration laws. MTD at 16. Such power would be extraordinary; the Commerce Clause does not ordinarily empower Congress to authorize warrantless arrests of unwitnessed misdemeanors. *See United States v. Watson*, 423 U.S. 411, 418 (1976). That would grant the

10

federal government the ability to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." *NFIB*, 567 U.S. at 560. Indeed, James Madison criticized the Act Concerning Aliens of 1798 for authorizing the President to order the warrantless arrests of noncitizens. Such a power, Madison wrote, would violate the "sacred" principles of "preventive justice" that require "some probable ground of suspicion be exhibited before some judicial authority" before a person may be arrested. Report of 1800, *supra*. No judge ever upheld the Act of 1798, but several have, with Madison, cast doubt on the constitutionality of that act as "one of our sorriest chapters." *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 710 (1969) (Douglas, J., concurring).

Even if this Court entertained the federal government's request to expand its power to include the authority to conduct warrantless arrests of noncitizens, that still would not condone such arrests "within federal and state courthouses," MTD at 1, particularly without the consent of relevant state actors. As the federal government acknowledges, arrests involving state courts have historically been conducted "in collaboration with court security and staff." *Id.* at 3. For instance, the federal government routinely issues *detainers*, which are voluntary requests for local law enforcement agencies to notify the federal government of certain noncitizens within their custody. *See United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004); *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1152 (Mass. 2017). "All Courts of Appeals to have commented on the character of [the federal government's] detainers refer to them as 'requests' or as part of an 'informal procedure.'" *Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014).

But the federal government now claims that to enforce a constitutionally enumerated power, Congress gave it the authority to make arrests in Massachusetts courts unilaterally, against the express wishes of the Commonwealth's officers. MTD at 1. This leap is unwarranted.

Considering the "cautionary instruction that [courts] may not 'pile inference upon inference' in order to sustain congressional action under Article I," *Comstock*, 560 U.S. at 146, such a power is not necessary.

**D.  The implied power on which the federal government relies is improper.**

Even more troubling than the multiple degrees of removal separating the federal government's claimed power from the Constitution's text are the "essential attributes of state sovereignty [that would be] compromised" if this Court recognized the power that the federal government asserts here. *NFIB*, 567 U.S. at 560 (quoting *Comstock*, 560 U.S. at 153 (Kennedy, J., concurring)). Specifically, it is well-established that courthouse arrests improperly impede Massachusetts's interest in maintaining state proceedings, limit the Commonwealth's ability to fulfill its constitutional duty to provide all residents access to courts, and implicate the anticommandeering doctrine.

**1.  Such a power would improperly limit Massachusetts's ability to conduct its courthouse proceedings.**

Massachusetts, like every other state, has a "legitimate, indeed compelling, interest in maintaining a judiciary fully capable of performing the demanding tasks that judges must perform." *Gregory*, 501 U.S. at 472. These tasks include controlling the "courtroom and courthouse premises," including by regulating the public's access to the courtroom, insulating witnesses, and monitoring the behavior of police officers, witnesses, and counsel. *Sheppard v. Maxwell*, 384 U.S. 333, 358–59 (1966). Out of respect for these tasks, Congress has traditionally allowed state judges to conduct their proceedings "unimpaired by intervention of the lower federal courts." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988); *see also In re Justices of Superior Court Dep't of Mass. Trial Court*, 218 F.3d 11, 16 (1st Cir. 2000). Yet the

federal government asserts here that Congress has empowered the Executive Branch to conduct an even more disruptive intervention by conducting arrests on state court premises.

Contrast this intervention with *Comstock*, where the Supreme Court held that a federal civil commitment law did not improperly curtail states' power because each state retained "the right, at any time, to assert its authority over the [civilly committed] individual, which [would] prompt the individual's immediate transfer to state custody." 560 U.S. at 145. The civil immigration enforcement system provides no such guarantee: once the federal government has arrested a criminal defendant or witness and placed them in detention, "no state court [can] assume control of [their] body without the consent of the United States." *Ponzi v. Fessenden*, 258 U.S. 254, 261 (1922). As the Plaintiffs point out, "[w]hen criminal defendants are arrested and detained by ICE while their criminal cases are still pending, the defendants often are unable to return to state court." Compl. ¶ 51(f). And when parties and witnesses fail to attend court, it "significantly harms . . . the entire Massachusetts justice system." *Id.* ¶ 63.

