UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARIAN RYAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:19-CV-11003-IT |
| | ) | |
| U.S. IMMIGRATION AND CUSTOMS | ) | |
| ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO THE MOTION TO DISMISS

For the reasons discussed in Defendants' Motion to Dismiss and herein, this Court should dismiss Plaintiffs' Complaint in its entirety. Nothing in Plaintiffs' Opposition to the Motion to Dismiss overcomes the threshold flaws in their Complaint. Specifically, Plaintiffs fail to establish that the policy is a final agency action rather than a general statement of policy, MTD Opp. 6-8; fail to engage with Defendants' cases showing that the privilege against courthouse arrest, to the extent it even exists in the form Plaintiffs plead, was not incorporated against the federal government through the Immigration and Nationality Act (INA), *id.* at 9-12; cannot establish that the Directive violates the Tenth Amendment when it does not compel any action but merely places parameters on ICE's ability to conduct arrests in areas open to the public, *id.* at 12-16; and seek a novel expansion of the right of access to encompass immunity from law enforcement, *id.* at 16-20.

## ARGUMENT

A.  *Plaintiffs Lack a Valid Cause of Action under the Administrative Procedure Act (APA) to Challenge ICE's Arrest Policies.[1]*

The APA provides the only waiver of sovereign immunity for Plaintiffs' claims. MTD 6-8. Plaintiffs continue to maintain that the APA has no bearing on their common-law and constitutional claims without addressing this point. *See* MTD Opp. at 4 n.3. Because the APA provides the only framework through which this Court may analyze Plaintiffs' claims, the unavailability of APA review dooms all of Plaintiffs' claims.[2] *See* MTD 5-8.

---

[1] Defendants acknowledge that this Court has determined that there is standing in this case. However, Defendants reject Plaintiffs' contention that "[t]he allegations in Plaintiffs' Complaint do not differ in any way from the evidence Plaintiffs introduced in support of their motion for a preliminary injunction." MTD Opp. 3. This Court held at the preliminary-injunction stage that Plaintiffs' clients are not "voluntarily choosing not to attend court, but [rather] ICE … civilly arrested their clients when these individuals came to court to attend state proceedings against them." ECF 51 at 17. But Plaintiffs make no such allegation in their Complaint, which never mentions the arrests of persons specified to be clients. *See* Compl. ¶¶ 49-82. This Court may not reference any preliminary-injunction affidavits now in determining whether the Complaint sufficiently states a claim. Any consideration of evidence outside these pleadings is inappropriate at the motion-to-dismiss stage, where the inquiry is whether the well-pleaded complaint supports the allegations. The Complaint does not.

[2] As Defendants stated in their Motion to Dismiss, Defendants recognize that this Court has ruled against them on the question of whether Plaintiffs fall within the INA's zone of interests. However, Plaintiffs state that this Court should continue to do so because *New York v. ICE* has held the same. That argument is circular because *New York* relied on this Court's opinion for that holding, and Plaintiffs are now asking this Court to use *New York* as support. *New York v. ICE*, --- F. Supp. 3d ---, 2019 WL 6906274, at *4 (S.D.N.Y. Dec. 19, 2019).

*First*, ICE's decision to arrest persons in public places (in other words, where and when to make arrests) is left to ICE's unreviewable discretion, as ICE has statutory and constitutional authority to do so. *See* MTD 8-20. Plaintiffs "do not challenge ICE's *exercise* of discretion in conducting a specific arrest." MTD Opp. 5. Indeed, Plaintiffs do not challenge individual arrests of aliens; rather, they challenge the Directive and the "corresponding practice" of courthouse arrests of certain targeted aliens. Compl. ¶ 5. Not a single alien is a named Plaintiff in this case, and the Complaint names no specific clients who have been, or will be, subject to this "corresponding practice." Without any such person, the Plaintiffs' Complaint amounts to little more than a policy disagreement with ICE's law-enforcement activities.