Federal arrests *around* state courthouses have had a similarly disruptive effect. *See id.* ¶ 60. Furthermore, "the publicity around these stories [of arrests both within and outside courthouses] . . . has had a dramatic impact on many noncitizens' willingness to appear in Massachusetts courts." *Id.* ¶ 62. Thus, the federal government's alleged power to conduct such arrests outside state courthouses also improperly interferes with powers that belong to the states.

**2. Such a power would improperly limit Massachusetts's duty to protect the right of its residents to access its courts.**

The power that the federal government seeks to establish here would also improperly interfere with Massachusetts's duty under numerous constitutional provisions to ensure that noncitizen civil and criminal defendants, litigants, witnesses, and members of the public can access its courts.

13

First, the Due Process Clause of the Fourteenth Amendment requires states to afford "civil litigants a 'meaningful opportunity to be heard' by removing obstacles to their full participation in judicial proceedings." *Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). Such "obstacles" include any government created impediments—physical, financial, or otherwise—that would deter a litigant from participating in court. *See Boddie*, 401 U.S. at 380–81. Massachusetts's duty to remove such obstacles is closely related to its obligation under the Petition Clause of the First Amendment to protect all peoples' "right of access to courts for redress of wrongs." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896–97 (1984)). All of these duties are compromised by the federal government's warrantless arrests in Massachusetts courts. For example, "ICE has arrested at least one woman while appearing in court to obtain a protective order from an abusive partner." Compl. ¶ 39. The Complaint also recounts a "clearly actionable" fraud scheme, wherein "the undocumented victims have refused to initiate civil claims . . . due to fear of ICE arrest upon appearing in court." *Id.* ¶ 69.

A second right at issue is that of criminal defendants "to be present at all stages of the trial where [their] absence might frustrate the fairness of the proceedings." *Lane*, 541 U.S. at 523 (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). This right is guaranteed by the Sixth and Fourteenth Amendments, which also require states to allow criminal defendants "to offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Plaintiffs' Complaint provides examples of how warrantless arrests in and around state courthouses have violated both of these rights. For example, the Complaint quotes the Essex County district attorney as reporting that "[ICE] arrests at courthouses in our county have impacted witnesses appearing for trial." Compl. ¶ 81. And the

14

Complaint notes that "if a defense witness refuses to appear . . . , defending the client becomes significantly more difficult, and at times impossible." *Id.* ¶ 82(a).

A final right at issue is the Sixth Amendment's guarantee to criminal defendants of the right to a public trial. *See United States v. Negron-Sostre*, 790 F.3d 295, 301 (1st Cir. 2015) *see also In re Oliver*, 333 U.S. 257, 278 (1948). This right goes hand in hand with the public and press First Amendment right to access criminal trials. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7 (1986). When the public is unable to attend court—whether due to arrest or fear of arrest—such arrests limit the Commonwealth's ability to protect its residents' rights to a public trial. Yet federal immigration officers have arrested at least some members of the public, such as "family members accompanying someone ICE has targeted for arrest." Compl. ¶ 51(c).

### 3. Such a power would improperly violate the federalism principles underlying the anticommandeering doctrine.

A final consideration that confirms the impropriety of the federal government's alleged power to conduct warrantless courthouse arrests is that this power would implicate the same federalism concerns that underly the Supreme Court's anticommandeering doctrine.

Over the past two centuries, the Supreme Court has repeatedly held that Congress lacks the power to "commandeer" state governments. *New York v. United States*, 505 U.S. 144, 161 (1992). For example, in *Prigg v. Pennsylvania*, 41 U.S. (16 Pet.) 539 (1842), the Court declared that states could prohibit their officers from "act[ing] under" the Fugitive Slave Act of 1793. 41 U.S. at 561. On the basis of this decision, Massachusetts passed a "personal liberty law" that prohibited state officials from making state courthouses or state facilities available for the enforcement of the Fugitive Slave Act. *See, e.g.*, 1843 Mass. Acts 33. The Supreme Court subsequently confirmed that Congress lacks the power to compel states to "enact and enforce a federal regulatory program." *New York*, 505 U.S. at 161.