For example, the Complaint does not clearly plead that CPCS or Chelsea Collaborative — the only two organizations that theoretically may call individual aliens "clients" or "members," as prosecutors represent the People of Massachusetts as a general matter and no individual clients — have had any of *their own* clients be subject to a courthouse arrest. *See* Compl. ¶¶ 52-59 (providing the only examples in the Complaint of specific arrests, all of which were of criminal defendants and none of whom are specified to be CPCS clients), 66-72 (not once mentioning that any of Chelsea Collaborative's members have been arrested or would actually be subject to ICE arrest under the Directive, i.e. that they have committed crimes, been involved in terrorism or gang activity, or had final orders or removal), 82 (referencing how CPCS needs to deal with clients' failure to appear "due to fear or actual ICE arrest" but without making any particularized allegations about any actual arrests). Instead, they argue that the arrest of certain aliens has in essence created a chilling effect in participation for nontargeted aliens, like domestic violence victims, who are governed by another ICE policy. *See* Compl. ¶¶ 54-72. But "chilling effects" only provide an exception to traditional standing doctrine for free speech claims, not APA claims. *See, e.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 507 (1982) (White, J., concurring); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980). Contrary to Plaintiffs' assertion, Defendants do not maintain that courthouse enforcement actions are never reviewable. *See* MTD Opp. 5. Defendants acknowledge, as described below, that final agency action is reviewable for true constitutional or statutory claims — but not to challenge lawful acts of discretion. Parties disagree about whether there

is a true statutory challenge here, as Defendants maintain that the statute is clear and thus ICE's valid arrests taken under it are unreviewable.

*Second,* it is settled law that general statements of policy that are not binding on individual officers are unreviewable under the APA. MTD 7-8. As the D.C. Circuit has long held, a general statement of policy is not "final agency action" under 5 U.S.C. § 704 because it "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Community Nutrition Inst. v. Young,* 818 F.2d 943, 946 (D.C. Cir. 1987). Thus, Plaintiffs and Defendants agree that an agency action is "final" only if it is the "consummation of the agency's decisionmaking process" and a decision that creates rights, obligations, or legal consequences. *Nat'l Min. Ass'n v. McCarthy,* 758 F.3d 243, 250 (D.C. Cir. 2014). (internal quotation marks and citation omitted). Plaintiffs argue that *California Communities Against Toxics v. Environmental Protection Agency* is a watershed decision that "explicitly overturned" the distinction between unreviewable general policy statements and other reviewable rules. MTD Opp. 8; *see Cal. Communities Against Toxics v. EPA,* 934 F.3d 627 (D.C. Cir. 2019). Instead, *California Communities Against Toxics* relies extensively on, and does not overrule, then-Judge Kavanaugh's decision in *National Mining Association,* which explicitly states that "legislative rules and sometimes even interpretive rules may be subject to pre-enforcement judicial review, but general statements of policy are not." *Nat'l Min. Ass'n,* 758 F.3d at 251; *see Cal. Communities Against Toxics,* 934 F.3d at 635. Indeed, that case forecloses Plaintiffs' argument: a statement of policy "merely explains how the agency will enforce a statute or regulation," that is "how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Min. Ass'n v. McCarthy,* 758 F.3d 243, 252 (D.C. Cir. 2014). Final agency action does not occur in such circumstances until the agency in fact *applies* the statute or regulation at issue in an individual case. *Am. Tort Reform Ass'n v. OSHA,* 738 F.3d 387, 395 (D.C. Cir. 2013).

Moreover, *California Communities Against Toxics* does not help Plaintiffs. It held that, even when a memo "forecasts" an agency's "definitive interpretation' of a statute, it has no "direct or appreciable legal consequences" when the agency cannot "rely on it as independently authoritative in any proceeding." *Id.* at 638. As then-Judge Kavanaugh emphasized, "[t]he question is not whether judicial review will be available but whether judicial review is available *now*." *Nat'l Min. Ass'n,* 758 F.3d at 253.