15

In recent years, the Supreme Court has explained that the anticommandeering doctrine vindicates three valuable principles of federalism—all of which are implicated by this case. First, federalism "divides authority between federal and state governments" to "protect[] individuals" and reduce the "risk of tyranny and abuse from either front." *New York*, 505 U.S. at 181. Here, by contrast, the federal government has sought to condense state and federal power into one. In April 2019, for instance, federal prosecutors indicted Judge Shelley Joseph, a Massachusetts district court judge, for allegedly interfering with an ICE arrest outside her own courtroom. *See* Indictment, *United States v. Joseph*, No. 19-cr-10141 (D. Mass. Apr. 25, 2019). Where courthouse arrests are accompanied by a *requirement* that state judges assist the federal government, state and federal authority is no longer divided in a way that protects individuals from tyranny and abuse.

Second, federalism increases political accountability by ensuring that "[v]oters who like or dislike the effects of [a] regulation know who to credit or blame." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018). These lines of accountability are blurred when state courthouses and state facilities become associated with an increased risk of federal immigration arrest and detention. Bystanders observing immigration arrests both in and around courthouses have struggled to identify ICE agents as federal officers rather than state officers. Compl. ¶ 51(e).

Finally, federalism prevents the federal government from "shift[ing] the cost of regulation" to the states. *Murphy*, 138 S. Ct. at 1477. Here, the federal government has transgressed that obstacle by purposefully taking advantage of the money the Commonwealth spends both on screening people for weapons and other contraband, *see* U.S. Immigration & Customs Enf't, Directive No. 11072.1, Civil Immigration Enforcement Actions Inside Courthouses 1 (2018), and on identifying and locating noncitizens. The ICE Directive makes clear that "[c]ivil

immigration enforcement actions inside courthouses should . . . be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.* And as the Complaint highlights, "ICE often reviews court dockets upon arriving in court, and sometimes arrests or attempts to arrest others who happen to appear in court that day." Compl. ¶ 51(c).

## II.   Congress has not clearly authorized the federal government to regulate immigration in a manner that would disrupt proceedings in state courthouses or interfere with a state's duty to provide access to its courts.

Because the power that the federal government claims here is too attenuated from an enumerated power to be *necessary* and too invasive of state interests to be *proper*, it is unlikely that Congress actually permitted federal agents to exercise it. As a matter of statutory interpretation, it would also be inappropriate to locate this unconstitutional authorization in a specific application of some generally worded statute. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). "[A] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 909 (1st Cir. 1988).

This principle applies with even more force when important state interests are involved, because when "Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). As the Supreme Court has explained, "[t]his plain statement rule is nothing more than an acknowledgment that the States

retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Id.* at 461. "[W]hen legislation 'affect[s] the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)). This is particularly true when the statute diminishes the role of state judges and state courts. *See Gregory*, 501 U.S. at 460. "Perhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Bond*, 572 U.S. at 858.

Here, the federal government argues that its conduct is justified by three statutory provisions: The first authorizes the Attorney General to order that "an alien may be arrested." 8 U.S.C. § 1226(a). The second declares that any federal immigration agent "shall have power without warrant . . . to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.* § 1357(a)(2). The third requires immigration agents to comply with certain confidentiality rules if "an enforcement action leading to . . . removal proceeding[s] was taken against an alien at . . . a courthouse (or in connection with that appearance of the alien at a courthouse)." *Id.* § 1229(e). Based on these provisions, the federal government concludes that Congress has unambiguously given it "plenary and unqualified" authority to conduct warrantless arrests however and wherever it likes, even if the arrests disrupt Massachusetts's courthouse proceedings and interfere with the Commonwealth's duty to protect its residents' right to access its courts. MTD at 3, 5-6.