Judicial review is available to challenge a particular, discrete action taken under the policy, not the Directive itself. *Am. Tort Reform Ass'n*, 738 F.3d at 395 ("The APA only provides for judicial review of 'final agency action' and … statements of policy generally do not qualify because they are not finally determinative of the issues or rights to which [they are] addressed."). Under longstanding D.C. Circuit precedent, reaffirmed in *National Mining Association*, "[w]hen the agency applies [a general statement of] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Id.* (quoting *Pacific Gas & Electric Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)) (alteration in original). Thus, because the Directive is unreviewable under the APA as non-final action, the APA claim — and all other claims, which must be viewed through its lens — must be dismissed.[3]

Plaintiffs misconstrue Defendants' argument in two crucial ways. First, they maintain that the Defendants "do not dispute that the Directive 'marks the 'consummation' of the agency's decisionmaking process." MTD Opp. 7. That is incorrect. Because the policy articulates criteria guiding how ICE officers are to exercise their preexisting discretion and is not binding on ICE officers, it is not a final agency action. MTD 7-8. Second, Plaintiffs incorrectly summarize Defendants' argument as that "the Directive is unreviewable because it is only a policy statement and not a legislative rule." MTD Opp. 8. But the term "legislative rule" is used not once in Defendants' brief. *See* MTD 7-8. Instead, Defendants describe the longstanding and continually reaffirmed principle that no judicial review is available for a general statement of policy, defined as "[a]n agency action that merely explains how the agency will enforce a statute or regulation — in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Min. Ass'n*, 758 F.3d at 252. The Directive's general alert about authority thus is different from the policy at issue in *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, which actually "limit[ed] liability." 136 S. Ct. 1807, 1814 (2016). Thus, the *New York v. ICE* court was wrong to determine that "legal consequences flow from [ICE's] interpretation" because it "*would* subject aliens to civil immigration

---

[3] Even if a freestanding constitutional claim could be brought outside the APA — a proposition that, as Defendants have elaborated, MTD 6-7, is incorrect, *see, e.g., Markham v. United States*, 434 F.3d 1185, 1187–88 (9th Cir. 2006); *Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1433 (7th Cir. 1996) (en banc) — there is no basis for any review of "common law" outside the scope of the APA.

arrest in settings where they were not previously so subject" rather than creating legal effect at the moment that the Directive was issued. *New York v. ICE*, --- F. Supp. 3d ----, 2019 WL 6906274, at *4 (S.D.N.Y. Dec. 19, 2019) (emphasis added).

Because Plaintiffs lack a cause of action under the APA to challenge the Directive, this Court should dismiss the Complaint in its entirety.

B.      *The INA Does Not Codify a Common-Law Privilege Against Immigration Arrests in Courthouses*

Defendants' Motion to Dismiss provides extensive history and background on the privilege against courthouse arrests and shows why that privilege does not apply to federal immigration enforcement. *See* MTD 8-17. The original privilege was based on a far different premise from the rule that Plaintiffs attempt to assert. MTD 8-17. The privilege in its current form concerns lawful avoidance of process based on transient jurisdiction. *Id.* Plaintiffs' proposed privilege pursues a different policy end: immunity against lawful law enforcement against persons violating U.S. laws. Plaintiffs seek an impermissible extension of the rule to apply it to federal immigration enforcement.[4] In response, Plaintiffs provide no rigorous legal analysis of these points. MTD Opp. 9-12.