But these provisions do not provide the unmistakable clarity that the government needs. First, the two provisions discussing Congress's power to "arrest any alien in the United States" do not

identify where in the United States an arrest may take place. 8 U.S.C. §§ 1226(a), 1357(a)(2). Although the third provision mentions "a courthouse," it does so ambiguously—in a separate provision and in connection with a different statutory term: "an enforcement action." *Id.* § 1229(e). Even taken together, these provisions are far from the clear language Congress ordinarily uses when it intends to apply a statute to courthouses. *See, e.g.*, *Lane*, 541 U.S. at 517; *Ex parte Virginia*, 100 U.S. 339, 340 (1879). They certainly do not suggest that Congress "intended to bring into issue" the frontiers of its domestic power to enforce its immigration laws.

Second, even assuming that Congress did intend to authorize warrantless immigration arrests in a "courthouse," nowhere has Congress mentioned *state* courthouses. As Congress possesses fewer powers with respect to state courthouses than it does with respect to federal courthouses, there is no reason to presume that Congress intended to extend its arrest authority to state facilities. As the Supreme Court wrote in a similar situation, courts "will not read [a federal statute] to cover state judges unless Congress has made it clear that judges are *included*." *Gregory*, 501 U.S. at 467.

Third, the three provisions do not clearly indicate that Congress intended to authorize courthouse arrests absent the cooperation of the court. As discussed above, the federal government until very recently conducted courthouse arrests by issuing detainers to courthouse officials, asking them to voluntarily arrest people in their custody. *See Female Juvenile*, 377 F.3d at 35. It is therefore highly unlikely that Congress intended the enormously disruptive effects that would follow if federal immigration officials thought themselves empowered to conduct such arrests unilaterally, whenever they wished, and even after state officials have asked them to stop.

Fourth, the provisions say nothing about background common-law privileges and immunities, including the privilege against civil arrest. "Part of a fair reading of statutory text is

19

recognizing that 'Congress legislates against the backdrop' of certain unexpressed presumptions." *Bond*, 572 U.S. at 857. For example, 42 U.S.C. § 1983 applies to "[e]very person," but the Warren Court interpreted that phrase not to extend damages liability to state judges because of the established common-law principle of absolute judicial immunity. *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Similarly, Judge Rakoff recently joined this Court in interpreting the arrest provisions at issue here not to apply to immigrants in or around state courthouses because of the established common-law privilege against civil arrests in such circumstances. *See New York v. U.S. Immigration & Customs Enf't*, 2019 WL 6906274 at *11 (S.D.N.Y. 2019); *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 157 (D. Mass. 2019). Because Congress has not made unmistakably clear its intent to allow federal agents to conduct warrantless courthouse arrests despite that traditional privilege, it would be inappropriate to disregard the privilege now.

But ultimately, the most persuasive reason why Congress did not authorize the federal government to conduct warrantless courthouse arrests is because any such authorization would have exceeded Congress's constitutional powers. Those powers were drafted into the Constitution alongside respect, not disregard, for the important role that states serve in helping the People of the United States "establish Justice." U.S. Const. pmbl. Neither the Constitution nor Congress has permitted federal immigration agents to overturn that constitutional balance. The agents should not be allowed to continue doing so on their own initiative.

## CONCLUSION

For these reasons, the federal government's motion to dismiss should be denied.

Dated: February 20, 2020

By their attorneys,

/s/ *Nikolas Bowie*
Nikolas Bowie
BBO # 690597
nbowie@law.harvard.edu
**HARVARD LAW SCHOOL**
1525 Massachusetts Avenue,
Cambridge, Massachusetts 02138
Tel: (617) 496-0888

/s/ *Philip L. Torrey*
Philip L. Torrey
BBO #673506
ptorrey@law.harvard.edu
Sabrineh Ardalan, *Pro Hace Vice Forthcoming*
sardalan@law.harvard.edu
**HARVARD IMMIGRATION AND REFUGEE**
**CLINICAL PROGRAM**
6 Everett St., Suite 3103
Cambridge, Massachusetts, 02138
(617) 495-0638

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed using the Court's CM/ECF system on February 20, 2020. I certify that all participants are CM/ECF users and that service will be accomplished via CM/ECF system.

/s/ *Philip L. Torrey*
Philip Torrey
*Amici Curiae*

22