Instead, Plaintiffs rely on a number of policy grounds to support the grafting of a new rule onto a clear statute. *Id.* 9-10. However, policy considerations may not "re-write a federal statute." *Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986); *see City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981). Unlike a state court, which has common-law authority to craft new rules of decision, a federal court lacks authority to create substantive rules to tack onto a clear federal statute. *See City of Milwaukee*, 451 U.S. at 312; *Nachwalter*, 805 F.2d at 960. The recourse to "common law" to interpret clear statutes is simply inappropriate in the federal scheme. If a "common-law rule was not so well established" that it "must [be] assume[d] that Congress considered the impact of its enactment" on that rule, it is "not sufficient to overcome the broad statutory language Congress did enact." *United States v. Craft*, 535 U.S. 274, 288 (2002). Indeed, the Supreme Court has rejected importing common law into the plain meaning of statutes when the common-law rule "d[id] not plainly suggest that" the rule "swept so broadly" as to cover a federal statute and "the early English cases [cited] rest on a far

---

[4] *New York v. ICE* also relies on a "New York state privilege" inapposite here and improperly relies on the enumerated constitutional privilege against arrest of legislators in Congress found in the Speech and Debate Clause to import a broad privilege into the INA. *New York*, 2019 WL 6906274, at *10.

different foundation from that on which the … rule came to rest." *Pasquantino v. United States*, 544 U.S. 349, 359, 366 (2005). Plaintiffs do not, and cannot, rebut Defendants' point that the privilege never applied against federal law enforcement or immigration enforcement in particular. MTD Opp. 9-10. Nor do they attempt to address the clear Supreme Court precedent showing the weight of the governmental interest in enforcing the laws Congress wrote. *See* MTD 11-12.

Moreover, Plaintiffs' — and this Court's — distinction between criminal and civil arrests does not hold in the context of federal immigration enforcement. MTD Opp. 10; *contra* MTD 13-17. Congress has authorized a *civil* immigration-enforcement scheme. Under that scheme, criminal aliens subject to mandatory detention are subject to *civil* arrest, although their state (or federal) criminal conviction provides the basis for their mandatory detention. *See* 8 U.S.C. § 1226(c) (requiring mandatory detention for criminal aliens). Plaintiffs argue that 8 U.S.C. § 1229(e) "does not establish that those enacting VAWA in 2006 understood the INA to allow *civil* courthouse arrests." MTD Opp. 11. But this is contrary to the plain language of the statute, which describes the disclosure of information in "an enforcement action leading to a removal proceeding." 8 U.S.C. § 1229(e). A criminal arrest — for criminal prosecution — is not an "enforcement action leading to a removal proceeding." An "enforcement action leading to a removal proceeding" is a *civil* process no matter what the predicate grounds for removability are. *See Arizona v. United States*, 567 U.S. 387, 396 (2012) ("Removal is a civil, not criminal, matter."). There are no criminal removal proceedings.

Plaintiffs also do not engage the clear case law that holds that a statutory scheme is considered in its entirety. MTD Opp. 11. "'[A] specific policy embodied in a later federal statute should control … construction of the [earlier] statute, even though it ha[s] not been expressly amended.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998)); *see* MTD 14-17. The "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988). "[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown &*

*Williamson Tobacco Corp.*, 529 U.S. at 133.[5] Even the cases that Plaintiffs cite for the contrary position involve interpreting congressional enactments in relation to the entire statutory scheme. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."); *see id.* at 839 (holding that the later-enacted amendment "correct[ed] the error, thus clarifying the original meaning of the section"); *Rainwater v. United States*, 356 U.S. 590, 593 (1958) ("noting that [t]he language of the 1918 amendment" does not bear on the question before the Court).

Therefore, Plaintiffs fail to state a claim that Defendants exceed their statutory authority to arrest in public areas of courthouses.

C.      *Plaintiffs Fail to State a Cognizable Tenth-Amendment Claim*

Plaintiffs fail to state a cognizable Tenth-Amendment claim, as ICE has the constitutional and congressional authority to conduct arrests in public places and does not commandeer state officers to effect arrests even accepting the factual allegations in the Complaint as true.[6] MTD 17-19.

At the outset, this question is entirely distinct from whether, as a statutory matter, Congress incorporated a privilege against arrest, and, even if the Court rules in Plaintiffs' favor on the statutory point, that does not reach the Tenth-Amendment question. Furthermore, a state attempt to restrict ICE from places otherwise open to the public would raise intergovernmental immunity concerns. *See* MTD 18; *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019) ("The doctrine of

---

[5] Defendants respectfully point out that, in its preliminary-injunction order this Court erred by citing dicta from a concurrence in the judgment in *Bilski v. Kappos*, 561 U.S. 593 (2010), as the majority opinion in holding that the 2006 amendment to the INA "has little bearing on the court's interpretation of Congressional intent regarding courthouse arrests in 1952." ECF 51 at 24; *see Bilski*, 561 U.S. at 645 (Stevens, Breyer, Ginsburg, Sotomayor, J.J., concurring in the judgment). The *Bilski* majority supports interpreting the INA as a harmonious whole. The majority opinion does not divine congressional intent. *Bilski*, 561 U.S. at 607-08 (majority op.). Rather, it does the opposite: it interprets the contested provision in light of the exact statute on which the concurrence in the judgment refuses to rely. *Id.* It applies the "canon against interpreting any statutory provision in a matter that would render another provision superfluous" to interpret the two provisions in tandem. *Id.* It explicitly states that the "principle, of course, applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Id.* at 608. It thus disclaims "judicial speculation as to the subjective intent of various legislators in enacting the subsequent provision." *Id.*

[6] At the motion-to-dismiss stage, "an inquiring court must separate wheat from chaff; that is, the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012).

intergovernmental immunity … mandates that the activities of the Federal Government are free from regulation by any state" and prohibit "discriminat[ion] against the Federal Government … .") (internal quotation marks and citations omitted).

Plaintiffs misconstrue the nature of a Tenth-Amendment challenge. MTD Opp. 12-16. They admit, as they must, that the Supreme Court has "eliminated the need for courts to grapple with" whether a particular function is a "traditional" state function. MTD Opp. 13 (quoting *Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 546-47 (1985)). They maintain that courts still consider "intrinsic state functions" as part of their analysis. *Id.* But that consideration is a mirror-image of the principle that powers granted to the federal government are supreme. As Plaintiffs admit, "courts should look to the constitutional limitations of federal authority." MTD Opp. 13. The federal division of sovereignty is written into the federal Constitution through the enumerated powers of the federal government. If there is a constitutional source for the federal government's action, then the states cannot protest that there is an intrusion upon their own authority. *See Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 275 (1981) (rejecting argument that court must consider whether action is "within the inherent police powers of the States" because "the Commerce Clause is a grant of plenary authority to Congress" that "acknowledges no limitations other than are prescribed in the constitution") (internal quotation marks and citation omitted). The Supreme Court "long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its [constitutional] authority … in a manner that displaces the States' exercise of their police powers." *Id.* at 292. Consequently, because the federal government "possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters." *Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000). "[T]he Supremacy Clause permits no other result." *Id.* (quoting *Hodel*, 452 U.S. at 290).

The cases that Plaintiffs cite amply support this uncontroversial proposition. *United States v. Morrison* involved a law purportedly based in the Commerce Clause that regulated gender-motivated violence. 529 U.S. 598, 609 (2000). The Court held that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." *Id.* at 613. The *Morrison* court recognized the now-uncontroversial proposition that the federal government lacks a generalized police power, and so

cannot claim that every non-economic activity incidentally affects interstate commerce. *Id.* at 619. So, too, *United States v. Lopez* involved the rejection of a "general federal police power" through an expansive definition of what constitutes commerce. 514 U.S. 549, 564 (1995). The Court's analysis focused on enumeration. *See id.* at 566 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 196 (1824)).

Plaintiffs cite *Younger v. Harris*, which involves the principle of abstention, and related cases. 401 U.S. 37, 43 (1971); *see* MTD Opp. 12-13. Plaintiffs provide no case applying the doctrine to the Executive Branch's actions in initiating parallel enforcement proceedings while a state proceeding is pending. *See* MTD Opp. 12-13. When the federal government has concurrent jurisdiction over an issue, there is no abstention concern with the federal proceeding happening at the same time. Congress has created an immigration system that allows, and indeed sometimes requires, the arrest and detention of aliens independently from their state proceedings. *See, e.g.*, 8 U.S.C. § 1226(c).

Despite Plaintiffs' contentions to the contrary, nothing in their Complaint shows that state officers are being commandeered by the federal government's actions in a public space. *See* MTD Opp. 14 (citing Compl. ¶¶ 1-2, 6, 37-38, 47-62, 76-80, 115-17). The Complaint makes a number of legal conclusions alleging commandeering, and a number of paragraphs that they cite make no mention at all of commandeering. *See* Compl. ¶¶ 1-2 (alleging "appropriation" of the courts), 6 (ICE has "coopted the state's justice system"), 37-38 (alleging that ICE's appreciation of the courts' screening of the public for contraband is "using the state's resources for federal benefit"), 47-62 (no discussion of ICE commanding state officers to take any action), 76-80 (no allegation that ICE commanded that DAs take any action), 115-17 (legal argument about how public arrests do what the federal government could not directly). But those legal conclusions are not supported by the factual allegations in the Complaint, which amount to two statements in the passive voice: "[g]iven the physical nature of some of these incidents, ICE arrests can require intervention of state court staff," ¶ 51(d); and after a criminal defendant resisted ICE arrest, "[t]he disruption was sufficiently violent that state court officers were required to intervene," ¶ 58. Neither of those passive-voice statements plead that ICE itself commanded the state court officers to act. *See Morales-Cruz*, 676 F.3d at 224. Those two factual allegations cannot support a commandeering claim. And, if the state court officers did voluntarily assist, *cooperation* with federal law enforcement entities is permissible and commonplace

in our system of dual sovereignty, raising no commandeering concerns. *See New York v. U.S. Dep't of Justice*, --- F.3d ----, 2020 WL 911417, at *20 (2d Cir. Feb. 26, 2020).

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018), makes clear that the question to determine commandeering is whether the federal government is making a *command* of the state, either to prohibit or to mandate state action. MTD 17-19. No allegation in the Complaint plausibly alleges that ICE has done any such thing. Further, as the Second Circuit recently explained, the federal government's request that a state not interfere with its ability to enforce federal laws does not implicate anti-commandeering concerns even after *Murphy*. *See U.S. Dep't of Justice*, 2020 WL 911417, at *19-21. As the Second Circuit noted, in *Murphy*, "there was no question" that the states had authority but-for the law to regulate sports gambling. *Id.* at *20. But "[t]hat conclusion is not so obvious in the immigration context where it is the federal government that holds 'broad' and 'preeminent' power." *Id.* (quoting *Arizona*, 567 U.S. at 394, & *Toll v. Moreno*, 458 U.S. 1, 10 (1982)). Hence "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the federal government." *Id.* at *1 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 436 (1819)). The Second Circuit has thus rejected *New York v. ICE*'s conclusion that ICE commandeers "state and local judges and court officials *not* to take action in response to ICE arrests." *New York*, 2019 WL 6906274, at *12.

Plaintiffs rely extensively on the *New York* courthouse-arrest decision in support. *See* MTD Opp. 12-16. That decision is wrong for the reasons described in the Motion to Dismiss and above. MTD 17-19. It also does not include detailed analysis for its holding that "the Complaint [in that case] unmistakably alleges a type of commandeering similar to those that the Supreme Court has found to lie at the heart of a Tenth Amendment cause of action." *New York*, 2019 WL 6906274, at *12. And importantly, the Second Circuit has overruled by implication that decision's holding that the INA "does not necessarily preempt state laws that narrowly limit federal enforcement authority." *Id.* at *11. Because Congress has provided for the civil immigration-enforcement scheme, and federal authority over immigration is "plenary," Plaintiffs may not "undermine federal law" by seeking to "adopt … immigration policies *contrary* to those preferred by the federal government." *U.S. Dep't of Justice*, 2020 WL 911417, at *20 (internal quotation, citations, and alteration omitted).

Because Plaintiffs fail to state a valid Tenth-Amendment commandeering claim, that claim should be dismissed.

D.     *Plaintiff Chelsea Collaborative Fails to State an Access-to-Courts Claim*

Plaintiff Chelsea Collaborative fails to assert a cognizable access-to-courts claim. *See* MTD 19-20.

The Complaint fails to allege any particulars about members' criminal history, gang affiliation, national security or public safety risks, or their being subject to a final order of removal to show that they would actually be subject to the Directive. *See generally* Compl. The Complaint also fails to reference any member who was indeed subjected to a courthouse-enforcement arrest. *Id.* Even accepting the premise that a third party's fear of enforcement action can state an access-to-courts claim, without any allegations that a person's fear of courthouse arrest is actually warranted, there can be no chain of causation between ICE's Directive and the members' fears. *See New York*, 2020 WL 911417 (when policies "do not put law-abiding undocumented aliens who have been crime victims or witnesses at risk of removal" they "should not dissuade such aliens from reporting crimes or cooperating in their investigation"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (rejecting standing based on "highly speculative fear" and a "highly attenuated chain of possibilities" that shows that no threat of injury is "certainly impending"); *Katz v. Pershing*, 672 F.3d 64, 79 (1st Cir. 2012) ("When a [plaintiff] alleges that her injury is having to take or forebear from some action, that choice must be premised on a reasonably impending threat. Such a requirement is fully consistent with the well-settled principle that the harm or injury must be actual or imminent, not speculative.").

Plaintiff Chelsea Collaborative cites the wrong standard for establishing an access-to-courts claim. As the Supreme Court has held, a complaint must state an underlying claim "in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued." *Christopher v. Harbury*, 536 U.S. 403, 405 (2002). Plaintiff claims that the standard requires mere "fair notice." MTD Opp. 17 (quoting *Christopher*, 536 U.S. at 413, 416). However, that statement is a relic from the old pleading standard that *Twombly* and *Iqbal* replaced. *See Christiopher*, 536 U.S. at 416 (noting that it must be pled "[l]ike any other element of an access claim" and citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), for that standard); *see also Woods v. City of Greensboro*, 855 F.3d 639, 547 (4th Cir. 2017)

(recognizing that *Twombly* and *Iqbal* created a "heightened standard" from *Swierkiewicz*).

Chelsea Collaborative fails to allege sufficient facts to support a claim under the *Twombly* and *Iqbal* standard. It provides no specific details about any of the claims that it alleges that its members would pursue but-for their fear of courthouse arrests, rather than speaking in generalities.[7] *See* Compl. ¶¶ 67-72 (providing no names of any of the alleged malfeasants, no names of any noncitizens who have allegedly been victims, and no specific information about the specific nature of the claims, or the dates that the violations took place). Nor does it sufficiently allege how Chelsea Collaborative cannot pursue these claims on behalf of its members by filing its own cases. Even in the prisoner-litigation context, "there is no right to *litigate effectively* once in court." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). Even if there were, Chelsea Collaborative has not alleged with particularity that it needs the physical presence of their clients in a courthouse as a condition precedent to pursue their claims.

Chelsea Collaborative attempts to avoid the conclusions of cases holding that "right of access" cannot be used as a shield to evade lawful enforcement. MTD Opp. 19. It claims that those cases are distinguishable because they involve criminal processes. *Id.* But the cases make no such distinction. The "right of access" is not grant of immunity from arrest throughout the pendency of litigation. As courts have held, "[t]he right of reasonable access to the courts does not entail immunity from arrest warrants issued by lawful processes." *Turner v. Cty. of Cook*, No. 05-cv-2890, 2005 WL 3299822, at *15 (N.D. Ill. Dec. 2, 2005); *see Cooper v. City of Plano*, No. 4:10-CV-689, 2011 WL 4100721, at *5 (E.D. Tex. Aug. 19, 2011), *report and recommendation adopted*, No. 4:10-CV-689, 2011 WL 4101160 (E.D. Tex. Sept. 13, 2011) (similar). There is no logical limiting principle on the right of access to the courts: the theory, taken to its logical end, would foreclose any parallel immigration enforcement while a civil suit remained pending. The Complaint even goes so far as to indicate that criminal aliens' rights are violated when lawfully removed prior to the resolution of their criminal cases. *See* Compl. ¶ 60. "[I]n any world other than the artificial world of ever-expanding [purported] constitutional rights," Plaintiffs' asserted right of access to the courts is nothing more than a desire to evade lawful process so long as a case was pending. *See Kerry v. Din*, 575 U.S. 86, 86 (2015) (plurality op.).

---

[7] Further, Chelsea Collaborative maintains that its claims are "forward-facing," but it has not shown what forward-facing suits may be available for the past harm of "illegal rent increase" after a family voluntarily moved out instead of paying that increase. *See* Compl. ¶ 72.

Notably, all of the cases that Chelsea Collaborative cites are distinguishable from their present claim. The vast majority of the "forward-facing" cases that it cites are prison-litigation cases that pre-date *Lewis* and its disclaiming of any right to litigate effectively. *See* MTD Opp. 16-19 (citing *Simmons v. Dickhaut*, 804 F.2d 182, 183 (1st Cir. 1986) (prisoner litigation); *Bounds v. Smith*, 430 U.S. 817, 824 (1977), *overruled in part by Lewis*, 518 U.S. 343 (same); *Germany v. Vance*, 868 F.2d 9, 15 (1st Cir. 1989) (same)). *Lewis* "disclaimed" any broader definition of the right of access to the courts, holding that the "tools [the right] requires are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge their conditions of confinement." *Lewis*, 518 U.S. at 355. The other two cases that Chelsea Collaborative cites involve the existence of an appeals process for family-law rights, *see M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996), and an Americans with Disabilities Act case that did not concern a freestanding right-of-access constitutional claim but rather discussed the basis of the ADA's statutory authority, *see Tennessee v. Lane*, 541 U.S. 509, 530 (2004). The Supreme Court disclaimed any further extension of even prisoners' rights: "[i]mpairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Lewis*, 518 U.S. at 355. Similarly here, the self-imposed impairment of litigating capacity to avoid lawful immigration enforcement is an incidental and perfectly constitutional consequence of attempting to evade law enforcement. But Chelsea Collaborative cites no case holding that one can state a valid access-to-courts claim against otherwise-lawful law enforcement activity.

Because there is no broad right to avoid federal law enforcement based on the existence of a state suit and, regardless, Plaintiffs have failed to allege harm traceable to the Defendants, this Court should dismiss the right-of-access claim.

## CONCLUSION

Thus, for the foregoing reasons, this Court should dismiss the Complaint in full.

13

Dated: February 28, 2020

ANDREW E. LELLING
United States Attorney

RAYFORD A. FARQUHAR
Assistant U.S. Attorney

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation

EREZ REUVENI
Assistant Director

*/s/ Francesca Genova*
FRANCESCA GENOVA
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-1062
Fax: (202) 305-7000
Email: Francesca.M.Genova@usdoj.gov

JULIAN KURZ
Trial Attorney

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      I, Francesca Genova, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on February 28, 2020.

*/s/ Francesca Genova*